WRIGHT, FINLAY & ZAK, LLP
Dana Jonathon Nitz, Esq.
Nevada Bar No. 0050
Paterno C. Jurani, Esq.
Nevada Bar No. 8136
Natalie C. Lehman, Esq.
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 475-7964; Fax: (702) 946-1345
pjurani@wrightlegal.net
*Attorneys for Plaintiff, Deutsche Bank National Trust Company, As Trustee for Residential Asset Securitization Trust 2006-A3CB Mortgage Pass-Through Certificates Series 2006-C*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A3CB MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-C;<br><br>Plaintiff,<br><br>vs.<br><br>SFR INVESTMENTS POOL 1, LLC; ALIANTE MASTER ASSOCIATION; NEVADA ASSOCIATION SERVICES, INC.;<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**EXEMPT FROM ARBITRATION: ACTION FOR QUIET TITLE AND DECLARATORY RELIEF** |

COMES NOW Plaintiff, Deutsche Bank National Trust Company, As Trustee for Residential Asset Securitization Trust 2006-A3CB Mortgage Pass-Through Certificates Series 2006-C (hereinafter "Deutsche Bank" or "Plaintiff"), by and through its attorneys of record, Dana Jonathon Nitz, Esq., Paterno C. Jurani, Esq., and Natalie C. Lehman, Esq., of the law firm of Wright, Finlay & Zak, LLP, and hereby files this civil action against the Defendants.

## PARTIES, JURISDICTION AND VENUE

1.     The real property at issue is known as 6853 Jungle Fowl Street, North Las Vegas, Nevada, 89084; APN 124-19-214-025 (hereinafter, the "Property").

**2.**     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as all Plaintiff are "citizens of different States" from all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**3.**     This Court also has original federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff, Deutsche Bank is asserting civil claims arising under the Constitution, laws, or treaties of the United States.

**4.**     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1)-(2) because Defendant resides in this district; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district; and the Property that is the subject of this action is situated in this district, in Las Vegas, Clark County, Nevada.

**5.**     Plaintiff is a national banking association, with its main office located in California, organized and existing under the laws of the United States.

**6.**     Plaintiff is now and at all times relevant herein, the assigned Beneficiary under a Deed of Trust signed by Norman R. Flemens (hereinafter "Flemens"), and recorded on December 27, 2005, (hereinafter "Deed of Trust"), which encumbers the Property and secures a promissory note.

**7.**     Upon information and belief, Defendant, SFR Investments Pool 1, LLC (hereinafter "Buyer"), is a Nevada domestic limited-liability company, licensed to do business in the State of Nevada and claims to be the current titleholder of the Property.

**8.**     Upon information and belief, Defendant, Aliante Master Association (hereinafter the "HOA") is a Nevada domestic non-profit Corporation, licensed to do business in the State of Nevada, and was the HOA that foreclosed on the Property.

**9.**     Upon information and belief, Defendant, Nevada Association Services, Inc. (hereinafter "HOA Trustee") is a Nevada corporation licensed to do business in the State of Nevada, and acted as the foreclosure trustee, which allegedly mailed and served the foreclosure notices, if any, and cried the foreclosure sale  for the HOA.

**10.**     Upon information and belief, HOA Trustee was the agent of the HOA, and the HOA is responsible for their acts and omissions under the doctrine of respondeat superior.

**11.** In accordance with NRS Chapter 38.310, Deutsche Bank is preparing a Nevada Real Estate Division Alternative Dispute Resolution (hereinafter, "NRED") claim naming HOA and HOA Trustee as Respondents.

## GENERAL ALLEGATIONS

**12.** On or about December 22, 2005, Flemens purchased the Property.[1]

**13.** The Deed of Trust executed by Flemens identified Meridias Capital, Inc. as the Lender, Mortgage Electronic Registration Systems, Inc. ("MERS") solely as a nominee for Lender and Lender's successors and assigns, as Beneficiary, and Lawyers Title of Nevada as the Trustee, securing a loan in the amount of $280,450.00 (hereinafter the "Flemens Loan").[2]

**14.** On January 14, 2009, a Notice of Lien was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of January 9, 2009, was $1,950.00.[3]

**15.** On November 20, 2009, a Notice of Default and Election to Sell Under Homeowners Association Lien was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of November 18, 2009, was $2,612.70.[4]

**16.** On July 23, 2010, a Notice of Foreclosure Sale was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of the initial publication of the Notice of Sale was $4,033.03.[5]

**17.** On February 20, 2013, a Notice of Foreclosure Sale was recorded against the Property by the HOA Trustee on behalf of the HOA, stating that the amount due as of the initial

---

[1] A true and correct copy of the Grant, Bargain and Sale Deed recorded in the Clark County Recorder's Office as Book and Instrument Number 20051227-0000666 is attached hereto as **Exhibit 1**. All other recordings stated hereafter are recorded in the same manner.

[2] A true and correct copy of the Deed of Trust recorded as Book and Instrument Number 20051227-0000668 is attached hereto as **Exhibit 2.**

[3] A true and correct copy of the Notice of Lien recorded as Book and Instrument Number 20090114-0002258 is attached hereto as **Exhibit 3.**

[4] A true and correct copy of the Notice of Default and Election to Sell recorded as Book and Instrument Number 200911200002166 is attached hereto as **Exhibit 4.**

[5] A true and correct copy of the Notice of Foreclosure Sale recorded as Book and Instrument Number 201007230000807 is attached hereto as **Exhibit 5.**

1    publication of the Notice of Sale was $7,194.78.[6]

2        18.    Upon information and belief, pursuant to the Foreclosure Deed, a non-judicial

3    foreclosure sale occurred on March 8, 2013 (hereinafter, the "HOA Sale"), whereby Buyer

4    acquired its interest, if any, in the Property for $8,100.00.[7]

5        19.    A homeowner's association sale conducted pursuant to NRS Chapter 116 must

6    comply with all notice provisions as stated in NRS 116.31162 through NRS 116.31168 and NRS

7    107.090.

8        20.    A lender or holder of a beneficial interest in a senior deed of trust, such as

9    Plaintiff and its predecessors-in-interest in the Deed of Trust, has a right to cure a delinquent

10    homeowner's association lien in order to protect its interest.

11        21.    Further the Declaration of Covenants, Conditions, Restrictions and Reservation of

12    Easements for Aliante Master Association ("CC&Rs")[8] require reasonable notice of delinquency

13    to all lien holders on the Property.

14        22.    Upon information and belief, the HOA and its agent, the HOA Trustee, did not

15    comply with all mailing and noticing requirements stated in NRS 116.31162 through NRS

16    116.31168, or as required by the CC&Rs.

17        23.    A recorded notice of default must "describe the deficiency in payment."

18        24.    The above-identified Notice of Default did not properly "describe the deficiency

19    in payment" in violation of NRS Chapter 116.

20        25.    The HOA assessment lien and foreclosure notices included improper fees and

21    costs in amount demanded.

22        26.    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents,

23    servicers or trustees, what proportion whether any amount of the HOA lien included a super-

24    priority amount.

25

26    [6] A true and correct copy of the Notice of Foreclosure Sale recorded as Book and Instrument Number 201302200000677 is attached hereto as **Exhibit 6.**

27    [7] A true and correct copy of the Foreclosure Deed recorded as Book and Instrument Number 201303150003250 is attached hereto as **Exhibit 7.**

28    [8] A true and correct copy of the current HOA CC&R's recorded as Book and Instrument Number 20021127.01887 is attached hereto as **Exhibit 8.**

27.    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents, servicers or trustees, whether the HOA was foreclosing on the "super-priority" portion of its lien, if any, or under the non-super-priority portion of the lien.

28.    The HOA Sale occurred without notice to Plaintiff, or its predecessors, agents, servicers or trustees, of a right to cure the delinquent assessments and the super-priority lien, if any.

29.    The HOA Sale violated Plaintiff's rights to due process because Plaintiff was not given proper, adequate notice and the opportunity to cure the deficiency or default in the payment of the HOA's assessments and the super-priority lien, if any.

30.    The HOA Sale was an invalid sale and could not have extinguished Plaintiff's secured interest because of defects in the notices given to Plaintiff, or its predecessors, agents, servicers or trustees, if any.

31.    Under NRS Chapter 116, a lien under NRS 116.3116(1) can only include costs and fees that are specifically enumerated in the statute.

32.    A homeowner's association may only collect as a part of the super priority lien (a) nuisance abatement charges incurred by the association pursuant to NRS 116.310312 and (b) nine months of common assessments which became due prior to the institution of an action to enforce the lien.

33.    Upon information and belief, the HOA Foreclosure Notices included improper fees and costs in the amount demanded.

34.    The attorney's fees and the costs of collecting on a homeowner's association lien cannot be included in the super-priority lien.

35.    Upon information and belief, the HOA assessment lien and foreclosure notices included fines, interest, late fees, dues, attorney's fees, and costs of collection that are not properly included in a super-priority lien under Nevada law and that are not permissible under NRS 116.3102 et seq.

36.    The HOA Sale did not comply with NRS 116.3102 et seq. because none of the aforementioned notices identified above identified what portion of the claimed lien were for

alleged late fees, interest, fines/violations, or collection fees/costs.

37.     The HOA Sale deprived Plaintiff of its right to due process because the foreclosure notices failed to identify the super-priority amount, to adequately describe the deficiency in payment, to provide Plaintiff notice of the correct super-priority amount, and to provide a reasonable opportunity to satisfy that amount.

38.     Alternatively, the sale itself was valid but Buyer took its interest subject to Plaintiff's first position Deed of Trust.

39.     The HOA Sale is unlawful and void because the "opt-in" provision in NRS 116.3116 does not satisfy Constitutional Due Process safeguards under the 5th and 14th Amendment to the United States Constitution, nor Clause 1, Section 8, of the Nevada Constitution, so that the statute is unconstitutional on its face.

40.     The HOA Sale is unlawful and void because the statutory scheme set forth in NRS 116.3116, et seq. constitutes a regulatory taking of private property without adequate compensation.

41.     NRS Chapter 116 is unconstitutional on its face as it lacks any express requirement for the HOA or its agents to provide notice of a foreclosure to the holder of a first deed of trust or mortgage.

42.     NRS Chapter 116 is unconstitutional on its face as it lacks any express requirement for the HOA or its agents to provide notice of the super-priority amount, if any, to the holder of a first deed of trust or mortgage to accept tender of the super-priority amount or any amount from the holder.

43.     NRS Chapter 116 is unconstitutional on its face due to vagueness and ambiguity.

44.     A homeowner's association sale must be done in a commercially reasonable manner.

45.     At the time of the HOA Sale, the amount owed on the Flemens Loan exceeded $279,586.78.

46.     Upon information and belief, at the time of the HOA Sale, the fair market value of the Property exceeded $209,000.00.

47.     The amount paid at the HOA Sale allegedly totaled $8,100.00.

48.     The HOA Sale was not commercially reasonable, and the HOA Sale was not done in good faith, in light of the sale price, and the market value of the Property, and the errors alleged above.

49.     The circumstances of the HOA Sale of the Property breached the HOA's obligations of good faith under NRS 116.1113 and its duty to act in a commercially reasonable manner.

50.     The HOA Sale by which Buyer took its interest was commercially unreasonable if it extinguished Plaintiff's Deed of Trust.

51.     In the alternative, the HOA Sale was an invalid sale and could not have extinguished Plaintiff's secured interest because it was not a commercially reasonable sale.

52.     Without providing Plaintiff, or its predecessors, agents, servicers or trustees, notice of the correct super-priority amount and a reasonable opportunity to satisfy that amount, including its failure to identify the super-priority amount and its failure to adequately describe the deficiency in payment as required by Nevada law, the HOA Sale is commercially unreasonable and deprived Plaintiff of its right to due process.

53.     Pursuant to NRS 116.31162(1) an association may only proceed with foreclosure under NRS 116.31162-116.31168 if the declaration or CC&Rs so provide.

54.     Upon information and belief, the HOA and HOA Trustee failed to comply with all requirements set forth in the CC&R's including any mortgage protection provisions.

55.     Because Plaintiff, or its predecessors, agents, servicers or trustees, were not given proper notice that the HOA intended to foreclose on the super-priority portion of the dues owe, Plaintiff did not know that it had to attend the HOA Sale to protect its security interest.

56.     Because proper notice that the HOA intended to foreclose on the super-priority portion of the dues owing was not given, prospective bidders did not appear for the HOA Sale, making the HOA Sale commercially unreasonable.

57.     Defendants knew that Plaintiff would not know that HOA was foreclosing on super-priority amounts because of the failure of HOA and HOA Trustee to provide such notice.

1    Plaintiff's absence from the HOA Sale allowed Buyer to appear at the HOA Sale and purchase

2    the Property for a fraction of market value, making the HOA Sale commercially unreasonable.

3          **58.**    Defendants knew that prospective bidders would be less likely to attend the HOA

4    Sale because the public at large did not receive notice, constructive or actual, that the HOA was

5    foreclosing on a super-priority portion of its lien because HOA and HOA Trustee improperly

6    failed to provide such notice.  The general public's belief therefore was that a buyer at the HOA

7    Sale would take title to the Property subject to Plaintiff's Deed of Trust.  This general belief

8    resulted in the absence of prospective bidders at the HOA Sale, which allowed Buyer to appear

9    at the HOA Sale and purchase the Property for a fraction of market value, making the HOA Sale

10   commercially unreasonable.

11         **59.**    The circumstances of the HOA Sale of the Property breached the HOA's and the

12   HOA Trustee's obligations of good faith under NRS 116.1113 and their duty to act in a

13   commercially reasonable manner.

14         **60.**    Upon information and belief, Buyer is in the business of buying and selling real

15   estate and/or is otherwise a professional property purchaser, and either knew or should have

16   known of defects with the HOA Sale based on the sales price, among other factors.

17         **61.**    The circumstances of the HOA Sale of the Property and Buyer's status as a

18   professional property purchaser prevents Buyer from being deemed a bona fide purchaser for

19   value.

20         **62.**    Upon information and belief, Buyer had actual, constructive or inquiry notice of

21   Plaintiff's first Deed of Trust, which prevents Buyer from being deemed a bona fide purchaser or

22   encumbrancer for value.

23         **63.**    Upon information and belief, Buyer knew or should have known that it would not

24   be able to obtain insurable title to the Property as a result of the HOA Sale.

25         **64.**    As a direct and proximate result of the foregoing, Buyer is not entitled to bona

26   fide purchaser protection.

27         **65.**    In the event Plaintiff's interest in the Property is not reaffirmed nor restored,

28   Plaintiff suffered damages in the amount of the fair market value of the Property or the unpaid

balance of the Flemens Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater, as a proximate result of Defendant's acts and omissions.

## FIRST CAUSE OF ACTION
**(Quiet Title/Declaratory Relief Pursuant to 28 U.S.C. § 2201,
NRS 30.010 et seq., and NRS 40.010 – Against All Defendants)**

66.     Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

67.     Pursuant to 28 U.S.C. § 2201, NRS 30.010 et seq., and NRS 40.010, this Court has the power and authority to declare Plaintiff's rights and interests in the Property and to resolve Defendant's adverse claims in the Property.

68.     Further, pursuant to NRS 30.010 et seq., this Court has the power and authority to declare the rights and interests of the parties following the acts and omissions of the HOA and HOA Trustee in foreclosing the Property.

69.     Plaintiff's Deed of Trust is the first secured interest on the Property as intended by and whose priority is protected by NRS 116.3116(2)(b).

70.     Upon information and belief, Buyer claims an interest in the Property through a Foreclosure Deed recorded in the Clark County Recorder's Office as Book and Instrument Number 201303150003250 that is adverse to Plaintiff's interest.

71.     Plaintiff is the current beneficiary under the Deed of Trust and the Flemens Loan and is entitled to enforce its interest and first position status in the chain of title against Buyer, or any successor in interest, for the reasons alleged herein.

72.     Because the CC&Rs did not provide the HOA with authority to foreclose on the Property, the HOA Sale could not have extinguished the Deed of Trust or displaced it from its first position status in the chain of title, such that Buyer took subject to the Deed of Trust. Or in the alternative, the HOA Sale is void, invalid and/or should be set aside.

73.     Because, upon information and belief, the HOA and the HOA Trustee failed to provide proper, adequate and sufficient notices required by Nevada law and the CC&Rs, the HOA Sale could not have extinguished the Deed of Trust or displaced it from its first position status in the chain of title, such that Buyer took subject to the Deed of Trust. Or in the

1  alternative, the HOA Sale is void, invalid and/or should be set aside.

2      **74.**    Based on the adverse claims being asserted by the parties, Plaintiff is entitled to a

3  judicial determination regarding the rights and interests of the respective parties to the case.

4      **75.**    A justiciable controversy exists between Plaintiff and Defendant and Plaintiff has

5  a legally protectable interest in the controversy. The issue is ripe for judicial determination.

6      **76.**    For all the reasons set forth above and in the General Allegations, Plaintiff is

7  entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS

8  40.010, that Plaintiff is the beneficiary of a first position Deed of Trust which still encumbers the

9  Property.

10      **77.**    Based upon the foregoing, Plaintiff is entitled to a determination from this Court,

11  pursuant to 28 U.S.C. § 2201, NRS 30.010 and NRS 40.010, that the purported HOA Sale did

12  not extinguish the Deed of Trust because it was conducted in violation of NRS 116.3116 *et seq.*

13  and the CC&Rs.

14      **78.**    Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. §

15  2201, NRS 30.010 and NRS 40.010, that Plaintiff's secured interest by virtue of its Deed of Trust

16  is superior to the interest, if any, acquired by Buyer through the Foreclosure Deed and all other

17  parties, if any.

18      **79.**    In the alternative, if it is found under state law that Plaintiff's interest could have

19  been extinguished by the HOA Sale, for all the reasons set forth above and in the General

20  Allegations, Plaintiff is entitled to a determination from this Court, pursuant to 28 U.S.C. § 2201,

21  NRS 30.010 and NRS 40.010, that the HOA Sale was void, invalid and/or should be set aside

22  and conveyed no legitimate interest to Buyer.

23      **80.**    Plaintiff has been compelled to retain counsel to represent it in this matter and has

24  and will continue to incur attorney's fees and costs.

25              **SECOND CAUSE OF ACTION**
              **(Declaratory Relief Under Amendments V and XIV**
26          **to the United States Constitution – Against All Defendants)**

27      **81.**    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth

28  herein.

82.     Pursuant to 28 U.S.C. § 2201, this Court is empowered to declare the rights and legal relations of the parties in this matter, both generally and in relation to the foreclosure sale and the Property.

83.     On its face, NRS 116.3116 *et seq.*, prior to its amendment effective October 1, 2015, violated Plaintiff's constitutional rights to due process secured by the Fifth and Fourteenth Amendments to the United States Constitution.  *See Bourne Valley Court Trust v. Wells Fargo Bank, N.A.*, 832 F.3d 1154 (9th Cir. 2016).

84.     Any purported notice provided was inadequate, insufficient, and in violation of Plaintiff's rights to due process.

85.     An actual and justiciable controversy exists between Plaintiff and Defendants regarding the purported HOA Sale and the rights associated with the HOA Sale.

86.     Without declaratory relief interpreting the constitutional validity of NRS 116.3116 *et seq.* prior to its amendment effective October 1, 2015, Plaintiff's rights will be adversely affected.

87.     Plaintiff is entitled to a declaration that the purported HOA Sale conducted under NRS 116.3116 *et seq.* did not extinguish the Deed of Trust, which continued as a valid encumbrance against the Property.

88.     Based upon the foregoing, Plaintiff requests an order declaring that the purported HOA Sale did not extinguish the Deed of Trust because it was conducted under NRS 116.3116 *et seq.* prior to its amendment effective October 1, 2015, which on its face violated Plaintiff's rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

89.     Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

### THIRD CAUSE OF ACTION
**(Quiet Title Under the Amendments V and XIV**
**to the United States Constitution – Against Buyer)**

90.     Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**91.**    Pursuant to 28 U.S.C. § 2201 and NRS 40.010, this Court is empowered to declare the rights and legal relations of the parties in this matter, both generally and in relation to the foreclosure sale and the Property.

**92.**    The Deed of Trust is a first secured interest in the Property.  Plaintiff owns the Deed of Trust and is beneficiary of record of the Deed of Trust.

**93.**    Buyer claims an interest in the Property through the Foreclosure Deed which is adverse to Plaintiff's interest.

**94.**    On its face, NRS 116.3116 *et seq.*, prior to its amendment effective October 1, 2015, violated Plaintiff's constitutional rights to due process secured by the Fifth and Fourteenth Amendments to the United States Constitution and thus did not extinguish the Deed of Trust. *See Bourne Valley Court Trust v. Wells Fargo Bank*, *N.A.*, 832 F.3d 1154 (9th Cir. 2016).

**95.**    Any purported notice provided was inadequate, insufficient, and in violation of Plaintiff's rights to due process under the Fifth and Fourteenth Amendment to the United States Constitution.

**96.**    Based on the adverse claims being asserted by the parties, Plaintiff is entitled to a judicial determination that the Deed of Trust continues to encumber the Property after the HOA Sale and subsequent transfer via the Foreclosure Deed.

**97.**    Plaintiff is entitled to a determination that the HOA Sale (and any subsequent transfers) did not convey the Property free and clear of the Deed of Trust to the Buyer at the HOA Sale, and thus that any interest acquired by Buyer is subject to the Deed of Trust.

**98.**    Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(Permanent and Preliminary Injunction versus Buyer)**

</div>

**99.**    Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

**100.**    As set forth above, Buyer may claim an ownership interest in the Property that is

adverse to Plaintiff.

101.    Any sale or transfer of the Property, prior to a judicial determination concerning the respective rights and interests of the parties to the case, may be rendered invalid if Plaintiff's Deed of Trust still encumbered the Property in first position and was not extinguished by the HOA Sale.

102.    Plaintiff has a reasonable probability of success on the merits of the Complaint, for which compensatory damages will not compensate Plaintiff for the irreparable harm of the loss of title to a bona fide purchaser or loss of the first position priority status secured by the Property.

103.    Plaintiff has no adequate remedy at law due to the uniqueness of the Property involved in the case.

104.    Plaintiff is entitled to a preliminary injunction and permanent injunction prohibiting Buyer, its successors, assigns, and agents from conducting any sale, transfer or encumbrance of the Property if it is claimed to be superior to Plaintiff's Deed of Trust or not subject to that Deed of Trust.

105.    Plaintiff is entitled to a preliminary injunction requiring Buyer to pay all taxes, insurance and homeowner's association dues during the pendency of this action.

106.    Plaintiff is entitled to a preliminary injunction requiring Buyer to segregate and deposit all rents with the Court or a Court-approved trust account over which Buyer has no control during the pendency of this action.

107.    Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

### FIFTH CAUSE OF ACTION
#### (Unjust Enrichment versus Buyer)

108.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

109.    Plaintiff has been deprived of the benefit of its secured deed of trust by the actions of Buyer.

**110.**    Buyer has benefitted from the unlawful HOA Sale and nature of the real property.

**111.**    Buyer has benefitted from Plaintiff's payment of taxes, insurance or homeowner's association assessments since the time of the HOA Sale.

**112.**    Should Plaintiff's Complaint be successful in quieting title against Buyer and setting aside the HOA Sale, Buyer will have been unjustly enriched by the HOA Sale and usage of the Property.

**113.**    Plaintiff will have suffered damages if Buyer is allowed to retain its interest in the Property.

**114.**    Plaintiff will have suffered damages if Buyer is allowed to retain its interest in the Property and the benefit of Plaintiff's payment of taxes, insurance or homeowner's association assessments since the time of the HOA Sale.

**115.**    Plaintiff is entitled to general and special damages.

**116.**    Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(Negligence versus the HOA and HOA Trustee)**

</div>

**117.**    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**118.**    The HOA and HOA Trustee owed a duty to Plaintiff and its predecessors in interest and subordinate lienholders to conduct the HOA Sale at issue in this case properly.

**119.**    The HOA and HOA Trustee breached their duty by failing to disclose the amount of the super-priority lien, by failing to specify that it was foreclosing on the super-priority portion of its lien as opposed to the non-super-priority portion, and by failing to provide notice of the HOA Sale and the notice that Plaintiff and subordinate lienholders had an opportunity to cure.

**120.**    As an actual and proximate result of the breaches of duties owed by the HOA and HOA Trustee, Plaintiff has incurred general and special damages.

**121.**    If Plaintiff is found to have lost its first secured interest in the Property, it was the

proximate result of the HOA and HOA Trustee's breaches of their duties, and Plaintiff has thereby suffered general and special damages.

122.    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

### SEVENTH CAUSE OF ACTION
#### (Negligence Per Se versus the HOA and HOA Trustee)

123.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

124.    NRS Chapter 116 imposes a duty on homeowners associations to conduct HOA foreclosure sales in a manner that is consistent with its provisions and, by reference, the provisions of NRS 107.090.

125.    The HOA and HOA Trustee breached the statutory duties imposed by NRS Chapter 116 by proceeding with the HOA foreclosure sale; and by proceeding with the sale without notice that the successful bidder would take title subject to the Deed of Trust.

126.    The HOA and HOA Trustee violated NRS 116.31162(1)(b)(1) by failing to disclose the correct amount in deficiency.

127.    The HOA and HOA Trustee violated NRS 116.3116 et seq. by failing to give proper notice to Plaintiff and its predecessors in interest.

128.    Plaintiff and its predecessors in interest are members of the class of persons whom NRS Chapter 116 is intended to protect.

129.    The injury that Plaintiff faces— extinguishment of the Deed of Trust —is the type against which NRS Chapter 116 is intended to protect.

130.    As an actual and proximate result of the HOA and the HOA Trustee's breaches of their statutory duties, Plaintiff and its predecessors in interest were unable to cure by tendering a pay-off of the super-priority lien threatening its security interest.

131.    As a proximate result of HOA and the HOA Trustee's breaches of their duties, Plaintiff has incurred general and special damages to defend its title in this action, in an amount not yet liquidated.

132.    If it is determined that the Deed of Trust was extinguished and Plaintiff is found

to have lost its first-position secured interest in the Property, Plaintiff's loss was actually and proximately caused by the actions and inactions of the HOA and the HOA Trustee, and the breaches of their statutory duties, and Plaintiff has thereby suffered general and special damages, which are not yet liquidated.

133.    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract versus the HOA and HOA Trustee)

134.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

135.    Plaintiff and its predecessors in interest were intended beneficiaries of the HOA's CC&Rs and Restated CC&Rs.

136.    The HOA and HOA Trustee breached the obligations, promises, covenants and conditions of the CC&Rs owed to Plaintiff and its predecessors in interest by the circumstances under which they conducted the HOA Sale of the Property.

137.    The HOA and HOA Trustee breaches of the obligations, promises, covenants and conditions of the CC&RS and Restated CC&Rs proximately caused Plaintiff general and special damages.

138.    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## NINTH CAUSE OF ACTION
### (Misrepresentation versus HOA and HOA Trustee)

139.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

140.    Plaintiff and its predecessors in interest are within the class or persons or entities that the HOA intended or had reason to expect to act or to refrain from action in reliance upon the provisions of the CC&Rs.

141.    Plaintiff and its predecessors in interest justifiably relied upon the provisions of the CC&Rs and NRS 116.3116(2)(b) in giving consideration for the Deed of Trust, and the

Flemens Loan it secures, and the HOA intended or had reason to expect their conduct would be influenced.

**142.**    The HOA's misrepresentations in the provisions of the CC&Rs were false or it had an insufficient basis for making the representations.

**143.**    The HOA had a pecuniary interest in having Plaintiff and its predecessors in interest rely on the provisions of the CC&Rs.

**144.**    The HOA failed to exercise reasonable care or competence in communicating the information within the provisions of the CC&Rs or it had an insufficient basis for making.

**145.**    The HOA and HOA Trustee acted in contravention to the provisions in the CC&Rs when they conducted the HOA Sale in a manner that could extinguish the Deed of Trust.

**146.**    Plaintiff suffered general and specific damages as a proximate cause of its reliance.

**147.**    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees.

<u>**TENTH CAUSE OF ACTION**</u>
**(Breach of the Covenant of Good Faith and Fair Dealing versus HOA and HOA Trustee)**

**148.**    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**149.**    Implicit in every contract in the State of Nevada is an implied covenant of good faith and fair dealing.

**150.**    Plaintiff and its predecessors in interest were intended beneficiaries of the HOA's CC&Rs.

**151.**    The HOA and HOA Trustee breached the duties, obligations, promises, covenants and conditions, express and implied, in the CC&Rs owed to Plaintiff and its predecessors in interest by the circumstances under which they conducted the HOA Sale and failed to act in good faith.

**152.**    The HOA and HOA Trustee acts and omissions proximately caused Plaintiff general and special damages.

**153.** Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## ELEVENTH CAUSE OF ACTION
### (Wrongful/Defective Foreclosure versus the HOA and HOA Trustee)

**154.** Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**155.** Upon information and belief, the HOA and HOA Trustee did not comply with all mailing and noticing requirements stated in NRS 116.31162 through NRS 116.31168.

**156.** The HOA and HOA Trustee failed to provide notice pursuant to Nevada law and assure due process.

**157.** The HOA and HOA Trustee wrongfully rejected the tender.

**158.** The HOA Sale was wrongfully conducted and violated applicable law, and therefore, the Court should set it aside to the extent that it purports to have extinguished the Deed of Trust.

**159.** The HOA Sale was not commercially reasonable, and therefore, it was invalid, wrongful, and should be set aside.

**160.** The HOA and HOA Trustee did not give Plaintiff, or its agents, servicers or predecessors-in-interest, the proper, adequate notice of the sale and the opportunity to cure the deficiency or default in the payment of the HOA's assessments required by Nevada statutes, the CC&Rs, and Due Process, and therefore, the HOA Sale should be set aside or declared invalid or void.

**161.** As a proximate result of the HOA and HOA Trustee's wrongful/statutorily defective foreclosure of the Property by the HOA Sale, as more particularly set forth above and in the general allegations, Plaintiff has suffered general and special damages in an amount to be determined at trial.

**162.** If it is determined that the Deed of Trust has been extinguished by the HOA Sale as a proximate result of HOA and HOA Trustee's wrongful foreclosure of the Property by the HOA Sale, Plaintiff has suffered special damages in the amount equal to the fair market value of

the Property or the unpaid balance of the Flemens Loan, plus interest, at the time of the HOA Sale, whichever is greater, in an amount not presently known or liquidated, and according to proof at trial.

163.    The HOA and HOA Trustee acts and omissions proximately caused Plaintiff general and special damages.

164.    Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

<div align="center">

**TWELFTH CAUSE OF ACTION**
**(Unjust Enrichment versus the HOA and HOA Trustee)**

</div>

165.    Plaintiff incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

166.    The HOA and HOA Trustee have benefitted from the unlawful HOA Sale.

167.    Should Plaintiff's Complaint be unsuccessful in quieting title against Defendants or setting aside the HOA Sale, the HOA and the HOA Trustee retained proceeds from the HOA Sale which belonged to Plaintiff under NRS 116.3116 et seq. and they will have been unjustly enriched by retention of those proceeds.

168.    Plaintiff will have suffered damages if the HOA and the HOA Trustee are allowed to retain these proceeds and the proceeds are not delivered to Plaintiff.

169.    Plaintiff is entitled to general and special damages.

170.    Plaintiff has been compelled to retain counsel to represent it in this matter and has and will continue to incur attorney's fees and costs.

<div align="center">

**PRAYER**

</div>

Wherefore, Plaintiff prays for judgment against the Defendant as follows:

1.    For a declaration and determination that Plaintiff's interest is secured against the Property, and that Plaintiff's first Deed of Trust was not extinguished by the HOA Sale;

2.    For a declaration and determination that Buyer's interest, and any and all successors' interest, in the Property, if any, is subject to the Deed of Trust;

3.    For a declaration and determination that the HOA Sale was invalid to the extent it purports to convey the Property free and clear to Buyer;

4.    In the alternative, for a declaration and determination that the HOA Sale was void, invalid and/or should be set aside and conveyed no legitimate interest to Buyer;

5.    In the alternative, for a declaration and determination that the HOA Foreclosure Sale did not extinguish the Deed of Trust because it was conducted under a statute that facially violated Plaintiff's rights to due process;

6.    For a preliminary injunction that Buyer, its successors, assigns, and agents are prohibited from conducting a sale or transfer of the Property and representing the sale is free and clear of the Deed of Trust, unless Buyer tenders payment of the debt secured by the Deed of Trust, or from encumbering the Property during the pendency of this action;

7.    For a preliminary injunction that Buyer, its successors, assigns, and agents pay all taxes, insurance and homeowner's association dues during the pendency of this action;

8.    For a preliminary injunction that Buyer, its successors, assigns, and agents be required to segregate and deposit all rents with the Court or a Court-approved trust account over which Buyer have no control during the pendency of this action;

9.    If it is determined that Plaintiff's Deed of Trust has been extinguished by the HOA Sale, for special damages in the amount of the fair market value of the Property or the unpaid balance of the Flemens Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater;

10.   For general and special damages;

11.   For attorney's fees;

1    12.    For costs incurred herein, including post-judgment costs; and

2    13.    For any and all further relief deemed appropriate by this Court.

3    DATED this 11th day of October, 2017.

4
                            WRIGHT, FINLAY & ZAK, LLP
5
                            /s/ Paterno C. Jurani, Esq.
6                           Paterno C. Jurani, Esq.
                            Nevada Bar No. 8136
7                           7785 W. Sahara Ave., Suite 200
                            Las Vegas, NV 89117
8                           *Attorneys for Plaintiff, Deutsche Bank National*
9                           *Trust Company, As Trustee for Residential Asset*
                            *Securitization Trust 2006-A3CB Mortgage Pass-*
10                          *Through Certificates Series 2006-C*

11

12                          **EXHIBIT LOG**

13

| Document | Exhibit |
|---|---|
| Grant, Bargain and Sale Deed | 1 |
| Deed of Trust | 2 |
| Notice of Lien | 3 |
| Notice of Default and Election to Sell | 4 |
| Notice of Foreclosure Sale | 5 |
| Notice of Foreclosure Sale | 6 |
| Foreclosure Deed | 7 |
| HOA CC&R's | 8 |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1 – Grant, Bargain and Sale Deed

20051227-0000666

Fee: $17.00      RPTT: $1,790.10
N/C Fee:  $0.00

12/27/2005          09:03:05
T20050232900
Requestor:
    LAWYERS TITLE OF NEVADA
Frances Deane                    ADF
Clark County Recorder    Pgs: 4

**APN: 124-19-214-025**
**ESCROW NO:**  01903552-190-PR4
**WHEN RECORDED MAIL TO and**
**MAIL TAX STATEMENT TO:**

Norman R. Flemens
4375 Las Vegas Blvd Ste 20A
Las Vegas, NV 89118



## GRANT, BARGAIN, SALE DEED

R.P.T.T. **1,790.10**

THIS INDENTURE WITNESSETH:  That

**PN II Inc., a Nevada Corporation, d/b/a Pulte Homes of Nevada**

FOR A VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, do(es) hereby Grant, Bargain, Sell and Convey to

**Norman R. Flemens, an unmarried man as his sole and separate property**

all that real property situated in the County of Clark, State of Nevada, described as follows:

See Exhibit A attached hereto and made a part hereof.

SUBJECT TO:     1.  Taxes for the fiscal year 2005 – 2006
                2.  Rights of Way, reservations, restrictions, easements, and conditions of record.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining.

SELLER:

PN II, Inc. a Nevada Corporation dba Pulte Homes of Nevada

Debi Greer, Lawful Agent

_____

**STATE OF NEVADA**

**COUNTY OF CLARK**

On 12-22-05 _____ personally appeared
before me, a Notary Public, Debi Greer, Lawful Agent
personally known (or proved) to me to be the person
whose name is subscribed to the above instrument who
acknowledged that  she executed the instrument.

(NOTARY PUBLIC)

RACHELLE FOWLER
Notary Public State of Nevada
No. 05-95958-1
My appt. exp. Mar. 22, 2009

.

**Exhibit A**

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

Lot One Hundred Thirty-Five (135) in Block Six (6) of  ALIANTE PARCEL 12A PHASE 2 as shown by map thereof on file in Book 119, page 42 of Plats in the Clark County Recorder's Office, Clark County, Nevada.

## STATE OF NEVADA
## DECLARATION OF VALUE

1. **Assessor Parcel Number(s)**
   a) 04-19-214-025
   b) _____
   c) _____
   d) _____

2. **Type of Property:**

   | a) ☐ Vacant Land | b) ☑ Single Fam Res |
   |---|---|
   | c) ☐ Condo/Twnhse | d) ☐ 2-4 Plex |
   | e) ☐ Apt. Bldg | f) ☐ Comm'l/Ind'l |
   | g) ☐ Agricultural | h) ☐ Mobile Home |
   | Other _____ | |

   **FOR RECORDER'S OPTIONAL USE ONLY**
   Book:_____ Page:_____
   Date of Recording:_____
   Notes:

3. **Total Value/Sales Price of Property:**                          $350,616.00
   Deed in Lieu of Foreclosure Only (value of property) ($                          )
   Transfer Tax Value per NRS 375.010, Section 2:        $350,616.00
   Real Property Transfer Tax Due:                       $1,790.10

4. **If Exemption Claimed**

   a. Transfer Tax Exemption, per NRS 375.090, Section _____

   b. Explain Reason for Exemption: _____
   _____

5. Partial Interest: Percentage being transferred: _____%

The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. **Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.**

Signature _Debi Greer_____ **Capacity**: Debi Greer, Lawful Agent

Signature _____ **Capacity**: Buyer

| **SELLER (GRANTOR) INFORMATION** | **BUYER (GRANTEE) INFORMATION** |
|---|---|
| **(REQUIRED)** | **(REQUIRED)** |
| Print Name: PN II, Inc. A Nevada Corporation dba | Print Name: Norman R. Flemens |
| Pulte Homes of Nevada | |
| Address: 8345 W. Sunset Rd #180 | Address: 4375 Las Vegas Blvd ste 204 |
| City/State/Zip: Las Vegas, NV 89113 | City/State/Zip: Las Vegas, NV 89118 |

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buyer)**

LAWYERS TITLE OF NEVADA, INC.                    Escrow #: 01903552 - PR
8345 W. Sunset Road                              Escrow Officer: Patricia Rodriguez
Las Vegas, NV  89113

**AN ADDITIONAL RECORDING FEE OF $1.00 WILL APPLY FOR EACH DECLARATION OF VALUE FORM PRESENTED TO CLARK COUNTY, EFFECTIVE JUNE 1, 2004.**

EXHIBIT 2 – Deed of Trust

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
**20051227-0000668**

Fee: $33.00
N/C Fee: $0.00

12/27/2005          09:03:05
T20050232900
Requestor:
    LAWYERS TITLE OF NEVADA

**Frances Deane**          ADF
**Clark County Recorder**   Pgs: 20

Assessor's Parcel Number:124-19-214-025

Recording Requested By:
MERIDIAS CAPITAL, INC.

And When Recorded Return To:
MERIDIAS CAPITAL, INC.
1018 WEST ATHERTON DRIVE
SALT LAKE CITY, UTAH 84123
Loan Number: 1400045625

01903553-PR    [Space Above This Line For Recording Data] ————

# DEED OF TRUST

MIN: 100256014000456251

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated   DECEMBER 21, 2005   , together with all Riders to this document.
**(B)** "**Borrower**" is NORMAN R. FLEMENS, AN UNMARRIED MAN


Borrower is the trustor under this Security Instrument.
**(C)** "**Lender**" is MERIDIAS CAPITAL, INC.

Lender is a   NEVADA CORPORATION                                           organized
and existing under the laws of  NEVADA
Lender's address is 1018 WEST ATHERTON DRIVE, SALT LAKE CITY, UTAH
84123

**(D)** "**Trustee**" is LAWYERS TITLE OF NEVADA
8345 W. SUNSET ROAD #180, LAS VEGAS, NEVADA 89113

**(E)** "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)**   "**Note**" means the promissory note signed by Borrower and dated   DECEMBER 21, 2005

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS     **DocMagic** *eFormss* 800-649-1362
Form 3029 1/01                                    Page 1 of 15                                **www.docmagic.com**

The Note states that Borrower owes Lender   TWO HUNDRED EIGHTY THOUSAND FOUR HUNDRED FIFTY AND 00/100     Dollars (U.S. $  280,450.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2036         .

(G)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)   "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)   "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | PREPAYMENT RIDER |

(J)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)   "Escrow Items" means those items that are described in Section 3.

(N)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS     DocMagic *eF*Rarmss  800-649-1362
Form 3029 1/01                              Page 2 of 15                                      www.docmagic.com

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
              COUNTY              of              CLARK              :
        [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
LOT ONE HUNDRED THIRTYOFIVE (135) IN BLOCK SIX (6) OF ALIANTE
PARCEL 12A PHASE 2 AS SHOWN BY MAP THEREOF ON FILE IN BOOK 119,
PAGE 42 OF PLATS IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK
COUNTY, NEVADA.
A.P.N. #: 124-19-214-025


MAIL TAX STATEMENTS TO: MERIDIAS CAPITAL, INC., 1018 WEST
ATHERTON DRIVE, SALT LAKE CITY, UTAH 84123
which currently has the address of  6853 JUNGLE FOWL STREET
                                        [Street]

        NORTH LAS VEGAS              , Nevada        89084        ("Property Address"):
              [City]                            [Zip Code]

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
        THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

        UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
        1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an

---

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic *eRarms*  800-649-1362
Form 3029 1/01                            Page 3 of 15                                          www.docmagic.com

institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

  2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

  If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

  Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

  3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an

Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this

Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as

Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

    Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums

for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair

---

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3029 1/01
Page 8 of 15

DocMagic *eFerms* 800-649-1362
*www.docmagic.com*

is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security

---

Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower s notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of:  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower:  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with

the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

    **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

    NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

    **22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

    If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lenders' election to cause the Property to be sold, and shall

---

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3029 1/01                                    Page 12 of 15

DocMagic *eRorms* 800 649-1362
www.docmagic.com

cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $ N/A                .

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
NORMAN R. FLEMENS          -Borrower                                        -Borrower


_____ (Seal)                    _____ (Seal)
                           -Borrower                                        -Borrower


_____ (Seal)                    _____ (Seal)
                           -Borrower                                        -Borrower


Witness:                                          Witness:


_____                           _____

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eFormns  800-649-1362
Form 3029 1/01                              Page 14 of 15                          www.docmagic.com

State of Nevada
County of     CLARK

    This instrument was acknowledged before me on *December 22, 2005*
by     NORMAN R. FLEMENS



RACHELLE FOWLER
Notary Public State of Nevada
No. 05-95958-1
My appt. exp. Mar. 22, 2009

Rachelle Fowler
Notary Public

(Seal)

My commission expires: 3-22-05

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3029 1/01                          Page 15 of 15

*DocMagic* *eRamms* 800-649-1362
*www.docmagic.com*

Case 2:17-cv-02638-GMN-EJY     Document 1     Filed 10/11/17     Page 43 of 168

# EXHIBIT "A"

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

Lot One Hundred Thirty-Five (135) in Block Six (6) of ALIANTE PARCEL 12A PHASE 2 as shown by map thereof on file in Book 119, page 42 of Plats in the Clark County Recorder's Office, Clark County, Nevada.

Assessor's Parcel Number:          124-19-214-025

Loan Number: 1400045625

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this     21st    day of DECEMBER, 2005                    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to   MERIDIAS CAPITAL, INC., A NEVADA CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

6853 JUNGLE FOWL STREET, NORTH LAS VEGAS, NEVADA 89084
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

ALIANTE

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                 Page 1 of 3

*DocMagic* *eFormS* 800-649-1362
www.docmagic.com

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                                    Page 2 of 3

*DocMagic* *eFerms* 800-649-1362
*www.docmagic.com*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD
Rider.

_____ (Seal)          _____ (Seal)
NORMAN R. FLEMENS          -Borrower                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                              -Borrower                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                              -Borrower                                                        -Borrower

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    *DocMagic eForms* 800-649-1362
Form 3150 1/01                                                                            www.docmagic.com
                                        Page 3 of 3

Loan Number: 1400045625

# PREPAYMENT RIDER
### (Multi-State)

This Prepayment Rider is made this 21st day of DECEMBER, 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to MERIDIAS CAPITAL, INC., A NEVADA CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at 6853 JUNGLE FOWL STREET, NORTH LAS VEGAS, NEVADA 89084 (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

**If, within the 36 month(s) period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 0 month(s) of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)          _____ (Seal)
NORMAN R. FLEMENS              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

PREPAYMENT RIDER - 6038.2 Multi-State
11/15/99

*DocMagic* *CRforms* 800-649-1362
www.docmagic.com

EXHIBIT 3 – Notice of Lien

Case 2:17-cv-02638-GMN-EJY     Document 1     Filed 10/11/17     Page 49 of 168

||| (barcode)
**20090114-0002258**

Fee: $14.00
N/C Fee: $0.00
01/14/2009          10:49:05
T20090013532
**Requestor:**
NORTH AMERICAN TITLE COMPANY

APN # 124-19-214-025
N39881

Debbie Conway          JJF
**Clark County Recorder** Pgs: 1

## NOTICE OF LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions and Restrictions (CC&Rs), recorded on November 27, 2002, as instrument number 01887 Book 20021127, in the office of the Clark County Recorder, the Aliante Master Association has a lien on the following legally described property.

The property against which the lien is imposed is commonly referred to as 6853 Jungle Fowl Street North Las Vegas, NV 89084 particularly legally described as Aliante Parcel 12A Phase 2, Plat Book 119, Page 42, Lot 135, Block 6, Clark County Nevada.

The owner(s) parties of record as reflected on the public record as of today's date is (are):
Norman R Flemens.

The total amount due as of today's date is $1,950.00.

    * Additional monies will accrue under this claim at the rate of the claimant's regular monthly or special assessments and/or fines, plus permissible late charges, permissible costs of collection and interest, accruing after the date of the notice.
    Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

Dated: January 9, 2009

BOSMAN
By Brittany Osman on behalf of Aliante Master Association

When Recorded Mail To:
Aliante Master Association
c/o NAS
6224 W. Desert Inn Rd, Suite A
Las Vegas, NV 89146
(702) 804-8885

EXHIBIT 4 – Notice of Default and Election to Sell

Inst #: **200911200002166**
Fees: $15.00
N/C Fee: $0.00
11/20/2009 09:05:00 AM
Receipt #: 135867
Requestor:
NORTH AMERICAN TITLE COMPAN
Recorded By: RNS   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 124-19-214-025
Trustee's Sale # N39881
North American Title # 19884
PropertyAddress: 6853 Jungle Fowl Street

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## HOMEOWNERS ASSOCIATION LIEN

### IMPORTANT NOTICE

### WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION and you may have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account.  No sale date may be set until ninety (90) days from the date this notice of default was mailed to you. The date this document was mailed to you appears on this notice.

 This amount is $2,612.70 as of November 18, 2009 and will increase until your account becomes current.
 While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property or pay other obligations as required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions, the Aliante Master Association (the Association) may insist that you do so in order to reinstate your account in good standing.  In addition, the Association may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes and hazard insurance premiums.
 Upon your request, this office will mail you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your Association may mutually agree in writing prior to the foreclosure sale to, among other things, 1) provide additional time in which to cure the default by transfer of the property or otherwise; 2) establish a schedule of payments in order to cure your default; or both (1) and (2).
 Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your Association permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your Association.
 To find out about the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: Nevada Association Services, Inc. on behalf of Aliante Master Association, 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146.  The phone number is (702) 804-8885 or toll free at (888) 627-5544.
 If you have any questions, you should contact a lawyer or the Association which maintains the right of assessment on your property.

Trustee's Sale # N39881

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.
## NOTICE IS HEREBY GIVEN THAT NEVADA ASSOCIATION SERVICES, INC.

is the duly appointed agent under the previously mentioned Notice of Delinquent Assessment Lien, with the owner(s) as reflected on said lien being Norman R Flemens, dated January 09, 2009, and recorded on January 14, 2009 as instrument number 0002258 Book 20090114 in the official records of Clark County, Nevada, executed by Aliante Master Association, hereby declares that a breach of the obligation for which the Covenants Conditions and Restrictions, recorded on November 27, 2002, as instrument number 01887 Book 20021127, as security has occurred in that the payments have not been made of homeowner's assessments due from June 01, 2008 and all subsequent homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, trustee's fees and costs, attorney's fees and costs and Association fees and costs.

That by reason thereof, the Association has executed and delivered to said agent a written authorization and has deposited with said agent such documents as the Covenants Conditions and Restrictions and documents evidencing the obligations secured thereby, and declares all sums secured thereby immediately due and payable and elects to cause the property to be sold to satisfy the obligations.

Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

Nevada Associations Services, Inc., whose address is 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146 is authorized by the association to enforce the lien by sale.

Legal_Description: Aliante Parcel 12A Phase 2, Plat Book 119, Page 42, Lot 135, Block 6 in the County of Clark

Dated: November 18, 2009

By: Shea Watkins, of Nevada Association Services, Inc.
on behalf of Aliante Master Association

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

EXHIBIT 5 – Notice of Foreclosure Sale

Inst #: 201302200000677
Fees: $18.00
N/C Fee: $0.00
02/20/2013 08:59:08 AM
Receipt #: 1503451
Requestor:
NORTH AMERICAN TITLE SUNSET
Recorded By: DXI   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN# _124-19-214-025_
11 digit number may be obtained at:
http://sandgate.co.clark.nv.us/cicsAssessor/ownr.htm

NOTICE OF FORECLOSURE SALE

**Type of Document**
(Example: Declaration of Homestead, Quit Claim Deed, etc.)

**Recording requested by:**

NORTH AMERICAN TITLE COMPANY

**Return to:**

**Name**   NORTH AMERICAN TITLE COMPANY

**Address**     8485 W. SUNSET, STE. 111

**City/State/Zip**   LAS VEGAS, NV   89113

This page added to provide additional information required by NRS 111.312 Sections 1-2
(An additional recording fee of $1.00 will apply.)

This cover page must be typed or printed clearly in black ink only.

CS12/03

APN # 124-19-214-025                                    NAS # N39881
Aliante Master Association

**Accommodation**          NOTICE OF FORECLOSURE SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL NEVADA ASSOCIATION SERVICES, INC. AT (702) 804-8885. IF YOU NEED ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION, AT 1-877-829-9907 IMMEDIATELY.**

YOU ARE IN DEFAULT UNDER A DELINQUENT ASSESSMENT LIEN, January 9, 2009. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

NOTICE IS HEREBY GIVEN THAT on 3/8/2013 at 10:00 am at the front entrance to the Nevada Association Services, Inc. 6224 West Desert Inn Road, Las Vegas, Nevada, under the power of sale pursuant to the terms of those certain covenants conditions and restrictions recorded on November 27, 2002 as instrument number 01887 Book 20021127 of official records of Clark County, Nevada Association Services, Inc., as duly appointed agent under that certain Delinquent Assessment Lien, recorded on January 14, 2009 as document number 0002258 Book 20090114 of the official records of said county, will sell at public auction to the highest bidder, for lawful money of the United States, all right, title, and interest in the following commonly known property known as: 6853 Jungle Fowl Street, North Las Vegas, NV 89084. Said property is legally described as: Aliante Parcel 12A Phase 2, Plat Book 119, Page 42, Lot 135, Block 6, official records of Clark County, Nevada.

The owner(s) of said property as of the date of the recording of said lien is purported to be: Norman R Flemens
The undersigned agent disclaims any liability for incorrectness of the street address and other common designations, if any, shown herein. The sale will be made without covenant or warranty, expressed or implied regarding, but not limited to, title or possession, or encumbrances, or obligations to satisfy any secured or unsecured liens. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $7,194.78. Payment must be in cash or a cashier's check drawn on a state or national bank, check drawn on a state or federal savings and loan association, savings association or savings bank and authorized to do business in the State of Nevada. The Notice of Default and Election to Sell the described property was recorded on 11/20/2009 as instrument number 0002166 Book 20091120 in the official records of Clark County.
Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

February 12, 2013                     Nevada Association Services, Inc.
                                      6224 W. Desert Inn Road, Suite A
                                      Las Vegas, NV 89146  (702) 804-8885, (888) 627-5544

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A          By: Elissa Hollander, Agent for Association and employee of
Las Vegas, NV 89146                       Nevada Association Services, Inc.

EXHIBIT 6 – Notice of Foreclosure Sale



**Inst #: 201007230000807**
Fees: $15.00
N/C Fee: $0.00
07/23/2010 10:12:12 AM
Receipt #: 437074
Requestor:
NORTH AMERICAN TITLE COMPAN
Recorded By: LEX   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN# *124-19-214-025*
11 digit number may be obtained at:
http://sandgate.co.clark.nv.us/cicsAssessor/ownr.htm

NOTICE OF FORECLOSURE SALE

**Type of Document**
(Example: Declaration of Homestead, Quit Claim Deed, etc.)

**Recording requested by:**

NORTH AMERICAN TITLE COMPANY

**Return to:**

**Name**   NORTH AMERICAN TITLE COMPANY

**Address**   3571 E. SUNSET ROAD

**City/State/Zip**   LAS VEGAS, NV   89120

This page added to provide additional information required by NRS 111.312 Sections 1-2
(An additional recording fee of $1.00 will apply.)

This cover page must be typed or printed clearly in black ink only.

CS12/03

APN # 124-19-214-025                          NAS # N39881
Aliante Master Association

## NOTICE OF FORECLOSURE SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL NEVADA ASSOCIATION SERVICES, INC. AT (702) 804-8885. IF YOU NEED ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION, AT 1-877-829-9907 IMMEDIATELY.**

YOU ARE IN DEFAULT UNDER A DELINQUENT ASSESSMENT LIEN, January 9, 2009.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

NOTICE IS HEREBY GIVEN THAT on August 13, 2010 at 10:00 am at the front entrance to the Nevada Legal News, 930 So. Fourth Street, Las Vegas, Nevada, under the power of sale pursuant to the terms of those certain covenants conditions and restrictions recorded on November 27, 2002 as instrument number 01887 Book 20021127 of official records of Clark County, Nevada Association Services, Inc., as duly appointed agent under that certain Delinquent Assessment Lien, recorded on January 14, 2009 as document number 0002258 Book 20090114 of the official records of said county, will sell at public auction to the highest bidder, for lawful money of the United States, all right, title, and interest in the following commonly known property known as: 6853 Jungle Fowl Street, North Las Vegas, NV 89084. Said property is legally described as: Aliante Parcel 12A Phase 2, Plat Book 119, Page 42, Lot 135, Block 6, official records of Clark County, Nevada.

The owner(s) of said property as of the date of the recording of said lien is purported to be: Norman R Flemens
The undersigned agent disclaims any liability for incorrectness of the street address and other common designations, if any, shown herein.  The sale will be made without covenant or warranty, expressed or implied regarding, but not limited to, title or possession, or encumbrances, or obligations to satisfy any secured or unsecured liens.  The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $4,033.03.  Payment must be in cash or a cashier's check drawn on a state or national bank, check drawn on a state or federal savings and loan association, savings association or savings bank and authorized to do business in the State of Nevada.  The Notice of Default and Election to Sell the described property was recorded on November 20, 2009 as instrument number 0002166 Book 20091120 in the official records of Clark County.

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

July 19, 2010                          Nevada Association Services, Inc.
                                       6224 W. Desert Inn Road, Suite A
                                       Las Vegas, NV 89146   (702) 804-8885, (888) 627-5544

When Recorded Mail To:
Nevada Association Services, Inc.      By: Elissa Hollander, Agent for Association and employee of
6224 W. Desert Inn Road, Suite A       Nevada Association Services, Inc.
Las Vegas, NV 89146

EXHIBIT 7 – Foreclosure Deed

Case 2:17-cv-02638-GMN-EJY     Document 1     Filed 10/11/17     Page 60 of 168

Inst #: 201303150003250
Fees: $18.00 N/C Fee: $0.00
RPTT: $43.35 Ex: #
03/15/2013 03:06:43 PM
Receipt #: 1536788
Requestor:
NORTH AMERICAN TITLE SUNSET
Recorded By: BGN    Pgs: 3
DEBBIE CONWAY
CLARK COUNTY RECORDER

Please mail tax statement and
when recorded mail to:
S F R Investments Pool 1, LLC
5030 Paradise Road B - 214
Las Vegas, Nv 89119

## Accommodation          FORECLOSURE DEED

APN # 124-19-214-025
North American Title #19884                    NAS # N39881

The undersigned declares:

Nevada Association Services, Inc., herein called agent (for the Aliante Master Association), was
the duly appointed agent under that certain Notice of Delinquent Assessment Lien, recorded
January 14, 2009 as instrument number 0002258 Book 20090114, in Clark County. The previous
owner as reflected on said lien is Norman R Flemens. Nevada Association Services, Inc. as agent
for Aliante Master Association does hereby grant and convey, but without warranty expressed or
implied to: S F R Investments Pool 1, LLC (herein called grantee), pursuant to NRS 116.31162,
116.31163 and 116.31164, all its right, title and interest in and to that certain property legally
described as: Aliante Parcel 12A Phase 2, Plat Book 119, Page 42, Lot 135, Block 6 Clark
County

AGENT STATES THAT:
This conveyance is made pursuant to the powers conferred upon agent by Nevada Revised
Statutes, the Aliante Master Association governing documents (CC&R's) and that certain Notice
of Delinquent Assessment Lien, described herein.  Default occurred as set forth in a Notice of
Default and Election to Sell, recorded on 11/20/2009 as instrument # 0002166 Book 20091120
which was recorded in the office of the recorder of said county.  Nevada Association Services,
Inc. has complied with all requirements of law including, but not limited to, the elapsing of 90
days, mailing of copies of Notice of Delinquent Assessment and Notice of Default and the
posting and publication of the Notice of Sale.  Said property was sold by said agent, on behalf of
Aliante Master Association at public auction on 3/8/2013, at the place indicated on the Notice of
Sale.  Grantee being the highest bidder at such sale, became the purchaser of said property and
paid therefore to said agent the amount bid $8,100.00 in lawful money of the United States, or by
satisfaction, pro tanto, of the obligations then secured by the Delinquent Assessment Lien.

Dated: March 8, 2013

_By Misty Blanchard, Agent for Association and Employee of Nevada Association Services_

STATE OF NEVADA                    )
COUNTY OF CLARK                    )

On March 8, 2013, before me, Elissa Hollander, personally appeared Misty Blanchard personally known
to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed
to the within instrument and acknowledged that he/she executed the same in his/her authorized capacity,
and that by signing his/her signature on the instrument, the person, or the entity upon behalf of which
the person acted, executed the instrument.

WITNESS my hand and seal.

(Seal)                                            (Signature)

**ELISSA HOLLANDER**
Notary Public, State of Nevada
Appointment No. 05-101835-1
My Appt. Expires Nov. 5, 2013

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1.  Assessor Parcel Number(s)
    a. 124-19-214-025
    b. _____
    c. _____
    d. _____

2.  Type of Property:

| | | | | | |
|---|---|---|---|---|---|
| a. ☐ | Vacant Land | b. ☑ | Single Fam. Res. | | |
| c. ☐ | Condo/Twnhse | d. ☐ | 2-4 Plex | | |
| e. ☐ | Apt. Bldg | f. ☐ | Comm'l/Ind'l | | |
| g. ☐ | Agricultural | h. ☐ | Mobile Home | | |
| ☐ | Other | | | | |

FOR RECORDERS OPTIONAL USE ONLY
Book_____ Page:_____
Date of Recording: _____
Notes:

3.a. Total Value/Sales Price of Property        $ 8,100.00
   b. Deed in Lieu of Foreclosure Only (value of property ( )
   c. Transfer Tax Value:                       $ 8,100.00
   d. Real Property Transfer Tax Due            $ 43.35

4.  **If Exemption Claimed:**
    a. Transfer Tax Exemption per NRS 375.090, Section_____
    b. Explain Reason for Exemption: _____

5.  Partial Interest: Percentage being transferred: 100  %
The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060
and NRS 375.110, that the information provided is correct to the best of their information and belief,
and can be supported by documentation if called upon to substantiate the information provided herein.
Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of
additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant
to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _____  Capacity: Agent

Signature _____  Capacity: _____

| **SELLER (GRANTOR) INFORMATION** | **BUYER (GRANTEE) INFORMATION** |
|---|---|
| **(REQUIRED)** | **(REQUIRED)** |
| Print Name: Nevada Association Services | Print Name: S F R Investments Pool 1, LLC |
| Address:6224 W. Desert Inn Road | Address: 5030 Paradise Road B-214 |
| City: Las Vegas | City: Las Vegas |
| State: Nevada        Zip: 89146 | State: Nevada        Zip:89119 |

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**

North American Title Company           Escrow # N39881
8485 W. Sunset Road #111
Las Vegas, NV  89113                    State: _____  Zip: _____

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

# EXHIBIT 8 - HOA CC&R's

202/002 2002127
01887

WHEN RECORDED RETURN TO:

APN: _124-17-000-001_
_124-19-101-002_
_124-19-301-002_
_124-20-000-001_
_124-21-101-001_

First American Title Company
3760 Pecos McLeod, #7
Las Vegas, NV  89121
Attn:  Sharon Silverberg

# MASTER DECLARATION
## OF
## COVENANTS, CONDITIONS, AND RESTRICTIONS
## AND RESERVATION OF EASEMENTS

## FOR

## ALIANTE

# TABLE OF CONTENTS

**PART ONE:  INTRODUCTION TO THE COMMUNITY**  . . . . . . . . . . . . . . . . . . . . . . . . . 1
    **Article 1**    **Creation of the Community** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        1.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        1.2    Purpose and Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.3    Master Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.4    The Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.5    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.6    Governing Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    **Article 2**    **Concepts and Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.1    "Act" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.2    "Active Adult Community" . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.3    "Active Adult Declaration" . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.4    "Active Adult Sub-Association" . . . . . . . . . . . . . . . . . . . . . . 6
        2.5    "Aliante" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.6    "Annexable Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.7    "Apartment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.8    "Architectural Guidelines" . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.9    "Architectural Review Committee" or "ARC" . . . . . . . . . . . . . 6
        2.10   "Areas of Common Responsibility" . . . . . . . . . . . . . . . . . . . 6
        2.11   "Articles of Incorporation" or "Articles" . . . . . . . . . . . . . . . . 6
        2.12   "Base Assessment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.13   "Board of Directors" or "Board" . . . . . . . . . . . . . . . . . . . . . 7
        2.14   "Builder" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.15   "Bylaws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.16   "City" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.17   "Common Elements" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.18   "Common Expenses" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        2.19   "Community-Wide Standard" . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.20   "Consent" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.21   "Cost Center" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.22   "Cost Center Assessments" . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.23   "Cost Center Expenses" . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.24   "Declarant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.25   "Declarant Assignment of Maintenance Obligation" . . . . . . . . . . . . . . . . . . . . 8
        2.26   "Declarant Control Period" . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.27   "Delegates" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.28   "Development Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.29   "Development Declaration" . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.30   "Excluded Amenities" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.31   "Golf Course" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.32   "Golf Course Park" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

| 2.33 | "Governing Documents" | 10 |
| 2.34 | "Home Owner" | 10 |
| 2.35 | "Improvements" | 10 |
| 2.36 | "Law" | 10 |
| 2.37 | "License Agreement" | 11 |
| 2.38 | "Limited Common Elements" | 11 |
| 2.39 | "Lot" | 11 |
| 2.40 | "Majority" | 11 |
| 2.41 | "Manager" | 11 |
| 2.42 | "Master Association" | 11 |
| 2.43 | "Master Plan" | 11 |
| 2.44 | "Maximum Number of Lots" | 11 |
| 2.45 | "Member" | 11 |
| 2.46 | "Mortgage" | 11 |
| 2.47 | "Multi-Family Lot" | 12 |
| 2.48 | "Neighborhood" | 12 |
| 2.49 | "Neighborhood Committee" | 12 |
| 2.50 | "Notice" and "Notify" | 12 |
| 2.51 | "Notice of Non-Compliance | 12 |
| 2.52 | "NRS" | 12 |
| 2.53 | "Occupy", "Occupies", "Occupant" or "Occupancy" | 13 |
| 2.54 | "Owner" | 13 |
| 2.55 | "Person" | 13 |
| 2.56 | "Plat" | 13 |
| 2.57 | "Project Plan" | 13 |
| 2.58 | "Property" | 13 |
| 2.59 | "Record", "Recording", "Recorded", or "Recording" | 13 |
| 2.60 | "Representation District" | 13 |
| 2.61 | "Residence" | 13 |
| 2.62 | "Residential Lot" | 13 |
| 2.63 | "Reviewing Builder" | 14 |
| 2.64 | "Rules" | 14 |
| 2.65 | "Special Assessment" | 14 |
| 2.66 | "Specific Assessment" | 14 |
| 2.67 | "Sub-Association" | 14 |
| 2.68 | "Supplemental Declaration" | 14 |
| 2.69 | "Use Restrictions" | 14 |
| 2.70 | "Violators" | 14 |
| 2.71 | Additional Defined Terms | 14 |

**PART TWO: CREATION AND MAINTENANCE OF COMMUNITY STANDARDS**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20021127
01887

**Article 3**      **Use and Conduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     3.1      Framework for Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     3.2      Rule Making Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     3.3      Owners' Acknowledgment and Notice to Purchasers . . . . . . . . . . . . . 17
     3.4      Protection of Owners and Others . . . . . . . . . . . . . . . . . . . . . . . 17
     3.5      Use Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     3.6      Occupants Bound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     3.7      Declarant and Builder Exemption . . . . . . . . . . . . . . . . . . . . . . 26
**Article 4**      **Architecture and Landscaping** . . . . . . . . . . . . . . . . . . . . . . 26
     4.1      General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     4.2      Architectural Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     4.3      Guidelines and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . 28
     4.4      No Waiver of Future Approvals . . . . . . . . . . . . . . . . . . . . . . . 30
     4.5      Variances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     4.6      Exemptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     4.7      Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     4.8      Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
**Article 5**      **Maintenance and Repair** . . . . . . . . . . . . . . . . . . . . . . . . . 33
     5.1      Maintenance of Lots . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     5.2      Maintenance of Neighborhood Property . . . . . . . . . . . . . . . . . . 34
     5.3      Responsibility for Repair and Replacement . . . . . . . . . . . . . . . . . 36

**PART THREE: COMMUNITY GOVERNANCE AND ADMINISTRATION** . . . . . . . . . . 36
**Article 6**      **The Master Association and Its Members** . . . . . . . . . . . . . . . . . 37
     6.1      Function of the Master Association . . . . . . . . . . . . . . . . . . . . . 37
     6.2      Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
     6.3      Membership Classes and Voting Rights . . . . . . . . . . . . . . . . . . . 37
     6.4      Neighborhoods and Delegates . . . . . . . . . . . . . . . . . . . . . . . 38
     6.5      Representation Districts . . . . . . . . . . . . . . . . . . . . . . . . . . 41
     6.6      Representative Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
**Article 7**      **Master Association Powers and Responsibilities** . . . . . . . . . . . . . 42
     7.1      Acceptance and Control of Master Association Property . . . . . . . . . . . 42
     7.2      Maintenance of Areas of Common Responsibility . . . . . . . . . . . . . 42
     7.3      Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
     7.4      Compliance and Enforcement . . . . . . . . . . . . . . . . . . . . . . . 48
     7.5      Implied Rights; Board Authority . . . . . . . . . . . . . . . . . . . . . . 50
     7.6      Indemnification of Officers, Directors and Others . . . . . . . . . . . . . 50
     7.7      Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
     7.8      Provision of Services . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
     7.9      Change of Services and Use of Common Element . . . . . . . . . . . . . 52
     7.10     View Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
     7.11     Relationship with Sub-Associations . . . . . . . . . . . . . . . . . . . . 54
     7.12     Relationship with Other Properties; Entities . . . . . . . . . . . . . . . . 54

**Article 8**     **Master Association Finances** . . . . . . . . . . . . . . . . . . . . . . . . . . 54
  8.1     Budgeting and Allocating Common Expenses . . . . . . . . . . . . . . . . . . . . 54
  8.2     Limitations on Common Assessment Increases . . . . . . . . . . . . . . . . . . . 56
  8.3     Budgeting and Allocating Cost Center Expenses . . . . . . . . . . . . . . . . . . 56
  8.4     Budgeting for Reserves; Use of Reserves . . . . . . . . . . . . . . . . . . . . . . 56
  8.5     Special Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
  8.6     Specific Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
  8.7     Authority To Assess Owners; Time of Payment . . . . . . . . . . . . . . . . . . 57
  8.8     Obligation for Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
  8.9     Lien for Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
  8.10    Exempt Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
  8.11    Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**PART FOUR: COMMUNITY DEVELOPMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . 61
**Article 9**     **Expansion of the Community** . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
  9.1     Expansion by Declarant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
  9.2     Expansion by the Master Association . . . . . . . . . . . . . . . . . . . . . . . . . 63
  9.3     Additional Covenants and Easements . . . . . . . . . . . . . . . . . . . . . . . . . 63
  9.4     Effective Date of Supplemental Declaration . . . . . . . . . . . . . . . . . . . . . 63
**Article 10**    **Additional Rights Reserved to Declarant** . . . . . . . . . . . . . . . . . . . 63
  10.1    Withdrawal of Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
  10.2    Marketing and Sales Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
  10.3    Right to Develop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
  10.4    Right to Designate Sites for Governmental and Public Interests . . . . . . . . . 64
  10.5    Right to Approve Additional Covenants . . . . . . . . . . . . . . . . . . . . . . . . 64
  10.6    Right to Approve Change in Community Standards . . . . . . . . . . . . . . . . . 64
  10.7    Right to Merge or Consolidate the Master Association . . . . . . . . . . . . . . . 65
  10.8    Right to Appoint and Remove Directors During Declarant Control Period . 65
  10.9    Right to Transfer or Assign Declarant Rights . . . . . . . . . . . . . . . . . . . . 65
  10.10   Exclusive Rights to Use Name of Development . . . . . . . . . . . . . . . . . . . 65
  10.11   Declarant Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
  10.12   Equal Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
  10.13   Right to Use Common Elements for Special Events . . . . . . . . . . . . . . . . 66
  10.14   Right to Assign Declarant Rights under Development Agreement to Master
          Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**PART FIVE: PROPERTY RIGHTS WITHIN THE COMMUNITY** . . . . . . . . . . . . . . . . 67
**Article 11**    **Easements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
  11.1    Easements in Common Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
  11.2    Easements of Encroachment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
  11.3    Right To Develop; Construction Easement . . . . . . . . . . . . . . . . . . . . . . 68
  11.4    Easements for Utilities, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
  11.5    Easement to Inspect and Right to Correct . . . . . . . . . . . . . . . . . . . . . . . 69

| | | |
|---|---|---|
| 11.6 | Easements for Vehicular and Pedestrian Traffic | 70 |
| 11.7 | Easements to Serve Annexable Property | 70 |
| 11.8 | Easements for Maintenance, Emergency, and Enforcement | 70 |
| 11.9 | Easements for Flood Water | 71 |
| 11.10 | Easements for Cross-Drainage | 71 |
| 11.11 | Rights to Stormwater Runoff, Effluent, and Water Reclamation | 72 |
| **Article 12** | **Limited Common Elements** | 72 |
| 12.1 | Purpose | 72 |
| 12.2 | Designation | 72 |
| 12.3 | Use by Others | 73 |
| **Article 13** | **Party Walls and Other Shared Structures** | 73 |
| 13.1 | General Rules of Law to Apply | 73 |
| 13.2 | Maintenance, Damage, and Destruction | 73 |
| 13.3 | Right to Contribution Runs with Land | 73 |
| 13.4 | Disputes | 73 |
| **Article 14** | **Excluded Amenities** | 73 |
| 14.1 | General | 73 |
| 14.2 | Conveyance of Excluded Amenities | 74 |
| 14.3 | Cost Sharing | 74 |
| 14.4 | Rights of Access and Parking | 74 |
| 14.5 | Additional Golf Course Easements | 75 |
| 14.6 | Limitations on Amendments | 76 |
| 14.7 | Jurisdiction and Cooperation | 76 |
| **PART SIX: RELATIONSHIPS WITHIN AND OUTSIDE THE COMMUNITY** | | 77 |
| **Article 15** | **Dispute Resolution and Limitation on Litigation** | 77 |
| 15.1 | Prerequisites to Actions Against Declarant | 77 |
| 15.2 | Consensus for Master Association Litigation | 77 |
| 15.3 | Alternative Method for Resolving Disputes | 77 |
| 15.4 | Claims | 77 |
| 15.5 | Mandatory Procedures | 78 |
| 15.6 | Allocation of Costs of Resolving Claims | 79 |
| 15.7 | Enforcement of Resolution | 79 |
| 15.8 | Attorneys' Fees | 79 |
| **Article 16** | **Mortgagee Provisions** | 79 |
| 16.1 | Notices of Action | 80 |
| 16.2 | No Priority | 80 |
| 16.3 | Notice to Master Association | 80 |
| 16.4 | Failure of Mortgagee to Respond | 80 |
| 16.5 | HUD/VA Approval | 80 |
| **PART SEVEN: CHANGES IN THE COMMUNITY** | | 81 |
| **Article 17** | **Changes in Ownership of Lots** | 81 |

20021127
01887

| Article 18 | Changes in Common Elements | 81 |
| 18.1 | Condemnation | 81 |
| 18.2 | Partition | 82 |
| 18.3 | Transfer or Dedication of Common Elements | 82 |
| 18.4 | Actions Requiring Member Approval | 82 |
| 18.5 | Delivery of Amendments to Owners | 82 |
| 18.6 | Liberal Construction to Comply with the Act | 82 |
| Article 19 | Amendment of Declaration | 82 |
| 19.1 | Corrective Amendment | 82 |
| 19.2 | By Owners | 83 |
| 19.3 | Validity and Effective Date | 83 |
| 19.4 | Exhibit | 83 |

| PART EIGHT: ADDITIONAL PROVISIONS | | 83 |
| Article 20 | Additional Disclosures, Disclaimers and Releases | 83 |
| 20.1 | General Disclosures | 83 |
| 20.2 | Disclaimers Regarding Excluded Amenities | 83 |
| 20.3 | Additional Disclosures and Disclaimers Regarding Excluded Amenities | 84 |
| 20.4 | Disclosures and Disclaimers of Certain Other Matters | 85 |
| 20.5 | Releases | 87 |
| Article 21 | General Provisions | 87 |
| 21.1 | No Public Right or Dedication | 87 |
| 21.2 | No Representations or Warranties | 87 |

-TABLE OF EXHIBITS-

| Exhibit | Subject Matter | Pages First Mentioned |
| --- | --- | --- |
| "A" | Land Initially Submitted | 1 |
| "B" | Land Subject to Annexation | 5 |
| "C" | Golf Course Land | 5 |

20021127
.01887

# MASTER DECLARATION OF
# COVENANTS, CONDITIONS, AND RESTRICTIONS
# AND RESERVATION OF EASEMENTS
# FOR
# ALIANTE

THIS MASTER DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR ALIANTE is made as of the _____ day of November, 2002, by NORTH VALLEY ENTERPRISES, LLC, a Nevada limited liability company ("Declarant"). Capitalized terms used herein shall have the meanings set forth in Article 2.

## PART ONE: INTRODUCTION TO THE COMMUNITY

*North Valley Enterprises, LLC, as master developer of Aliante, has established this Declaration to provide a governance structure and a flexible system of standards and procedures for the overall development, administration, maintenance, and preservation of the residential areas of Aliante as a master planned community.*

## Article 1    Creation of the Community

### 1.1    Introduction.

Aliante is a master planned community located in the City of North Las Vegas, Nevada (the "City"), which is intended to include both residential (single family and multi-family) and commercial developments (including office, retail, and gaming). Development of Aliante is governed by a Development Agreement dated January 16, 2002 (as now or hereafter in effect, the "Development Agreement") between the City and Declarant, recorded April 8, 2002 in the Official Records of the Clark County, Nevada Recorder in Book 20020408 as Instrument No. 00884. The Development Agreement contains specific requirements concerning how Aliante may be developed, and includes "Design Standards" applicable to Aliante in whole or in part. Unless otherwise permitted by the express terms of the Development Agreement or Design Standards, this Declaration is subject to the Development Agreement, including the Design Standards, and neither this Declaration nor the Master Association may change the requirements of the Development Agreement or Design Standards. Within stated limitations contained in this Declaration or in the Development Agreement, the Master Association may be entitled or required to enforce or obtain the benefits of the Development Agreement.

The Development Agreement does permit certain changes in the way Aliante is developed. (For example, the maximum number of certain types of homes or apartments may be increased or decreased within stated limits.) In addition, because Aliante will be developed over an extended period of time and market and other conditions may change, Declarant and the City may elect to amend the Development Agreement, including the Design Standards, in the future.

20021127
01867

The Development Agreement contemplates a master association for all of the residential developments in Aliante (the "Aliante Residential Community"). It is presently contemplated that the Aliante Residential Community will consist of a number of separate subdivisions, including the Active Adult Community described below, built by different homebuilders. Each of these separate builder subdivisions is referred to in this Declaration as a "Neighborhood". The Active Adult Community will be a single Neighborhood. Certain builders may have more than one Neighborhood. A Neighborhood may or may not be governed by a separate Sub-Association, and may or may not have Limited Common Elements or be provided special services. The intent of this Declaration is to provide for communications between the Master Association and the Owners through the Neighborhoods, and that, with certain exceptions, each Sub-Association be responsible for enforcement of the Rules and Use Restrictions within its jurisdiction. This Declaration will not govern the commercial developments in Aliante.

When the period of Declarant control of the Master Association is over, it is intended that Owners in the Aliante Residential Community will elect members of the Board of Directors within three (3) specific geographical areas, referred to in this Declaration as Representation Districts. When this occurs, each Representation District will be entitled to elect two (2) members of the Board of Directors, and the seventh (7th) member will be elected at-large. The Active Adult Community will consist of one (1) Representation District. Representation Districts are described elsewhere in this Declaration: election procedures are described in, and will be subject to, the Bylaws.

Most of the Common Elements that will become subject to this Declaration will be rights to the use of "Public Use Acreage" as defined in the Development Agreement, through the existence of agreements between the City and Declarant and/or the Master Association (the "License Agreements"). Accordingly, both the Master Association's and the Owners' obligations, duties, and rights in and to the Common Elements will be subject to the terms of the License Agreements, as well as other limitations arising by reason of the public nature of such property. Except to the extent permitted by the License Agreements, the standards, restrictions, procedures, and other terms specified in the License Agreements will take precedence over conflicting provisions of this Declaration or actions by the Master Association, and may not be changed without the City's approval. Within stated limitations contained in this Declaration or in any License Agreement, the Master Association may be entitled or required to enforce or obtain the benefits of any License Agreement.

The Development Agreement contemplates and permits an age restricted community, referred to in the Development Agreement as the "Active Adult Community." The Active Adult Community will be part of the Aliante Residential Community, but will also be subject to a separate declaration (as defined in the Act) (the "Active Adult Declaration") and a separate association (as defined in the Act) (the "Active Adult Sub-Association"). The Development Agreement contemplates that the Active Adult Community will largely be autonomous within the Aliante Residential Community, through the Active Adult Declaration, the Active Adult Sub-Association and a separate and distinct set of development and architectural standards and guidelines. Owners within the Active Adult Community, however, will be members of the Master Association and governed by this Declaration. The Active Adult Declaration and this Declaration will limit to some degree, however, the authority of the Master Association within the Active Adult Community. Other developments within the Aliante Residential Community may also elect to provide for

20021127
.01887

a greater degree of autonomy, control, or services through the creation of a Sub-Association and of a Supplemental Declaration, however, each Sub-Association and Supplemental Declaration will be subject to the provisions of this Declaration.

1.2     Purpose and Intent.

The real property described in Exhibit "A" is the first phase within the Aliante Residential Community.  As the owner of the real property described in Exhibit "A," Declarant intends by Recording this Declaration to create a general plan of development for all portions of the Aliante Residential Community now or hereafter made subject to this Declaration. This Declaration provides a flexible and reasonable procedure for the future expansion of the Aliante Residential Community to include additional real property as Declarant deems appropriate and provides for the overall development, administration, maintenance, and preservation of the real property now and hereafter comprising the Aliante Residential Community.  The term "Property" is used in this Declaration to refer to all of the real property from time to time subject to this Declaration.

1.3     Master Association.

An integral part of the development plan is the creation of Aliante Master Association, a Nevada non-profit corporation (the "Master Association"), as an association comprised of all owners of real property in the Aliante Residential Community, to own and/or control, operate, and maintain various common areas and community Improvements within or benefitting the Aliante Residential Community, and to administer and enforce this Declaration and the other Governing Documents.  The Master Association is intended to be the "Master Association" referred to in the Development Agreement.

1.4     The Act.

This document is prepared pursuant to the Nevada Common-Interest Ownership Act, NRS 116.1101, *et seq.*, and establishes a "planned community" as defined therein.

1.5     Binding Effect.

All real property described in Exhibit "A," and any additional real property that is made a part of the Aliante Residential Community in the future by Recording one or more Supplemental Declarations, shall be owned, conveyed, and used subject to all of the provisions of this Declaration, which shall run with the title to such real property. This Declaration shall be binding upon all Persons having any right, title, or interest in any portion of the Property, their heirs, successors, successors-in-title, and assigns.

Unless otherwise provided by Nevada law, this Declaration shall run with the land and have perpetual duration. This Declaration may be terminated only by a Recorded instrument signed by Owners of at least eighty percent (80%) of the total number of Lots and the Declarant, so long as Declarant owns any land described on Exhibits "A" and/or "B", and only if the termination complies with the termination procedures set forth in the Act. Nothing in this Section shall be construed to permit termination of any

20021127
.01887

easement or similar right created in this Declaration without the consent of the holder of such easement. Termination of this Declaration is also subject to any provisions in the Development Agreement limiting such termination.

1.6     Governing Documents.

The Governing Documents create a general plan of development for the Aliante Residential Community that may be supplemented by additional covenants, conditions, restrictions, and easements applicable to particular Neighborhoods. The Governing Documents shall be construed to be consistent with one another to the extent possible. If there exists any irreconcilable conflicts or inconsistencies among the Governing Documents, then terms and provisions of this Declaration shall prevail (unless and to the extent only that any provision of the Declaration fails to comply with any applicable provisions of the Act), and thereafter the Articles shall prevail over the Bylaws, the Architectural Guidelines and the Rules. In the event of a conflict between or among the Governing Documents and any such additional covenants, conditions, or restrictions, and/or the provisions of any other articles of incorporation, bylaws, rules, or policies governing any Neighborhood, the Governing Documents shall control. Nothing in this Section shall preclude any Supplemental Declaration or other Recorded covenants, conditions, or restrictions applicable to any portion of the Property from containing additional restrictions or provisions that are more restrictive than the provisions of this Declaration. Each Sub-Association will be responsible for enforcing the covenants, conditions, restrictions, and other instruments applicable to its Neighborhood (including this Declaration), unless the Master Association determines that enforcement of this Declaration by the Sub-Association is not in accordance with the Community Wide Standard. The Master Association may, but shall not be required to, enforce any supplemental covenants, conditions, restrictions or other instruments applicable to any Neighborhood.

The Governing Documents shall be enforceable by Declarant, any Builder, the Master Association, any Owner, and their respective legal representatives, heirs, successors, and assigns, by any means available at law or in equity, subject to the provisions of Article 15, if applicable, and subject to the provisions of the Governing Documents that describe or limit how the Governing Documents may be enforced. In most cases the Board of Directors of the Master Association will be responsible for enforcing the Governing Documents.

If any provision of this Declaration is determined by judgment or court order to be invalid, or invalid as applied in a particular instance, such determination shall not affect the validity of other provisions or applications.

20021127
.01887

The following diagram summarizes the Governing Documents for the Aliante Residential Community.

**Aliante Residential Community**
**Governing Documents**

| **DECLARATION** |
|:---:|
| (Recorded in Clark County, Nevada) |

| **Supplemental Declarations** | **Use Restrictions** |
|---|---|
| • Recorded upon annexation of each parcel into the Property<br>• May contain additional covenants applicable to specific parcel<br>• Will designate a parcel within a particular Neighborhood and Representation District.<br>• May or may not provide for a Sub-Association | • Initial restrictions set forth in Declaration<br>• May be supplemented or amended |

| **ARTICLES OF INCORPORATION** |
|:---:|

| **BYLAWS** |
|:---:|

| **APPLICABLE ARCHITECTURAL GUIDELINES** |
|:---:|

| **RULES** |
|:---:|

All diagrams contained within this Declaration and the Bylaws (but excluding any diagrams that are included in the Exhibits to this Declaration) are intended only to summarize the express written terms therein. Such diagrams, are not intended to supplant or supplement the express written or implied terms contained in the Governing Documents.

**Article 2    Concepts and Definitions**

The terms used in the Governing Documents shall generally be given their natural, commonly accepted definitions unless otherwise specified. Capitalized terms shall be defined as set forth below.

2.1    "Act": The Nevada Common-Interest Ownership Act, NRS Chapter 116.1101, *et seq.*, as it may be amended from time to time.

2.2    "Active Adult Community": That portion of the Property designated by Declarant as one (1) Neighborhood, which will be established as an age restricted community referred to as the Active Adult Village under the Development Agreement.

2.3    "Active Adult Declaration": The Supplemental Declaration governing the Active Adult Community.

2.4    "Active Adult Sub-Association": The Sub-Association having jurisdiction over the Active Adult Community and its Owners.

2.5    "Aliante": That certain master planned community located in the City of North Las Vegas, Clark County, Nevada, which is more particularly described in the Master Plan, as it may be amended from time to time.

2.6    "Annexable Property": That certain real property described in Exhibit "B" which may hereafter be brought within the terms of this Declaration as part of the Property pursuant to Article 9.

2.7    "Apartment": Each individual single family dwelling unit located within a building or structure or portion of a building or structure situated upon a Multi-Family Lot.

2.8    "Architectural Guidelines": The architectural, design, and construction guidelines and application and review procedures applicable to the Aliante Residential Community as promulgated, supplemented, and administered pursuant to Article 4, as they may be amended, together with all applicable Development Standards in effect from time to time under the Development Agreement. Subject to restrictions in the Development Agreement, Architectural Guidelines may be different for different Neighborhoods.

2.9    "Architectural Review Committee" or "ARC": The committee created pursuant to Section 4.2.2 to review new construction (other than that installed by Declarant or installed by a Builder in accordance with Section 4.6.1) and modifications and to administer and enforce the architectural controls for the Aliante Residential Community, as more specifically provided in Article 4.

2.10    "Areas of Common Responsibility": The Common Elements, together with such other areas, if any, owned, controlled, leased or held by easement, license or otherwise, by the Master Association for the use and benefit of the Owners (whether some or all) for which the Master Association has or assumes responsibility pursuant to the terms of this Declaration, any Supplemental Declaration, each Declarant Assignment of Maintenance Obligation, or other applicable covenants, contracts, or agreements. Areas of Common Responsibility may, but need not be within, directly contiguous or adjacent to the Property and may include trails, linear parks, open space, and/or median areas located on public property or within any public right-of-way which provides access to the Aliante Residential Community.

2.11    "Articles of Incorporation" or "Articles": The Articles of Incorporation of Aliante Master Association, on file with the Nevada Secretary of State from time to time.

6

20021127
.01887

2.12  "Base Assessment": Assessments levied on all Lots subject to assessment under Article 8 to fund Common Expenses for the general benefit of all Lots, as determined in accordance with Section 8.1.

2.13  "Board of Directors" or "Board": The body responsible for administration of the Master Association, selected as provided in the Bylaws and serving the same role as the board of directors under Nevada corporate law and as the "executive board" as defined in the Act.

2.14  "Builder": Any Person designated by Declarant who purchases one or more Lots for the purpose of constructing Improvements for later sale to Home Owners or lease and occupancy as Apartments, or who purchases one or more parcels of land within the Property for further subdivision, development, and/or resale in the ordinary course of such Person's business.

2.15  "Bylaws": The Bylaws of Aliante Master Association, as they may be amended from time to time.

2.16  "City": The City of North Las Vegas, Nevada.

2.17  "Common Elements": All real and personal property, including easements, that the Master Association owns, leases, or otherwise holds possessory or use rights in for the common use and enjoyment of the Owners (whether some or all) together with all areas designated as a "common element" or "common area" on the Plats which may from time to time be deeded, assigned, transferred or otherwise conveyed to the Master Association; provided, however, that for so long as Declarant owns any real property subject to this Declaration or that may become subject to this Declaration, any deed, assignment, transfer or other conveyance of real property to the Master Association shall require the Declarant's consent. The term shall include the Limited Common Elements and Cost Centers, as defined below, and may also include, without limitation, recreational facilities, entry features, signage, landscaped medians, rights of way and roads, parks, greenbelts, enhanced and native open space, trails, and sidewalks, if owned or leased by the Master Association, or if included within a License Agreement to which the Master Association is a party, whether initially or pursuant to a Declarant Assignment of Maintenance Responsibility. The term "Common Elements" shall not include the Golf Course or any other Excluded Amenity. The Common Elements shall initially consist of the real property classified as Common Elements in Exhibit "A." Additional Common Elements may also be designated in the Supplemental Declaration annexing such property into the Property.

2.18  "Common Expenses": The actual and estimated expenses that the Master Association incurs or expects to incur for the general benefit of the Owners, which may include, without limitation, the expenses of maintaining, operating, insuring, repairing, and replacing an Area of Common Responsibility, a reasonable reserve for capital repairs and replacements, all expenses, fees and other charges imposed upon the Master Association by any governmental entity, and such other expenses as the Board may find necessary and appropriate pursuant to the Governing Documents but subject to the Master Association budget adopted in accordance with the Governing Document.

20021127
.01887

2.19    "Community-Wide Standard": The standard of conduct, maintenance, or other activity generally prevailing throughout the Aliante Residential Community. The initial standards shall be as set forth in the Development Agreement. including the Design Standards, thereafter Declarant shall establish such additional standards, which may be more specifically defined in the Architectural Guidelines, the Use Restrictions, Rules, and Board resolutions, provided the same are not in conflict with the Development Agreement, including the Design Standards. Any subsequent amendments to the standard shall meet or exceed the standards set during the Declarant Control Period. Such standards may contain both objective and subjective elements. Because the Aliante Residential Community will be developed over a period of time, the Community-Wide Standard may evolve and change.

2.20    "Consent": Shall mean the written consent, affirmative vote or combination thereof, of the Person whose consent is so required.

2.21    "Cost Center": Cost Center shall refer to (i) Limited Common Elements or (ii) Improvements ("Cost Center Improvements") or (iii) services that are allocated exclusively to a group of Lots or (iv) portions of the Areas of Common Responsibility that are allocated exclusively to a group of Lots. A Cost Center may or may not be a Neighborhood. Any Cost Center and the Lots within a Cost Center, shall be designated (a) by Declarant in this Declaration or in a Supplemental Declaration, or (b) by resolution of the Board from time to time in accordance with the provisions of this Declaration, provided that for so long as Declarant owns any of the real property described in Exhibits "A" and/or "B" any such resolution by the Board shall require the Declarant's written consent. The Cost Centers in the initial property subject to this Declaration, if any, are designated in Exhibit "A" to this Declaration. Declarant, in its sole discretion, may allocate Limited Common Elements, Cost Center Improvements or services and the related Cost Center Expenses applicable to Lots that subsequently become part of the Property either to a new Cost Center or to an existing Cost Center.

2.22    "Cost Center Assessments": Assessments levied against the Lots in a particular Cost Center to fund Cost Center Expenses, as described in Section 8.3.

2.23    "Cost Center Expenses": The actual and estimated expenses that the Master Association incurs or expects to incur exclusively for the benefit of Owners of Lots generated by a particular Cost Center, which may include, without limitation, the expenses of maintaining, operating, insuring, repairing, and replacing Limited Common Elements, Cost Center Improvements, and Areas of Common Responsibility assigned to the Cost Center, a reasonable reserve for capital repairs and replacements and a reasonable administrative charge.

2.24    "Declarant": North Valley Enterprises, LLC, a Nevada limited liability company, or any successor, successor-in-title, or assign who takes title to any portion of the real property described in Exhibits "A" or "B" for the purpose of development and/or sale and who is designated as Declarant in a Recorded instrument executed by the immediately preceding Declarant.

2.25    "Declarant Assignment of Maintenance Obligation": Each and every Recorded document executed by Declarant, whereunder Declarant assigns and delegates to the Master Association, pursuant

20021127
01887

to the Development Agreement, any obligation to maintain, repair, and replace landscape areas located within certain trails, linear parks, open space, and/or median areas located on public property, including public right-of-way, which provides access to the Property, together with the Declarant's rights under the applicable License Agreement or any encroachment permit or similar permit, license, or agreement, with the City related to any such obligation. No consent or approval of the Master Association is required as a condition to any Declarant Assignment of Maintenance Obligation, and upon the Recordation of each Declarant Assignment of Maintenance Obligation the Master Association shall have the absolute obligation and duty to maintain the public property referred therein in a manner consistent with the terms of the Declarant Assignment of Maintenance Obligation, the Development Standards in effect from time to time under the Development Agreement and any applicable Architectural Guidelines.

2.26    "Declarant Control Period": The period of time during which Declarant is entitled to appoint and remove the entire Board of Directors (or a majority thereof). The Declarant Control Period shall terminate upon the first to occur of the following:

2.26.1  sixty (60) days after seventy-five percent (75%) of the Maximum Number of Lots have been conveyed to Owners other than a Builder or Declarant;

2.26.2  five (5) years after the Declarant or any Builder has ceased to offer Lots for sale in the ordinary course of business; or,

2.26.3  five (5) years after Recording the most recent Supplemental Declaration adding property to the Declaration as provided in Section 9.1 of this Declaration; or,

2.26.4  such later date as may be permitted under the Act.

Nothing in this Declaration shall preclude Declarant from voluntarily relinquishing control of the Board earlier than required by this Section. In such event, Declarant reserves the right to receive notice of proposed Master Association actions as provided in Section 3.19 of the Bylaws until such time as the Declarant Control Period would have otherwise expired.

2.27    "Delegates": The representative or alternate selected by the Members within each Neighborhood to represent the Neighborhood in Master Association matters other than those requiring a vote of the membership, as described in Section 6.4.2 or, in a Sub-Association, the officer designated pursuant to Section 6.4.2.

2.28    "Development Agreement": That certain Development Agreement between the City of North Las Vegas and Declarant dated as of January 16, 2002, Recorded in the Official Records of the County Recorder of Clark County Nevada on April 8, 2002, in Book 20020408 as Instrument No. 00884, as it may from time to time be amended or modified.

20021127
01887

2.29    "Development Declaration": A Recorded declaration of development covenants and restrictions between North Valley Enterprises, LLC and a Builder governing the Residences and other Improvements to be constructed by a Builder within a Neighborhood.

2.30    "Excluded Amenities": Certain real property and any Improvements and facilities thereon located adjacent to, in the vicinity of or within Aliante, that may be privately owned or privately operated by Persons other than the Master Association for commercial, recreational and related purposes, or publicly owned but not a part of the Property, including, without limitation, the Golf Course, and/or any other office facility, day care facility, sales center, communication tower(s), Golf Course club house, if any, which is so located and all related and supporting facilities and Improvements. Excluded Amenities are **NOT A PART OF** the Property and **NOT A PART OF** the Common Elements and **NOT SUBJECT TO** this Declaration. Excluded Amenity ownership and/or membership is **NOT A PART OF** and is separate from membership in the Master Association. Notwithstanding the foregoing, the owners and members of Excluded Amenities, and their respective tenants, guests, and other invitees, shall have an easement of access to, enjoyment of, and ingress and egress over, Lots and Common Elements as provided in Article 14 and Article 20 below.

2.31    "Golf Course": That real property generally shown on Exhibit "C" (located adjacent to but **NOT A PART OF** the Aliante Residential Community or Common Elements) together with the Improvements constructed thereon, which is part of the Excluded Amenities and which may be operated as a public or private golf course (including, without limitation, golf course and playing elements, club house, practice facilities, maintenance or storage facilities, driving ranges, parking lots, lakes, water hazards, trees, bunkers, berms, fairways, greens, and/or other related elements, facilities, features, or components).

2.32    "Golf Course Park": The Golf Course and the included park facilities. This term has the same meaning given it in the Development Declaration.

2.33    "Governing Documents": A collective term referring to this Declaration, any applicable Supplemental Declarations, and the Bylaws, Articles, Architectural Guidelines, Use Restrictions, and Rules.

2.34    "Home Owner": An Owner other than Declarant, a Builder or an Owner of a Multi-Family Lot.

2.35    "Improvements": A collective term referring to any structure, fixture or facilities existing or to be constructed on the real property which is included in the Property, including, but not limited to: buildings, pools, utility wires, pipes, light poles, walls, and trees and shrubbery.

2.36    "Law": Any federal, state or local law, ordinance, code, order or similar requirement, and rules and regulations promulgated by any federal, state, or local governmental authority. This term also includes orders, judgements, and decrees of courts of competent jurisdiction and other governmental authorities.

20021127
.01887

2.37    "License Agreement": An agreement between North Valley Enterprises, LLC or the Master Association and the City, pursuant to which Declarant or the Master Association is responsible to maintain any Public Use Area (as defined in the Development Agreement).

2.38    "Limited Common Elements": A portion of the Common Elements primarily benefitting one or more, but less than all, Lots, as more particularly described in Article 12 and being a "limited common element" as defined in the Act. Limited Common Elements shall initially consist of those Common Elements classified as Limited Common Elements in Exhibit "A," if any. Additional Limited Common Elements may also be designated in a Supplemental Declaration annexing such property into the Property.

2.39    "Lot": A Residential Lot or a Multi-Family Lot.

2.40    "Majority": Unless otherwise specifically defined in a provision of the Governing Documents, a majority of those votes, owners, or other groups as the content may indicate totaling more than fifty percent (50%) of the total eligible number.

2.41    "Manager": A Person possessing all licenses, permits and certifications as required by the Act or otherwise under applicable Law, employed or engaged to perform management services for the Aliante Residential Community and/or the Master Association.

2.42    "Master Association": Aliante Master Association, a Nevada nonprofit corporation, its successors or assigns. The Master Association is a "master association" under the Act.

2.43    "Master Plan": The master land use plan for the development of Aliante referred to in the Development Agreement, as it may be amended by Declarant in accordance with the Development Agreement. The Master Plan presently includes all of the real property described in Exhibit "A" and all of the Annexable Property. Inclusion of real property on the Master Plan shall not, under any circumstances, obligate Declarant to subject such real property to this Declaration, nor shall the omission of any part of the Annexable Property from the Master Plan bar its later submission to this Declaration as provided in Article 9.

2.44    "Maximum Number of Lots": Fifteen thousand (15,000) Lots. When created, the Aliante Residential Community shall contain three hundred twenty-eight (328) Residential Lots.

2.45    "Member": An Owner subject to membership in the Master Association pursuant to Section 6.2. A "Member in Good Standing" refers to a Member whose voting rights have not been suspended in accordance with Section 7.4.1.2 of this Declaration, who does not have outstanding any fines or assessments more than 30 days past due, or a Notice of Non-Compliance Recorded against his or her Lot.

2.46    "Mortgage": A mortgage, a deed of trust, a deed to secure debt, or any other form of security instrument affecting title to any Lot. A "Mortgagee" shall refer to a beneficiary or holder of a Mortgage.

20021127
.01887

2.47    "Multi-Family Lot": A contiguous portion of the Property, whether improved or unimproved (other than a Residential Lot, Common Elements, common property of any Sub-Association, and real property dedicated to the public), which may be independently owned and conveyed, which is intended to be developed for attached single family residential uses with Apartments, and which is not established as a separate "common-interest community" as defined in the Act. The term "Multi-Family Lot" shall mean all interests defined as "Unit" in NRS 116.11039. The term shall refer to the land, if any, which is part of the Multi-Family Lot as well as any Improvements, including any Apartment, thereon. The boundaries of each Multi-Family Lot shall be delineated on a Plat.

Prior to the completion of the Apartments on a Multi-Family Lot, any portion of the Property which is a parcel of vacant land or land on which Improvements are under construction shall be deemed to contain the number of Apartments that are designated for residential use for such parcel on the applicable Project Plan approved by Declarant pursuant to a Development Declaration Recorded by Declarant against the Multi-Family Lot. Until a Project Plan has been approved by Declarant, such parcel shall be deemed to contain the maximum number of permissible Apartments designated by Declarant under the Supplemental Declaration that operates to annex the parcel into the Aliante Residential Community, or if no designation is made by Declarant, the maximum number of permissible Apartments permitted under the applicable zoning designation for the parcel.

2.48    "Neighborhood": A Neighborhood is intended to include, and be limited to, a subdivision of the same type of housing product constructed by a single Builder (or its successor). A Neighborhood will generally be one of three types: (i) a Neighborhood governed by a Sub-Association; (ii) a Neighborhood with Limited Common Elements or a Cost Center and no Sub-Association; or (iii) a Neighborhood with no Limited Common Elements or Cost Center and no Sub-Association.

Where the context permits or requires, the term "Neighborhood" shall also refer to the Neighborhood Committee (an advisory committee established in accordance with the Bylaws) or Sub-Association, if any, having concurrent jurisdiction over the real property within the Neighborhood. Neighborhood boundaries may be established and modified only as provided in Section 6.4.

2.49    "Neighborhood Committee": A committee elected by the Owners in a Neighborhood to represent the interests of the Owners in that Neighborhood as set forth in Section 6.4.1.

2.50    "Notice" and "Notify": The giving of any notice required by this Declaration or the notice itself. Notice may be given in any manner permitted under the Rules and the Act, including, if so permitted: U.S. mail; electronic telecommunication (i.e., fax or "e-mail") with confirmation of receipt; publication in the community newsletter delivered or mailed to each Owner (provided that such notice is clearly identified under a separate headline in the newsletter) or posting.

2.51    "Notice of Non-Compliance": A Recorded notice, pursuant to Section 4.8 or Section 7.4.1 that an Owner or a Lot is not in compliance with the Governing Documents.

2.52    "NRS": The Nevada Revised Statutes, in effect from time to time.

20021127
.01887

2.53    "Occupy", "Occupies", "Occupant" or "Occupancy": Unless otherwise specified in the Governing Documents, staying overnight in a particular Residence for at least sixty (60) days in the subject calendar year.

2.54    "Owner": One or more Persons, which may include Declarant, who hold the record title to any Lot, but excluding in all cases any Person holding an interest merely as security for the performance of an obligation. If a Lot is sold under a Recorded contract of sale, and the contract specifically so provides, the purchaser (rather than the fee owner) will be considered the Owner.

2.55    "Person": A natural person, a corporation, a partnership, a trustee, a limited liability company, a municipal entity, or any other legal entity.

2.56    "Plat": A final subdivision map or parcel map for any portion of the Property, together with such other information regarding the Property as may be required by the Act, other Laws, or included in the discretion of Declarant, as they may be amended and supplemented from time to time and Recorded.

2.57    "Project Plan": The approved plans for the development and construction of a Neighborhood in accordance with a Development Declaration.

2.58    "Property": The real property described in Exhibit "A," together with such additional real property as is made subject to this Declaration in accordance with Article 9 and the Act. Exhibit "A" and each Supplemental Declaration that subjects real property to the Declaration shall provide a legal description of the Common Elements and Limited Common Elements included therein, if any.

2.59    "Record", "Recording", "Recorded", or "Recording": To file, the filing, or filed of record with the Office of the County Recorder of Clark County, Nevada. The date of Recording shall refer to that time at which a document, map, or Plat is Recorded.

2.60    "Representation District": Any area within the Property that is designated as a Representation District as more particularly described in Section 6.5.

2.61    "Residence": Each building or structure situated upon a Residential Lot that is intended for use and Occupancy as an attached or detached residence for a single family. Notwithstanding the above, an ancillary "guest house," "casita," or "in-law suite" on a Residential Lot shall not be a separate Residence but, instead, shall be deemed a part of the structure serving primarily as the Residence on the Residential Lot.

2.62    "Residential Lot": A contiguous portion of the Property, whether improved or unimproved (other than a Multi-Family Lot, Common Elements, common property of any Sub-Association, and real property dedicated to the public), which may be independently owned and conveyed and which is intended to be developed with a Residence. The term shall mean all interests defined as "Unit" in NRS 116.11039. The term shall refer to the land, if any, that is part of the Residential Lot as well as any Improvements, including any Residence, thereon. The boundaries of each Residential Lot shall be delineated on a Plat.

20021127
.01887

Prior to the Recordation of a Plat on a Residential Lot, any portion of the Property which is a parcel of vacant land shall be deemed to contain the number of Residential Lots designated for such parcel on the applicable Project Plan approved by Declarant pursuant to a Development Declaration Recorded by Declarant against the parcel. Until a Project Plan has been approved by Declarant, such parcel shall be deemed to contain the maximum number of permissible Residential Lots designated by Declarant under the Supplemental Declaration that operates to annex the parcel into the Aliante Residential Community, or if no designation is made by Declarant, the maximum number of permissible Residential Lots permitted under the applicable zoning designation for the parcel.

2.63    "Reviewing Builder": The Builder to whom pursuant to Section 4.2.1 Declarant has delegated the obligation to review new construction (other than that installed by such Builder) and modifications and to administer and enforce the architectural controls for a portion of the Aliante Residential Community, as more specifically provided in Article 4, until such time as the Declarant revokes the delegation or the ARC is established.

2.64    "Rules": Rules, regulations, restrictions and guidelines relating to an Owner's use of his or her Residential Lot, the use of Common Elements and conduct of Persons on the Property, as more specifically authorized and provided for in Section 3.2 of this Declaration.

2.65    "Special Assessment": Assessments levied in accordance with Section 8.5.

2.66    "Specific Assessment": Assessments levied against a particular Lot or Lots for expenses incurred or to be incurred by the Master Association for the purposes described in Section 8.6.

2.67    "Sub-Association": An owners association (as defined in the Act) having subordinate, concurrent jurisdiction with the Master Association over any Neighborhood which is organized and established or authorized pursuant to or in connection with a Supplemental Declaration. Nothing in this Declaration shall require the creation of a Sub-Association for any Neighborhood.

2.68    "Supplemental Declaration": An instrument Declarant executes that amends this Declaration pursuant to Article 9 and the Act and subjects additional real property to this Declaration, and which may otherwise contain such information as more fully set forth in Section 9.1.3.

2.69    "Use Restrictions": The use restrictions set forth in Section 3.5 of this Declaration.

2.70    "Violators": An Owner, Occupant or other Person determined by the Board, after notice and a hearing in accordance with the procedures set forth in the Rules, to be in violation of the Governing Documents.

2.71    Additional Defined Terms. The following terms are defined elsewhere in this Declaration:

2.71.1    "Aliante Residential Community" in Section 1.1;

20021127
.01887

2.71.2 "Authorized Reviewer" in Section 4.3.2.2;

2.71.3 "Benefitted Property" in Section 14.4.1;

2.71.4 "Benefitted Property Owner" in Section 14.4.1;

2.71.5 "Burdened Property" in Section 14.4.1;

2.71.6 "Business" or "trade" in Section 3.5.1.2.4;

2.71.7 "chemical substances" in Section 20.3.1;

2.71.8 "Claimant" in Section 15.5.1;

2.71.9 "Cost Center Improvements" in Section 2.21;

2.71.10 "Declarant Marks" in Section 10.11;

2.71.11 "Eligible Holder" in Section 16.1;

2.71.12 "established drainage pattern" in Section 3.5.1.14;

2.71.13 "expected minor flaws" in Section 20.4.4;

2.71.14 "Golfers" in Section 20.3.1;

2.71.15 "leasing" in Section 3.5.2.1;

2.71.16 "Maintenance Facility" in Section 20.3.2;

2.71.17 "Maximum Authorized Base Assessment" in Section 8.2;

2.71.18 "Maximum Authorized Common Assessment" in Section 8.2;

2.71.19 "Notice" in Section 15.5.1;

2.71.20 "overspray" in Section 20.3.1;

2.71.21 "Parties" in Section 15.1.1;

2.71.22 "Plans" in Section 4.3.2.1;

2.71.23 "Protected Persons" in Section 4.7;

20021127
.01887

2.71.24 "Public Use Acreage" in Section 1.1;

2.71.25 "Respondent" in Section 15.5.1;

2.71.26 "rubbish and debris" in Section 3.5.1.6;

2.71.27 "Sight Visibility Restriction Areas" in Section 3.5.1.16;

2.71.28 "Termination of Negotiations" in Section 15.5.2;

2.71.29 "Volunteer" in Section 7.6.3.1;

## PART TWO: CREATION AND MAINTENANCE OF COMMUNITY STANDARDS

*The standards for use, conduct, maintenance, and architecture within the Aliante Residential Community are what give the community its identity and make it a place that people want to call "home." Yet those standards must be more than a static recitation of "thou shalt not's." This Declaration establishes procedures for rulemaking as a dynamic process that allows the community standards to evolve as the community grows and as technology evolves.*

## Article 3    Use and Conduct

3.1     Framework for Regulation. The Governing Documents establish, as part of the general plan of development for the Property, a framework of affirmative and negative covenants, easements, and restrictions governing the Property, including the establishment of the Use Restrictions set forth in Section 3.5. Within that framework, the Board and the Members must have the ability to respond to unforeseen problems and changes in circumstances, conditions, needs, desires, trends, and technology that inevitably will affect the Aliante Residential Community, its Owners and Occupants.   With this in mind, Sections 3.2 through 3.5 below establish procedures for the creation, modification and expansion of Rules.

3.2     Rule Making Authority.

3.2.1     Board's Authority. Subject to the terms of the Governing Documents, the Act, and the Board's duty to exercise business judgment on behalf of the Master Association and its Members, the Board may (i) create and enforce reasonable Rules governing the use of the Property, including the Areas of Common Responsibility and Lots, consistent with other provisions in the Governing Documents; and (ii) may, subject to the same limitations, modify, cancel, limit, create exceptions to, or expand the Rules. Delegates and Members shall have an opportunity to be heard at a Board meeting prior to such action being taken, subject to reasonable Board imposed restrictions.  Rules shall include, if necessary, procedural rules and regulations governing enforcement of the restrictions contained in the Rules (including without limitation notice and hearing procedures).  After termination of the Declarant Control Period, the creation, modification, termination or other action with respect to Rules shall become effective, after compliance with Section 3.2.3 below, unless acting at a meeting, Members representing a Majority of the total votes in the

20021127
.01887

Master Association and Declarant (for so long as Declarant owns any real property described on Exhibits "A" and/or "B") disapprove the action. The Board shall have no obligation to call a meeting to consider disapproval prior to the termination of the Declarant Control Period, and thereafter, only upon receipt of a petition signed by Owners representing at least ten percent (10%) of the total votes of the Master Association as required for special meetings in the Bylaws. Upon receipt of such petition prior to the effective date of any Board action under this Section 3.2.1 and after termination of the Declarant Control Period, the proposed action shall not become effective until after such meeting is held, and then subject to the outcome of such meeting.

      3.2.2   Members' Authority.  As an alternative to Rules being adopted by the Board as set forth in Section 3.2.1 above, following the termination of the Declarant Control Period the Members, at a Master Association meeting duly called for such purpose and in accordance with the Bylaws, may adopt provisions that create, modify, cancel, limit, create exceptions to, or expand the Rules by a vote of Delegates representing a Majority of the total votes in the Master Association and the approval of Declarant, for so long as it owns any real property described on Exhibits "A" and/or "B."

      3.2.3   Notice. At least thirty (30) days prior to the effective date of any action taken under Sections 3.2.1 or 3.2.2, the Board shall Notify each Owner of the new Rules or explanation of any modifications to the existing Rules (which Notice shall include a copy of any new or modified Rules), and specify the effective date. Upon written request by a Member or Mortgagee, the Master Association shall provide, without cost, a single copy of the newly revised Rules to a Mortgagee. The Master Association may charge a reasonable fee for additional copies of the revised Rules.

      3.3   Owners' Acknowledgment and Notice to Purchasers. All Owners are given notice that use of their Lots and the Common Elements is limited by the Rules as may be created, amended, expanded, and otherwise modified. Each Owner, by acceptance of a deed, acknowledges and agrees that the use and enjoyment and marketability of his or her Lot can be affected by this provision and that the Rules may change from time to time as provided under Section 3.2. All purchasers of Lots are on notice that changes may have been adopted by the Master Association. Copies of the current Rules may be obtained from the Master Association. Unless otherwise restricted by the Act or this Declaration, the Master Association may charge a reasonable fee for copies of the Rules.

      3.4   Protection of Owners and Others. The Rules shall be subject to and consistent with applicable Laws, the Development Agreement and Design Standards, the Declaration or any Supplemental Declaration approved by Declarant, the Bylaws, and the Architectural Guidelines, and must be adopted without intent to circumvent or evade the requirements and provisions of any of the foregoing. Additionally, no Rule or any other action by the Master Association or Board shall unreasonably hinder or impede the rights of Declarant and/or Builders to develop the Property and the real property described on Exhibit "B" in accordance with the rights reserved to the Declarant in this Declaration and the Act.  Subject to and without limiting the foregoing, no Rule shall be adopted or enforced in violation of any of the following provisions:

20021127
01867

3.4.1    No Authorization To Change Architectural Guidelines. Neither the Board nor the Master Association shall have the authority to modify, repeal, or expand the Architectural Guidelines without the approval of Declarant, for so long as it owns any real property described on Exhibit "A" and/or "B." In the event of a conflict between the Architectural Guidelines and the Rules, the Architectural Guidelines shall control.

3.4.2    Limitation with Respect to Rules Relating to Multi-Family Lots. Nothing in this Article shall authorize the Board or the Master Association to adopt, revise, or otherwise modify any Rules that would operate to interfere with or limit the right of each Owner of a Multi-Family Lot to lease the Apartments located thereon for residential use.

3.4.3    Abridging Existing Rights. If any new or amended Rule would otherwise require an Owner to dispose of personal property which he or she installed and maintained in or on a Lot prior to the effective date of such regulation and such personal property was installed and maintained or such Occupancy was in compliance with the Governing Documents and the Rule previously in force, such new or amended Rule shall not apply to any such Owner without his or her consent.

3.4.4    Activities Within Residences and Apartments. No Rule shall interfere with the activities carried on within the confines of Residences or Apartments, except that the Master Association may prohibit activities not normally associated with residential dwellings or residential neighborhoods, and it may restrict or prohibit any activities that create monetary costs for the Master Association or other Owners, that create a danger to the health or safety of Occupants of other Residences, that generate excessive noise, traffic or odor, that create unsightly conditions visible outside the Residence or Apartment, that create an unreasonable source of annoyance, or that otherwise violate any Law.

3.4.5    Alienation. No Rule shall place a blanket prohibition on the lease or transfer of any Lot or require the Master Association's consent before the lease or transfer of any Lot that is more restrictive than the provisions contained in Section 3.5.2.1. However, the Master Association may (i) impose a reasonable fee on the lease or conveyance of a Residential Lot based upon the Master Association's related administrative costs; (ii) require that Owners provide the Master Association Notice of any lease or transfer; (iii) require Owners of Residential Lots to use lease forms reasonably approved by the Board; and (iv) require Owners of Residential Lots to furnish a copy of all leases to the Master Association or the Board.

3.4.6    Displays; Signs. The rights of Owners to display religious and holiday signs, symbols, and decorations, inside structures on their Lots, of the kinds normally displayed in dwellings located in single-family residential neighborhoods shall not be abridged, except that the Rules may, to the maximum extent permitted by applicable Law, regulate the time, place, manner and duration of any displays visible from outside the Residences or Apartments. No Rule shall regulate the content of political signs; however, Rules may, to the maximum extent permitted by applicable Law, regulate the time, place and manner of posting such signs (including reasonable design criteria).

20021127
.01887

3.4.7    Reasonable Rights To Develop. No Rule, or any other action by the Master Association or Board shall unreasonably impede the rights of Declarant or any Builder to develop the Property in accordance with the rights reserved to the Declarant and Builders in this Declaration and the Act.

The limitations in Sections 3.4.1 through 3.4.7 shall only limit rulemaking authority exercised under Section 3.2; they shall not apply to amendments to this Declaration adopted in accordance with Article 19 and the Act.

3.5    Use Restrictions. Subject to the rights and exemptions of Declarant and the Builders as set forth in this Declaration, all real property within the Property shall be held, used and enjoyed subject to the limitations, restrictions and other provisions set forth in this Section 3.5. Any other provision herein notwithstanding, neither Declarant, a Builder, the Master Association, the ARC, nor their respective managers, directors, officers, members, agents or employees shall be liable to any Owner or to any other Person as a result of the failure to enforce any Use Restriction or for the granting or withholding of a waiver or modification of a Use Restriction as provided herein. Additional or supplemental Use Restrictions may be promulgated from time to time in Recorded Supplemental Declarations. Any Supplemental Declaration or any additional Recorded covenants may impose stricter standards than those contained in this Article and the Master Association shall have standing and the power to enforce such standards.

3.5.1    Use Restrictions Applicable to all Lots.

3.5.1.1    Residential and Related Uses. The Lots shall be used only for residential and ancillary recreational and related purposes. Related purposes may include, without limitation, offices for any management agent or agents retained by the Master Association or the Owner of a Multi-Family Lot, business offices for Declarant, the Owner of a Multi-Family Lot or the Master Association consistent with this Declaration and any Supplemental Declaration and the leasing of the Residences with the Active Adult Community on a temporary basis pursuant to Section 3.5.1.3.2 hereof. In addition, any commercial activity that directly advances the residential and recreational character of the Property may be authorized by Declarant or the Master Association, unless prohibited by the Governing Documents.

3.5.1.2    Business Use. No business or trade, garage sale, moving sale, rummage sale, or similar activity shall be conducted in or from any Apartment, Residence or Lot, except as may be expressly permitted by the Rules. Provided, however, that an Owner or Occupant may conduct business activities within an Apartment or Residence so long as:

3.5.1.2.1    the existence or operation of the business activity is not apparent or detectable by sight, sound, or smell from outside the Apartment or Residence;

3.5.1.2.2    the business activity conforms to all zoning, business licensing and other land use requirements applicable to the Property and the activity;

20021127
.01887

3.5.1.2.3     the business activity does not involve regular visitation of the Apartment or Residence by clients, customers, suppliers, or other business invitees or door-to-door solicitation of Occupants of the Property; and

3.5.1.2.4     the business activity is consistent with the residential character of the Property and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other Occupants of the Property, as may be determined in the sole discretion of the Board.

"Business" or "trade" shall be construed to have their ordinary, generally accepted meanings and shall include, without limitation, any occupation, work, or activity undertaken on an ongoing basis that involves the provision of goods or services to Persons other than the family of the producer of such goods or services and for which the producer receives a fee, compensation, or other form of consideration, regardless of whether (a) such activity is engaged in full or part time, (b) such activity is intended to or does generate a profit, or (c) a license is required.

3.5.1.3   Exceptions. Section 3.5.1.2 shall not prohibit or restrict: (i) any activity permitted under Article 10 hereof; or (ii) any other activity conducted by the Master Association or a Person approved by the Master Association for the purpose of operating, maintaining or advancing the residential character of the Property; (iii) the leasing and management activities of the Owner of any Multi-Family Lot; or (iv) the leasing activities by the Builder of Residential Lots in the Active Adult Sub-Association permitted under Section 3.5.2.1 hereof.

3.5.1.4   Animals and Pets. No animals of any kind, including livestock and poultry, shall be raised, bred, or kept on any Lot, except that a maximum of three (3) household pets is permitted in each Apartment or Residence, the composition of which may include dogs, cats, birds, or other pets as determined from time to time by the Board. Pets that are permitted to roam free, or which, in the sole discretion of the Board, endanger the health of other Persons, make objectionable noise, or constitute a nuisance or inconvenience to the Owners or others within the Property shall be removed upon the Board's request. If the Owner fails to honor such request, the Board may cause the pet to be removed. The Board may adopt reasonable Rules designed to minimize damage and disturbance to other Owners and Occupants, including Rules requiring damage deposits, waste removal, leash controls, noise controls, and limits based on any reasonable factor, including size and capacity of the Apartment or Residential Lot and fair share use of the Common Elements; provided, however, any Rules prohibiting the keeping of ordinary household pets shall apply prospectively only and shall not require the removal of any pet that was being kept on the Property in compliance with the Rules in effect prior to the adoption of such regulation. The Board may also adopt Rules that prohibit pets from certain Common Elements locations. Nothing in this provision shall prevent the Master Association from requiring removal of any animal that presents an actual threat to the health or safety of Occupants or from requiring abatement of any nuisance or unreasonable source of annoyance. No pets shall be kept, bred, or maintained for any commercial purpose.

3.5.1.5   No Hazardous Activities. No activities shall be conducted, nor shall any Improvements be constructed on any Lot which are or might be unsafe or hazardous to any Person, Lot,

20021127
.01887

or Common Elements. Without limiting the foregoing, (a) no firearm shall be discharged within the Property, and (b) there shall be no exterior or open fires whatsoever, except a regular barbecue fire contained within a receptacle commercially designed therefor or specifically authorized in writing by the ARC, while attended and in use for cooking purposes, so that no fire hazard is created and subject to applicable ordinances and fire regulations.

3.5.1.6   Nuisances. No rubbish, clippings, refuse, scrap lumber or metal; no grass, shrub or tree clippings; and no plant waste, compost, bulk materials, or other debris of any kind; (all, collectively, hereinafter, "rubbish and debris") shall be kept, stored or allowed to accumulate on any Lot unless stored within an enclosed structure or container that has been approved by the ARC, or unless such matter is screened from view in a manner approved by the ARC, and no odor arises therefrom so as to render the Property or any portion thereof unsanitary or offensive. Without limiting the foregoing, a refuse container, the use of which has been approved by the ARC, containing such materials, may be placed outside at times reasonably necessary (not to exceed twelve (12) hours before or after scheduled trash collection hours on Residential Lots) to permit garbage or trash pickup. No noxious or offensive activities (including, but not limited to the repair of motor vehicles) shall be carried out on the Property. No noise or other nuisance shall be permitted to exist or operate upon any portion of a Lot so as to be offensive or detrimental to any other Lot or to occupants thereof, to the Common Elements, or to the Excluded Amenities and/or the Golf Course or Golfers. Without limiting the generality of any of the foregoing provisions, no exterior speakers, horns, whistles, bells or other similar or unusually loud sound devices (other than devices used exclusively for safety, security or fire protection purposes), noisy or smokey vehicles, large power equipment or large power tools (excluding lawn mowers and other equipment utilized in connection with ordinary landscape maintenance), inoperable vehicle, unlicensed off-road motor vehicle, or other item that may unreasonably disturb other Owners or Occupants, or any equipment or item that may unreasonably interfere with television or radio reception within any Lot, or the Common Elements, shall be located, used or placed on any portion of the Property without the prior written approval of the ARC. No loud motorcycles, dirt bikes or other loud mechanized vehicles may be operated on any portion of the Areas of Common Responsibility without the prior written approval of the ARC, which approval may be withheld for any reason whatsoever. Alarm devices used exclusively to protect the security of a Residence or Apartment and its contents shall be permitted, provided that such devices do not produce annoying sounds or conditions as a result of frequently occurring false alarms. The Board shall have the right to determine if any noise, odor, or activity producing such noise or odor constitutes a nuisance. Each Owner and Occupant shall comply with all of the requirements of the local or state health authorities and with all other governmental authorities with respect to the Occupancy and use of a Lot.

3.5.1.7   Garages. Garages shall be used only for the their ordinary and normal purposes. Unless constructed or installed by Declarant (or Builder, as applicable) as part of its original construction, no Owner or Occupant may convert the garage on his or her Lot into living space or otherwise use or modify a garage so as to preclude regular and normal parking of vehicles therein, without the prior written approval of the ARC in its sole discretion.

3.5.1.8   Temporary Structures; Sports Equipment. Unless authorized by Declarant during initial construction within the Property or unless approved by the ARC, no tent, shack, or other

20021127
01887

structure of a temporary nature, which is visible from any adjacent street or sidewalk, shall be placed or constructed on any Lot. Temporary structures used during the construction or repair of a Residence, Apartment, or other Improvements shall be removed immediately after the completion of construction or repair. Furthermore, no basketball backboard, jungle gym, play, equipment, or other sports apparatus, whether temporary or permanent, shall be constructed, erected, or maintained on the Property without the prior written approval of the ARC.

3.5.1.9  Signs.  Subject to the reserved rights of Declarant in this Declaration (and any reserved rights of a Builder with regard to such Builder's subdivision), no flag, flag pole, balloon, beacon, banner, sign (including "open house" signs), poster, display, billboard or other advertising device or other display of any kind shall be installed or displayed to public view on any portion of a Lot, or on any public street abutting the Property, without the prior written approval of the ARC, except: (a) one (1) sign for each Residential Lot, advertising for sale or lease a privately owned Residential Lot, provided such sign conforms to the specifications promulgated (from time to time) by the ARC, relating to dimensions, design, number, style, and location of display; (b) one (1) flag of the United States of America, the State of Nevada or other type approved by the ARC may be displayed on each Lot, provided such flag is flown from a flagpole that conforms to the specifications promulgated (from time to time) by the ARC, relating to size and location of the flagpole and provided that the flagpole on any Residential Lot is attached to the front of the Residence in a location approved by the ARC; (c) one (1) sign for each Multi-Family Lot, advertising for Apartments therein for lease, provided such sign conforms to the specifications promulgated (from time to time) by the ARC, relating to dimensions, design, number, style, and location of display; and (d) traffic, entry, directional and other signs installed by Declarant or Builder as part of the original construction of the Property. All signs or billboards and the conditions promulgated for the regulation thereof shall conform with the Development Agreement, including Design Standards, and all applicable Laws.

3.5.1.10  TV Antennas and Satellite Dishes.  Standard TV antennas and other over-the-air reception devices (including satellite dishes) of less than one (1) meter in diameter shall be permitted upon any Lot. Installation of standard TV antennas and over-the-air reception devices shall comply with any and all Architectural Guidelines, or other applicable rules and guidelines adopted by the ARC or the Board; provided, however, that such guidelines do not unreasonably increase the cost of installing, maintaining, or using such devices. Declarant and/or the Master Association shall have the right, without obligation, to erect an aerial, satellite dish, or other apparatus (of any size) for a master antenna, cable, or other communication system for the benefit of all or any portion of Aliante, including the Property, should any master system or systems require such exterior apparatus.

3.5.1.11  Exterior Maintenance and Repair; Owner's Obligations.  No property or Improvement on a Lot shall be permitted to fall into disrepair, and all property (including any Improvements) in the Property shall at all times be kept in a safe condition, and in good condition and repair. If any Owner or Occupant shall permit any Lot, which is the responsibility of such Owner or Occupant to maintain, to fall into disrepair so as to create a dangerous, unsafe, unsightly or unattractive condition, the Board, after consulting with the ARC, and after affording such Owner or Occupant reasonable Notice, shall have the right but not the obligation to correct such condition, and to enter upon such Owner's Lot, for the purpose of so doing, and such Owner and/or Occupant shall promptly reimburse

20021127
.01887

the Master Association for the cost thereof. Such cost may be assessed as a Specific Assessment pursuant to the Declaration, and, if not paid timely when due, shall constitute an unpaid or delinquent assessment for all purposes of this Declaration. The Owner and/or Occupant of the offending Lot shall be personally liable for all costs and expenses incurred by the Master Association in taking such corrective acts, plus all costs incurred in collecting the amounts due. Each Owner and/or Occupant shall pay all amounts due for such work within ten (10) days after receipt of written demand therefor. The Master Association shall have no liability whatsoever for any damage done to an Owner's Lot as a result of such entrance and repair, provided, however, that the Master Association was acting in good faith.

3.5.1.12 Vehicles and Parking. No Person shall park, store, or keep on any street (public or private) or anywhere else within the Property any vehicle of any kind unless otherwise permitted by this Declaration. The following parking is permitted:

3.5.1.12.1. Temporary guests and Occupants shall be permitted to park within the Aliante Residential Community on the streets or within spaces and areas clearly marked for such purpose, if any, and for no longer than 48 consecutive hours.

3.5.1.12.2. Recreational vehicles (including, but not limited to, any camper unit, house car or motor homes, trailers, trailer coaches, camp trailers, watercraft, boats, aircraft, or mobile homes); provided that such recreational vehicles are kept or parked: (a) within the street but not left overnight; (b) within an authorized "R.V. Storage Area" (if any, designated as such by the Board) subject to all applicable Rules; and/or (c) subject to prior written approval of ARC, parked on a Residential Lot, but subject to all location, size, height, screening, and other restrictions, as determined by the ARC in its sole discretion.

3.5.1.12.3. During construction of the Property by Declarant or a Builder, construction vehicles may be parked in the street but may not be left overnight.

3.5.1.12.4. Maintenance and homeowner Improvement contractor's vehicles may be parked in the street but may not be left overnight.

3.5.1.12.5. Delivery vehicles may be parked in the street for loading and unloading.

The Master Association, through its officers, committees and agents is hereby empowered to establish "parking" and "no parking" areas within the parking areas of the Property, if any, as well as to enforce these parking limitations by all means lawful for such enforcement on public streets. No disabled, unregistered, or unlicensed vehicle shall be permitted to be parked on any street or elsewhere within the Property. Notwithstanding any of the foregoing, one camper truck, van, or similar vehicle, up to and including one (1) ton, when used for everyday-type transportation, may be kept or parked wholly enclosed within an Owner's garage. Without limiting the foregoing, no Owner shall park, store, or keep, anywhere within the Property, any vehicle or vehicular equipment, mobile or otherwise, deemed by the Board or the ARC to be a nuisance. No Person shall perform repair or restoration of any motor vehicle, trailer,

20021127
.01887

watercraft, aircraft, or other vehicle, upon any portion of the Property or on any street abutting the Property; provided that repair and/or restoration of one motor vehicle shall be permitted, but only if performed wholly within an Owner's garage with the garage door closed; provided further that such activity may be prohibited entirely by the Board or ARC if either determines, in its respective reasonable discretion, that such activity constitutes a nuisance. Each Owner and/or Occupant shall maintain his or her garage in a manner which ensures that the garage is capable of regularly and normally accommodating as many vehicles as it was originally designed to accommodate. Garages shall be kept closed at all times, except as reasonably required for ingress to and egress therefrom. The Board may establish Rules further governing or restricting parking (including, but not limited to, any guest parking in specifically designated areas). Notwithstanding any of the foregoing, these restrictions shall not be interpreted in such manner as to permit any activity contrary to any applicable Laws.

   3.5.1.13 <u>Insurance Rates</u>. Without the prior written approval of the ARC and the Board, nothing shall be done or kept in the Property or on a Lot which will increase the rate of insurance on any Lot or other portion of the Property, nor shall anything be done or kept in the Property that would result in the cancellation of insurance on any Lot or other portion of the Property or that would be a violation of any applicable Law. Any other provision herein notwithstanding, neither the ARC nor the Board shall have any power whatsoever to waive or modify this restriction.

   3.5.1.14 <u>Drainage</u>. By acceptance of a deed to a Lot, each Owner agrees that he or she shall not in any way interfere with or alter, or permit any Occupant to interfere with or alter, the established drainage pattern over any Lot, so as to affect said Lot, any other Lot, or the Common Elements, unless adequate alternative provision is made for proper drainage and approved in advance and in writing by the ARC. Any request therefor shall be subject to Article 4 of the Declaration, including, but not necessarily limited to, any condition imposed by the ARC, and further shall be subject to the Owner obtaining all necessary governmental approvals. For the purpose hereof, "established drainage pattern" is defined as the drainage which exists at the time that such Lot is conveyed to a Home Owner from a Builder, or later grading changes which are shown on plans and specifications approved by the ARC.

   3.5.1.15 <u>Alterations</u>. There shall be no excavation, construction, alteration or erection of any projection which in any way alters the exterior appearance of any Improvement from any street, or from any other portion of the Property without the prior approval of the ARC pursuant to Article 4 hereof. There shall be no violation of the setback, side yard or other requirements of local governmental authority, notwithstanding any approval of the ARC. This Section shall not be deemed to prohibit minor repairs or rebuilding that may be necessary for the purpose of maintaining or restoring a Lot to its original condition.

   3.5.1.16 <u>Sight Visibility Restriction Areas</u>. The maximum height of any and all Improvements (including, but not necessarily limited to, landscaping), on any "Sight Visibility Restriction Areas" set forth on a Plat, shall be restricted to a maximum height as set forth on the Plat. In the event that any Improvement located on any Sight Visibility Restriction Area on a Lot exceeds the maximum height permitted by the relevant Plat, the Master Association shall have the power and an easement (but not the obligation) to enter upon such Lot and to bring such Improvement into compliance, and the Owner of such

20021127
.01887

Lot shall be solely liable for the costs thereof and any and all costs reasonably related thereto, all of which costs may be assessed against such Owner as a Specific Assessment under this Declaration.

3.5.1.17 Time-Sharing. No Multi-Family Lot shall be made subject to any type of timesharing, fraction-sharing, or similar program whereby the right to exclusive use of an Apartment located thereon rotates among members of a program on a fixed or floating time schedule over a period of years. However, Declarant hereby reserves the right for itself and its assigns to operate such a program.

3.5.1.18 No Waiver. The failure of the Board or ARC to insist in any one or more instances upon the strict performance of any of the terms, covenants, conditions or restrictions of this Declaration, or to exercise any right, power or option herein contained, or to serve any Notice or to institute any action, shall not be construed as a waiver or a relinquishment for the future of such term, covenant, condition or restriction, but such term, covenant, condition or restriction shall remain in full force and effect. The receipt by the Board or Manager of any assessment from an Owner with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by the Board or Manager of any provision hereof shall be deemed to have been made unless expressed in writing and signed by the Board or the Manager.

### 3.5.2    Use Restrictions Applicable to all Residential Lots.

3.5.2.1    Leasing of Residences. For purposes of this Section 3.5.2.1, "leasing" is defined as regular, exclusive Occupancy in a Residence by any Person other than the Owner, for which the Owner receives any consideration or benefit, including, but not limited to, rent or any other fee, service, gratuity, or emolument. The leasing of a Residence shall not be considered a business or trade within the meaning of Section 3.5.1.2. Residences may be leased only in their entirety. No fraction or portion may be leased. Any failure by the lessee of such Lot to comply with the terms of the Governing Documents shall constitute a default under the lease or rental agreement. Except as expressly permitted under Section 3.5.2.1.2 hereof, the lease of all Residences shall be governed by Section 3.5.2.1.1 below.

3.5.2.1.1    By Owner.    No Residence may be leased for a term less than twelve (12) months. All leases shall be in writing. Notice of any lease, together with such additional information as may be required by the Board, shall be given to the Board or its designee by the Owner within ten (10) days of execution of the lease. The Owner must make available to the tenant copies of the Governing Documents. The Board may adopt reasonable Rules regulating leasing and subleasing by an Owner.

3.5.2.1.2    By Builder of Lots Within Active Adult Sub-Association. Declarant shall have the right to grant to the Builder of Residential Lots (or an affiliate of such Builder) within the Active Adult Community the on-going right to lease up to twenty-five (25) Residences on a temporary basis to prospective purchasers of Residential Lots within the Active Adult Community. Any right granted to a Builder by Developer under this Section 3.5.2.1.2, shall be made in a Recorded Supplemental Declaration that sets forth the terms and conditions of the Builder's right to lease Residences. Notwithstanding any provision contained herein to the contrary, leases of Residences under this Section

20021127
.01887

3.5.2.1.2 may be for a term less than twelve (12) months and all such leases shall not be required to be given to the Master Association or the Board; provided, however, that the Master Association shall be given written Notice of each such lease, the name of the tenant(s), the term of the lease and any additional information as may be reasonably required by the Board.

3.6    Occupants Bound.  All of the use restrictions set forth in Section 3.5 shall apply to all Occupants, guests, and invitees of all Lots (as applicable).  Every Owner shall cause all Occupants, guests, and invitees of his or her Lot to comply with the Governing Documents and shall be responsible for all violations and losses to the Areas of Common Responsibility caused by such Persons, notwithstanding the fact that such Persons also are fully liable and may be sanctioned for any violation.

3.7    Declarant and Builder Exemption.  Each Lot owned by either Declarant or a Builder shall be exempt from provisions set forth in Section 3.5, until such time as title to the Lot is transferred to a Home Owner or Owner of the Multi-Family Lot is engaged in Apartment leasing.  The activities of Declarant and each Builder that are reasonably related to the development, construction and marketing of the Property, shall be exempt from the provisions set forth in Section 3.5 and the Rules.  This Section 3.7 may not be amended without Declarant's prior consent, and any purported amendment in violation of this provision shall be null and void.

## Article 4    Architecture and Landscaping

4.1    General.  No structure or thing shall be placed, erected, installed, or posted on the Property and no Improvements or other work (including staking, clearing, excavation, grading, and other site work, exterior alterations of existing Improvements, or planting or removal of landscaping) shall take place within the Property, except in compliance with this Article and the Architectural Guidelines.

No approval shall be required to repaint the exterior of a structure in accordance with the originally approved color scheme or to rebuild in accordance with originally approved drawings and specifications.  Any Owner may remodel, paint, or redecorate the interior of his or her Residence or Apartment without approval.  However, modifications to the interior of screened porches, patios, windows, and similar portions of a Residence or Apartment visible from outside the structure shall be subject to the approval process set forth in this Article 4.

Subject to Section 6.1 below, all dwellings constructed on any portion of the Property shall be designed by and built in accordance with the drawings and specifications of an architect or building designer licensed in Nevada, unless otherwise approved by Declarant or its designee in its sole discretion.

This Article shall not apply to (i) the Master Association after the Declarant Control Period, or (ii) the Declarant at any time, or (iii) a Builder exempt under Section 4.6.1 at any time, or (iv) the Active Adult Sub-Association under Section 4.6.2 at any time.

20021127
.01887

4.2     Architectural Review.

4.2.1    By Declarant. Each Owner, by accepting a deed or other instrument conveying any interest in any portion of the Property, acknowledges that, as the developer of the Property and as an Owner of portions of the Property as well as other real property within the vicinity of the Property, Declarant has a substantial interest in ensuring that the Improvements within the Property enhance Declarant's reputation as a community developer and do not impair Declarant's ability to market, sell, or lease its real property. Therefore, each Owner agrees that no activity within the scope of this Article shall be commenced on such Owner's Lot unless and until Declarant or its designee (which may include the Builder within a Neighborhood) has given its prior written approval for such activity, which approval may be granted or withheld in the sole discretion of Declarant or its designee.

In reviewing and acting upon any request for approval, Declarant or its designee shall act solely in the interest of Declarant and shall owe no duty to any Person other than Declarant. The rights reserved to Declarant under this Article shall continue so long as Declarant owns any portion of the Property or has the right to expand the Property pursuant to Section 9.1, unless earlier terminated in a Recorded instrument executed by Declarant.

As Declarant sells portions of the Aliante Residential Community to Builders for the construction of Improvements on Lots, Declarant may delegate a portion of its reserved rights under this Article to each Builder (a "Reviewing Builder") to review new construction (other than that installed by such Builder), modifications, and to administer and enforce the architectural controls for those Lots that are owned or improved by such Builder, so that each Builder will be responsible to approve all activities that are within the scope of this Article until such time as Builder has sold all of its Lots to Home Owners. Each such delegation shall be in writing, setting forth the fact of delegation, the scope of responsibilities delegated, the name and address of the Reviewing Builder so appointed or removed, and the term of office of the person appointed, and such information shall also be identified in Exhibit "A" to this Declaration and/or each Supplemental Declaration which subjects real property to this Declaration. Each delegation shall be subject to: (i) the right of Declarant to revoke such delegation at any time (so long as Declarant's rights have not otherwise terminated under this Section) and reassume jurisdiction over the matters previously delegated; (ii) the requirement that any variance granted by a Reviewing Builder be approved by Declarant prior to the granting of such variance, in its sole discretion; and (iii) the right of Declarant to veto any decision by the Reviewing Builder which Declarant determines, in its sole discretion, to be inappropriate or inadvisable for any reason. So long as Declarant has any rights under this Section, the jurisdiction of each Reviewing Builder shall be limited to such matters as Declarant specifically delegates.

4.2.2    Architectural Review Committee. Upon Declarant's delegation to the Master Association, or upon expiration or termination of Declarant's rights under Section 4.2.1, the Master Association, acting through the ARC, shall assume jurisdiction over all architectural matters. The ARC, when appointed, shall consist of at least three (3), but not more than seven (7), persons who shall be approved, shall serve, and may be removed and replaced in the Board's discretion. The ARC may, in the Board's direction, be divided into one or more committees, each of which shall have the sole responsibility for performance of those ARC responsibilities as may be designated by the Board. The members of the

20021127
01867

ARC need not be Members of the Master Association or representatives of Members, and may, but need not, include architects, engineers, or similar professionals, who may be compensated in such manner and amount as the Board may establish.

Unless and until such time as Declarant delegates all or a portion of its reserved rights to the ARC or Declarant's rights under this Article terminate, the Master Association shall have no jurisdiction over architectural and landscaping matters.

4.2.3    Fees; Assistance. During the time that Declarant or one or more Reviewing Builders is performing the architectural review functions hereunder, Declarant or the Reviewing Builder may establish and charge reasonable fees for review of applications under this Article and may require such fees to be paid in full prior to review of any application. Once an ARC is established, the ARC may establish and charge reasonable fees for review of applications and may require such fees to be paid in full prior to review of any application. Such fees may include the reasonable costs incurred in having any application reviewed by architects, engineers, or other professionals. Declarant, each Reviewing Builder and/or the Master Association may employ architects, engineers, or other persons as deemed necessary to perform the review. The Board may include the compensation of such persons (including Declarant) in the Master Association's annual operating budget.

4.3    Guidelines and Procedures.

4.3.1    Architectural Guidelines. Declarant may prepare the initial Architectural Guidelines, which shall contain general provisions applicable to all of the Property and each Builder may prepare supplements to the Architectural Guidelines that set forth the specific provisions which vary from Neighborhood to Neighborhood. Architectural Guidelines are intended to provide guidance to Owners regarding matters of particular concern to Declarant, a Reviewing Builder, or the ARC in considering applications. Architectural Guidelines are not the exclusive basis for decisions, and compliance with the Architectural Guidelines does not guarantee approval of any application.

Declarant shall have sole and full authority to amend the Architectural Guidelines as long as it owns any portion of the Property or has the right to expand the Property pursuant to Section 9.1, notwithstanding a delegation of reviewing authority to the ARC, unless Declarant also delegates in writing the power to amend to the ARC. Each Reviewing Builder shall have the same rights to amend the Architectural Guidelines provided that such power is included within the authority delegated to the Reviewing Builder by Declarant. Upon termination or delegation of Declarant's right to amend, the ARC shall have the authority to amend the Architectural Guidelines with the Board's consent. Any amendments to the Architectural Guidelines shall be prospective only and shall not require modifications to or removal of structures previously approved once the approved construction or modification has commenced. There shall be no other limitation on the scope of amendments to the Architectural Guidelines, and such amendments may remove requirements previously imposed or otherwise make the Architectural Guidelines more or less restrictive.

20021127
.01867

The Architectural Guidelines shall be made available to Owners and any requesting prospective purchaser who is a party to a binding contract to purchase a Lot. In Declarant's sole discretion, such Architectural Guidelines may be Recorded, in which event the Recorded version, as it unilaterally may be amended from time to time, shall control in the event of any dispute as to which version of the Architectural Guidelines was in effect at any particular time.

### 4.3.2  Procedures.

4.3.2.1  Application.  Prior to commencing any activity within the scope of this Article, an Owner shall submit an application for approval of the proposed activity in such form as the Architectural Guidelines or the ARC may specify. A prospective purchaser who is a party to a binding contract to purchase a Lot also may be permitted to submit an application for approval. Such application shall include drawings and specifications ("Plans") showing site layout, structural design, exterior elevations, exterior materials and colors, landscaping, drainage, exterior lighting, irrigation, and other features of proposed construction, as applicable. The Architectural Guidelines and the ARC may require the submission of such additional information as the Declarant, Reviewing Builder,  or the ARC deem reasonably necessary to consider any application.

4.3.2.2  Review Criteria.  In reviewing each submission, Declarant, the Reviewing Builder or the ARC, or the "Authorized Reviewer", as applicable, may consider any factors it deems relevant. Decisions may be based on purely aesthetic considerations. Each Owner acknowledges that determinations as to such matters are purely subjective and opinions may vary as to the desirability and/or attractiveness of particular Improvements. Except to the extent of the rights reserved to Declarant under Section 4.2.1, the Authorized Reviewer shall have the sole discretion to make final, conclusive, and binding determinations on matters of aesthetic judgment and such determinations shall not be subject to appeal so long as they are made in accordance with the procedures set forth herein.

4.3.2.3  Procedures Applicable to ARC.  The Authorized Reviewer shall, within thirty (30) days after receipt of a completed application and all required information, respond in writing to the applicant at the address specified in the application. The response may: (i) approve the application, with or without conditions; (ii) approve a portion of the application and disapprove other portions; or (iii) disapprove the application. The Authorized Reviewer may, but shall not be obligated to, specify the reasons for any objections and/or offer suggestions for curing any objections.  However, no approval, whether expressly granted or deemed granted pursuant to the foregoing, shall be inconsistent with the Architectural Guidelines unless a variance has been granted pursuant to Section 4.5 or an exemption exists pursuant to Section 4.6.

In the event that the Authorized Reviewer fails to respond within the thirty (30) day period, disapproval of the application shall be deemed to have been given. Notice shall be deemed to have been given at the time the envelope containing the response is deposited with the U. S. Postal Service. Personal delivery of such written notice shall, however, be sufficient and shall be deemed to have been given at the time of delivery to the applicant.

20021127
.01887

Until expiration of Declarant's rights under Section 4.2.1, each Reviewing Builder or the ARC, as applicable, shall notify Declarant in writing within three (3) business days after Reviewing Builder or the ARC, as applicable, has approved any application relating to proposed activity within the scope of matters Declarant delegated to the Reviewing Builder or the ARC. The Notice shall be accompanied by a copy of the application and any additional information Declarant may require. Declarant shall have ten (10) days after receipt of such Notice to veto any such action, in its sole discretion, by written Notice to the Reviewing Builder or ARC, as applicable, and the applicant.

4.3.2.4    Effectiveness of Approval.    If construction does not commence on a project for which Plans have been approved within one hundred twenty (120) days, unless otherwise set forth in the approval, from the date of approval, such approval shall be deemed withdrawn and it shall be necessary for the Owner to reapply for approval before commencing any construction activity. Once construction is commenced, it shall be diligently pursued to completion. All construction shall be completed within one (1) year of commencement unless otherwise specified in the Notice of approval or unless the Authorized Reviewer grants an extension in writing, which it shall not be obligated to do. If approved construction is not completed within the required time, it shall be considered nonconforming and, unless an extension of time is granted, shall be subject to enforcement action by the Master Association, Declarant, the Reviewing Builder or any aggrieved Owner.

Notwithstanding the above, the initial landscaping in the front yard of each Residential Lot (other than those contained in the Active Adult Community) shall be installed as approved no later than the date of the initial closing of escrow on such Residential Lot in accordance with the Development Agreement; the initial landscaping in the front yard on each Residential Lot located within the Active Adult Community shall be installed as approved within one hundred twenty (120) days from the date of the initial closing of escrow on such Residential Lot.

4.3.2.5    Exemptions.    The Board, with the consent of Declarant (which must be in writing), may, by resolution, exempt certain activities from the application and approval requirements of this Article, provided such activities are undertaken in strict compliance with the requirements of such resolution.

4.4    No Waiver of Future Approvals.    Each Owner acknowledges that the persons reviewing applications under this Article will change from time to time and that opinions on aesthetic matters, as well as interpretation and application of the Architectural Guidelines, may vary accordingly. In addition, each Owner acknowledges that it may not always be possible to identify objectionable features of proposed activity until the work is completed, in which case it may be unreasonable to require changes to the Improvements involved, but the Authorized Reviewer may refuse to approve similar proposals in the future. Approval of applications or Plans for any work done or proposed, or in connection with any other matter requiring approval, shall not be deemed to constitute a waiver of the right to withhold approval as to any similar applications, Plans, or other matters subsequently or additionally submitted for approval.

4.5    Variances.    An Authorized Reviewer may, upon the request of an Owner and the submission of an application for a variance, authorize variances from compliance with any of the

20021127
.01887

Architectural Guidelines (as may be modified by a Reviewing Builder for a particular Neighborhood) when circumstances such as topography, natural obstructions, hardship, or aesthetic or environmental considerations warrant, in the sole discretion of the Authorized Reviewer, as appropriate, but only in accordance with duly adopted regulations and only within the scope of the Authorized Reviewer's authority (e.g., a Reviewing Builder may not grant a variance with respect to matters not within the delegation of authority to the Reviewing Builder). No variance shall (a) be effective unless in writing; (b) be contrary to this Declaration; or (c) estop the Authorized Reviewer from denying a variance in other circumstances. For purposes of this Section, the inability to obtain approval of any governmental agency, the issuance of any permit, or the terms of any financing shall not be considered a hardship warranting a variance. No variance may be impliedly approved. If a variance is required in connection with an application, the variances shall be specifically listed and requested on the application. Notwithstanding the above, neither a Reviewing Builder nor the ARC may authorize variances without the consent of Declarant, so long as Declarant owns any portion of the Property or has the right to expand the Property pursuant to Section 9.1, and no such variance shall be effective unless the variance is expressly approved by Declarant. No provision of this Article 4 shall be deemed to require the Recordation of any variance.

**EACH OWNER ACKNOWLEDGES THAT DETERMINATIONS AS TO VARIANCES HEREUNDER ARE PURELY SUBJECTIVE AND OPINIONS MAY VARY AS TO THE AESTHETIC EFFECT OF ANY PARTICULAR WAIVER. THEREFORE, EXCEPT TO THE EXTENT OF THE RIGHTS RESERVED TO DECLARANT UNDER SECTION 4.2.1 AND THIS SECTION, EACH AUTHORIZED REVIEWER SHALL HAVE THE SOLE DISCRETION TO MAKE FINAL, CONCLUSIVE, AND BINDING DETERMINATIONS ON VARIANCES (SUBJECT TO DECLARANT'S APPROVAL, AS APPLICABLE) AND THEREFORE SUCH DETERMINATIONS SHALL NOT BE SUBJECT TO APPEAL. THERE ARE NO THIRD PARTY BENEFICIARIES TO ANY VARIANCE WHICH MAY BE GRANTED PURSUANT TO THIS SECTION 4.5. FURTHERMORE, DECLARANT, THE REVIEWING BUILDER, OR THE ARC SHALL HAVE NO DUTY TO DISCLOSE THE GRANTING OR EXISTENCE OF ANY VARIANCE. EVERY OWNER AGREES, BY ACQUIRING TITLE AND/OR POSSESSORY RIGHTS TO ANY LOT, THAT HE OR SHE WILL NOT BRING ANY ACTION OR SUIT AGAINST DECLARANT, THE MASTER ASSOCIATION, ANY REVIEWING BUILDER, OR THE ARC OR ANY DESIGNATED REPRESENTATIVE OF ANY OF THE FOREGOING FOR THE RECOVERY OF DAMAGES BY REASON OF ANY REQUEST FOR A VARIANCE MADE BY SUCH OWNER, ANY OTHER OWNER OR ANY OTHER PERSON, WHETHER SUCH REQUEST IS GRANTED OR DENIED.**

4.6    Exemptions

4.6.1    Qualifying Builders. Each Builder who has received Declarant's approval of a Project Plan pursuant to the process set forth in any Recorded Development Declaration shall be exempt from the architectural review process set forth in this Article 4, but the exemption contained in this Section 4.6 shall apply only to that portion of the Aliante Residential Community that is described in both the approved Project Plan and the applicable Recorded Development Declaration.

4.6.2    Active Adult Sub-Association.  All property located within the Active Adult Sub-Association shall be exempt from the architectural review process set forth in this Article.

4.7    Limitation of Liability.  The standards and procedures in this Article are intended as a mechanism for maintaining and enhancing the overall aesthetics of the Property but shall not create any duty to any Person. Review and approval of any application are made on the basis of aesthetic considerations only, and no Authorized Reviewer shall bear any responsibility for ensuring (a) structural integrity or soundness of approved construction or modifications, (b) compliance with building codes and other governmental requirements; (c) approval of the construction or modification by the governing municipality or whether such approval will be obtained; or (d) conformity of quality, value, size, or design with other Residences or the Improvements on a Multi-Family Lot. Neither (1) Declarant or a Reviewing Builder, nor (2) the Master Association, the Board, the ARC or any Sub-Association or its board or any committee or member of the foregoing, nor (3) any Person retained by an Authorized Reviewer as a consultant, nor (4) any employee, agent or representative of those listed in (1), (2), (3) above, (collectively, "Protected Persons") shall be held liable for any claim whatsoever arising out of construction on or modifications to any Lot.

No Protected Person shall be held liable for soil conditions, drainage, or other general site work; any defects in Plans revised or approved hereunder; any loss or damage arising out of the action, inaction, integrity, financial condition, or quality of work of any contractor or its subcontractors, employees, or agents (including, without limitation, any contractor approved or featured as a builder in the Aliante Residential Community); or any injury, damages, or loss arising out of the manner or quality or other circumstances of approved construction on or modifications to any Lot. In all matters, the Protected Persons shall be defended and indemnified by the Master Association as provided in Section 7.6.

4.8    Enforcement.  Any construction, alteration, or other work done in violation of this Article or the applicable Architectural Guidelines shall be deemed to be nonconforming. Upon written Notice from Declarant, the Master Association, or the ARC, the Owner of such Lot shall, at his or her own cost and expense and within such time frame as set forth in such written Notice, cure such nonconformance to the satisfaction of the requester or restore the real property, Lot, Residence and/or Apartment to substantially the same condition as existed prior to the nonconforming work. Should an Owner fail to remove and restore as required, Declarant, the Master Association, any Sub-Association, or their designees shall have the right to Record a Notice of Non-Compliance and/or to enter the real property, remove the violation, and restore the real property to substantially the same condition as previously existed. All costs (which may include administrative charges and legal fees), together with interest at the rate established by the Board (not to exceed the maximum rate then allowed by Law), may be assessed against the non-conforming Lot under this Section 4.8 and collected as a Specific Assessment unless otherwise prohibited in this Declaration.  The right of the Declarant, the Master Association or their designees to remove a non-conforming construction, alteration, or other work in violation of this Article or otherwise remedy the noncompliance shall be in addition to all other rights and remedies which Declarant, the Master Association, or their designees may have at law, in equity, or elsewhere in the Governing Documents.

20021127
.01887

All approvals granted hereunder shall be deemed conditioned upon completion of all elements of the approved activity and all activity previously approved with respect to the same Lot, unless approval to modify any application has been obtained. If any Owner fails to commence and diligently pursue to completion all approved activity by the deadline set forth in the approval, Declarant or the Master Association or their designees, shall be authorized, after notice to the Owner of the Lot and an opportunity to be heard in accordance with the procedures set forth in the Rules, to enter upon the Lot and remove or complete any incomplete work and to assess all costs incurred against the Lot and the Owner thereof as a Specific Assessment unless otherwise prohibited in this Declaration.

All acts by any contractor, subcontractor, agent, employee, or invitee of an Owner shall be deemed as an act done by or on behalf of such Owner. Any contractor, subcontractor, agent, employee, or other invitee of an Owner who fails to comply with the terms and provisions of this Article and the Architectural Guidelines may be excluded from the Property, subject to any applicable notice and hearing procedures set forth in the Rules. In such event, Declarant, the Master Association, and their officers and directors, employees, agents, or representatives shall not be held liable to any Person for exercising the rights granted by this paragraph.

The Master Association, Declarant, any Sub-Association, and Reviewing Builders shall have the authority and standing to pursue all legal and equitable remedies available to enforce the provisions of this Article and the decisions of the Authorized Reviewers. To the fullest extent permitted by Law, enforcement of this Article by the Master Association and/or Declarant and/or any Sub-Association and/or Reviewing Builder shall not be subject to laches or any statute of limitations. Any Specific Assessment levied for costs due under this Section 4.8 shall not be considered a fine or penalty and may be imposed apart from, or in conjunction with any other Specific Assessment permitted under this Declaration.

## Article 5    Maintenance and Repair

5.1    Maintenance of Lots. Each Owner shall maintain his or her Lot, Residence, Apartment, and all landscaping and other Improvements comprising the Lot in a manner consistent with the Governing Documents, the Community-Wide Standard, the Development Agreement, and all applicable covenants, unless some or all of such maintenance responsibility is otherwise assumed by or assigned to the Master Association or a Sub-Association pursuant to any Supplemental Declaration or other declaration of covenants applicable to such Lot.

Except to the extent that a Lot is contained in a Sub-Association which is responsible for the maintenance of the exterior of walls and fences within a Neighborhood, the maintenance obligations of each Owner of a Lot that contains any wall or fence, including but not limited to a wall and/or fence that separates the Owner's Lot from the Common Elements or any Excluded Amenity, shall extend (jointly with each other Owner sharing such wall or fence) to the maintenance and repair of those walls and/or fences and, if necessary, to the replacement of the walls and/or fences as originally constructed, all at such Owner's (or Owners') sole cost and expense in compliance with the maintenance and schedules adopted by the Board. Furthermore, each Owner shall (jointly with each other Owner sharing such wall or fence), at such Owner's (or Owners') sole cost and expense, cause the wall and/or fence that is located on the

20021127
.01887

Owner's Lot to be maintained in full compliance with any maintenance schedules from time to time established by the Board. Once adopted by the Board, the maintenance schedule shall specify specific maintenance tasks, the time frame for the completion of each maintenance task, the approved contractor or contractor(s) that must used for the performance of the maintenance task, the paint color for the maintenance task (if applicable), and such other matters as may be appropriate to ensure that the walls and fences within the Aliante Residential Community are maintained in a manner consistent with the Governing Documents, the Community-Wide Standard, and the Development Agreement. No changes or alterations, including, without limitation, temporary alterations (e.g., removal for construction of pool) shall be made to the walls and/or fences except with the written permission of the Board, which may be conditioned upon the posting of adequate security. Neither a perimeter wall or fence nor a wall or fence that separate a Lot from the Common Elements or any Excluded Amenity shall be a party wall or party fence as set forth in Section 13.1.

Unless maintained by the City, each Owner shall be responsible for maintaining the City sidewalk and landscaping located in the public right-of-way adjacent to his or her Lot unless all or part of such maintenance is assumed by the Master Association or a Sub-Association pursuant to a Supplemental Declaration, or any additional covenants applicable to such Lot or Neighborhood.

In addition to any other enforcement rights, if an Owner or a Sub-Association, fails to perform properly the applicable maintenance responsibility, the Master Association may enter the Lot and perform such maintenance responsibilities and assess all costs incurred in accordance with Section 8.6. The Master Association shall afford the Owner reasonable notice and an opportunity to cure the problem in accordance with the procedures set forth in the Rules prior to entry, except when entry is required due to an emergency situation. The Master Association is hereby granted a right and easement over, under, upon and across each Lot for the purposes of exercising its rights under this Section.

5.2    Maintenance of Neighborhood Property.

5.2.1    Maintenance by Sub-Association. Each Sub-Association shall maintain its common property and any other property for which it has maintenance responsibility in a manner consistent with the Development Agreement, the Governing Documents, the Community-Wide Standard, and all applicable covenants. Each Sub-Association shall also be responsible for maintaining and irrigating the landscaping within that portion of any Common Elements or public right-of-way lying between the boundary of its common property and any wall, fence, or curb located on the Common Elements or public right-of-way adjacent to its boundary unless the Master Association otherwise agrees; provided, there shall be no right to remove trees, shrubs, or similar vegetation from this area without prior approval pursuant to Article 4. Each Sub-Association, if any, shall additionally be responsible for maintaining the exterior surface of all of the walls and/or fences located on Lots within the Neighborhood(s) which are part of the Sub-Association, including but not limited to any wall and/or fence that separates the Owner's Lot from the Common Elements or any Excluded Amenity, in full compliance with any maintenance schedules from time to time established by the Board. Once adopted by the Board, the maintenance schedule shall specify specific maintenance tasks, the time frame for the completion of each maintenance task, the approved contractor or contractor(s) that must used for the performance of the maintenance task, the paint color for the

20021127
.01887

maintenance task (if applicable), and such other matters as may be appropriate to ensure that the walls and fences within the Aliante Residential Community are maintained in a manner consistent with the Governing Documents, the Community-Wide Standard, and the Development Agreement.

5.2.2    Obligation of Master Association to Maintain Areas of Common Responsibility in Cost Centers.  The Owners of Lots within each Neighborhood that is not governed by a Sub-Association shall be responsible for paying, through Cost Center Assessments, the costs of operating, maintaining, and insuring any Limited Common Elements that are assigned to such Lots pursuant to Section 12.2 of this Declaration, through Cost Centers.  The Owners within each Cost Center shall additionally be responsible for paying, through Cost Center Assessments, the costs of operating, maintaining, and insuring such other portions of the Areas of Common Responsibility within or adjacent to such Cost Center as may be designated (a) under this Declaration or a Supplemental Declaration, or (b) by resolution of the Board from time to time, provided that for so long as Declarant owns any of the real property described in Exhibits "A" and/or "B" any such resolution by the Board shall require the Declarant's consent.  The costs provided for under this Section 5.2.2 may include, without limitation, the costs of maintaining any signage, entry features, right-of-way, landscaping area between a Neighborhood that is designated as a Cost Center or a Cost Center and adjacent public roads, and private streets within a Neighborhood that is designated as a Cost Center or a Cost Center, regardless of ownership and regardless of the fact that such maintenance may be performed by the Master Association; provided, however, all Neighborhoods and Cost Centers that are similarly situated shall be treated in a similar manner.

5.2.3    Right of Master Association to Maintain Property in Neighborhood.  The Master Association may assume maintenance responsibility for real property located within any Neighborhood, in addition to that designated by any Supplemental Declaration, either by agreement with the Neighborhood or because, in the opinion of the Board, the level and quality of service to Areas of Common Responsibility then being provided is not consistent with the Community-Wide Standard or because such area is located in close proximity to any portion of the Areas of Common Responsibility such that the Board by resolution deems it appropriate that the Master Association assume responsibility to maintain such real property by establishing a Cost Center for such real property, provided that for so long as Declarant owns any of the real property described in Exhibits "A" and/or "B" any such resolution by the Board shall require the Declarant's consent.  Any real property located within a Neighborhood with respect to which the Master Association establishes a Cost Center and assumes maintenance responsibility must be separately metered for any utilities necessary to maintain such property (including without limitation, water and power services) to ensure that the cost of such utilities is properly assessable against the Lots within the Cost Center.  In the event that any real property located within a Neighborhood with respect to which the Master Association assumes maintenance responsibility through a Cost Center is not separately metered for those utilities necessary to maintain such property, the Master Association shall have the right to cause the appropriate utility meters to be installed and assess the cost thereof as a Specific Assessment against the Lots within the Cost Center.  All costs of maintenance (including without limitation utility costs and the installation cost of any utility meters) pursuant to this Section 5.2.3 shall be assessed as a Cost Center Assessment only against the Lots within the Cost Center to which the services are provided.  The provision of services in accordance with this Section shall not constitute discrimination within a class.

20021127
.01887

5.3    Responsibility for Repair and Replacement.  Unless otherwise specifically provided for in the Governing Documents or in other instruments creating and assigning maintenance responsibility, responsibility for maintenance shall include responsibility for repair and replacement, as necessary to maintain the real property to a level consistent with the Community-Wide Standard.  By virtue of taking title to a Lot, each Owner covenants and agrees with all other Owners and with the Master Association to carry property insurance for the full replacement cost of all insurable Improvements on his or her Lot, less a reasonable deductible, except (i) with respect to those Improvements, if any, for which either the applicable Sub-Association (if any) for the Neighborhood in which the Lot is located or the Master Association carries such insurance (which they may, but are not obligated to do hereunder), and (ii) with respect to those Builders who are in compliance with the insurance requirements set forth in the applicable Development Declaration between North Valley Enterprises, LLC and each such Builder that is Recorded against the Lots owned by such Builder.  If the Master Association assumes responsibility for obtaining any insurance coverage on behalf of Owners, the premiums for such insurance shall be levied as a Specific Assessment against the benefitted Lots and the Owners.

Each Owner further covenants and agrees that in the event of damage to or destruction of structures on or comprising his or her Lot, the Owner shall proceed promptly to repair or to reconstruct the damaged or destroyed structures in a manner consistent with the original construction or such other drawings and specifications as are approved in accordance with Article 4.  Alternatively, the Owner shall promptly clear the Lot and maintain it in a neat and attractive, landscaped condition consistent with the Community-Wide Standard.  The Owner shall pay any costs that are not covered by insurance proceeds.

The requirements of this Section shall apply to any Sub-Association responsible for common property within a Neighborhood in the same manner as if the Sub-Association were an Owner and the common property were a Lot and all costs incurred by the Master Association in maintaining any common property within such Neighborhood shall be assessed against the Lots within that Neighborhood as a Specific Assessment. Additional Recorded covenants applicable to any Neighborhood may establish more stringent requirements for insurance and more stringent standards for rebuilding or reconstructing structures on the Lots within such Neighborhood and for clearing and maintaining the Lots in the event the structures are not rebuilt or reconstructed.

## PART THREE: COMMUNITY GOVERNANCE AND ADMINISTRATION

*The success of the community is dependent upon the support and participation of every Owner in its governance and administration. The Declaration establishes the Master Association as a mechanism by which each Owner, as a member of the Master Association, is able to provide that support and participation. While many powers and responsibilities are vested in the Board, some decisions are reserved for the Master Association's membership.  Furthermore, while the Declarant appoints all or some of the members of the Board during the Declarant Control Period, after the Declarant Control Period, it is the Owners who elect the members of the Board.*

20021127
.01887

**Article 6    The Master Association and Its Members**

6.1    Function of the Master Association.  The Master Association shall be the entity responsible for management, maintenance, operation, and control of the Areas of Common Responsibility. The Master Association also shall be the primary entity responsible for enforcement of the Governing Documents. The Master Association shall perform its functions in accordance with the Governing Documents and applicable Laws.

6.2    Membership.  Every Owner shall be a Member of the Master Association. There shall be only one (1) membership per Lot. If a Lot is owned by more than one Person, all co-Owners shall share the privileges of such membership, subject to reasonable Board regulation, and all such co-Owners shall be jointly and severally obligated to perform the responsibilities of Owners. The membership rights of an Owner who is not a natural person may be exercised by any officer, director, manager, member, partner or trustee of the Owner, or by the individual designated from time to time by the Owner in a written instrument provided to the Secretary of the Master Association.

6.3    Membership Classes and Voting Rights. The Master Association shall have two (2) classes of membership:  Class A and Class B.

6.3.1    Class A.  Class A shall be composed of all of the Owners of Residential Lots. Each Owner shall have one (1) equal vote for each Residential Lot in which it holds the interest required for membership under Section 6.2, except that there shall be only one (1) vote per Lot. Accordingly, the total number of Class A votes for the Master Association shall equal the total number of Residential Lots subject to this Declaration, from time to time.

6.3.2    Class B.  Class B shall be composed of all of the Owners of Multi-Family Lots. Each Owner shall have one (1) equal vote for every five (5) Apartments located on each Multi-Family Lot in which it holds the interest required for membership under Section 6.2, except that there shall be no fractional votes.  The total number of Class B votes for each Multi-Family Lot shall be equal the total number of Apartments contained on such Multi-Family Lot, divided by five (5) and then rounded to the nearest whole number.  Accordingly, the total number of Class B votes for the Master Association shall be equal to the total number of Apartments subject to this Declaration, from time to time, divided by five (5) and rounded to the nearest whole number.

6.3.3    No Votes Attributable to Exempt Property.  No vote shall be exercised for any real property that is exempt from assessment under Section 8.10.  Notwithstanding any other provision contained in the Governing Documents, only those Members in Good Standing shall be entitled to vote, whether in person, by proxy or ballot or otherwise.

6.3.4    Special Declarant Rights.  Special Declarant Rights (as defined in the Act), including the right to approve, or withhold approval of, actions proposed under the Governing Documents during the Declarant Control Period, are specified in the relevant sections of the Governing Documents. Declarant may appoint or remove officers of the Master Association and members of the Board during the

20021127
.01887

Declarant Control Period, as specified in the Bylaws or such longer period as may hereafter be permitted under the Act.

6.3.5 <u>Direct and Proxy Voting</u>. Members may vote directly or by proxy as provided in the Bylaws and subject to the Act. The Board shall determine whether votes shall be cast in person, by mail or by any other means permitted by Law. If there is more than one Owner of a Lot (or if the Owner is not a natural person, more than one representative of the Owner), the vote for such Lot shall be exercised as the co-Owners (or in the case of an Owner that is not a natural person, the representatives) determine among themselves and advise the Secretary of the Master Association in writing prior to the vote being taken. Absent such advice and in the event that more than one such co-Owner (or more than one representative) casts a vote, the Lot's vote shall be suspended and shall not be included in the final vote tally on the matter being voted upon.

6.4 <u>Neighborhoods and Delegates</u>.

The following diagram illustrates the interrelationships between various components of the Master Association:

## Components of Master Association



6.4.1 <u>Neighborhoods</u>. Every Lot shall be located within a Neighborhood. A Multi-Family Lot may be classified as a single Neighborhood. Lots within a particular Neighborhood may be subject to additional covenants. In addition, if required by Law or otherwise approved by Declarant, Owners within the Neighborhood may be members of a Sub-Association in addition to the Master Association. Owners within a Neighborhood, also may, but shall not be required to, elect a "<u>Neighborhood Committee</u>" to represent their interests. Neighborhood Committees may be elected as provided for in the Bylaws.

Exhibit "A" to this Declaration, and each Supplemental Declaration recorded pursuant to Article 9 which operates to submit additional real property to this Declaration, shall initially assign the real property submitted thereby to a specific Neighborhood (by name or other identifying designation), which Neighborhood may be then existing or newly created. So long as it has the right to subject additional real property to this Declaration pursuant to Section 9.1, Declarant unilaterally may amend this Declaration or

20021127
.01887

any Supplemental Declaration to create or redesignate Neighborhood boundaries without the consent of the Owners of the Lots in the affected Neighborhoods, subject only to the prior consent of any Builder who owns Lots in the affected Neighborhoods; thereafter the creation or re-designation of Neighborhoods requires an amendment to this Declaration under Section 19.2.

The following is a summary of the formation and function of Neighborhoods:

---

## NEIGHBORHOOD

- Created by Declarant when real property is annexed or later

- Comprised of Lots within same subdivision

- May or may not be subject to Sub-Association

- May request that the Master Association provide special services or a higher level of services as a Cost Center

---

A Neighborhood, or a Builder on behalf of the Neighborhood, may request that the Master Association provide a higher level of service than that which the Master Association generally provides to all Neighborhoods, or may request that the Master Association provide special services for the benefit of the Lots in such Neighborhood by establishing a Cost Center. Upon the consent of Owners of a Majority of the Lots within the Neighborhood and the consent of any Builder that owns any Lots within the Neighborhood, the Master Association may, in the Board's discretion, provide the requested services, provided that for so long as Declarant owns any of the real property described in Exhibits "A" and/or "B" any such action by the Board shall require the Declarant's consent. The cost of the services requested by a Neighborhood and provided by the Master Association through a Cost Center, which may include a reasonable administrative charge in such amount as the Board deems appropriate (provided, any such administrative charge shall apply at a uniform rate per Lot to all Cost Centers receiving the same service), shall be assessed against the Lots within such Neighborhood as a Cost Center Assessment.

Each Neighborhood that is not part of a Sub-Association shall hold meetings annually or more frequently as may be required by the Board or upon the petition of at least ten percent (10%) of the Owners of Lots within the Neighborhood. The Delegate shall preside over Neighborhood meetings, shall place such issues on the agenda as the Board or the Delegate may determine, and shall provide for an open forum for Neighborhood Owners to discuss new matters. The presence of at least fifteen percent (15%) of the Owners in a Neighborhood shall constitute a quorum at any Neighborhood meeting. Except as

20021127
.01887

otherwise provided herein, Neighborhood meetings shall be called and held in accordance with the relevant provisions of the Bylaws.

6.4.2    Delegate. The Delegate for each Neighborhood that is governed by a Sub-Association shall be the President, Vice President, or such other officer as may be designated by the board of directors of that Sub-Association. Accordingly, the references to Neighborhoods in this Section, as well as the election procedures in this Section, apply only to those Neighborhoods not subject to a Sub-Association. The Delegate for each Neighborhood that is not governed by a Sub-Association shall be elected or designated as set forth in this Section 6.4.2. Provided, however, that until such time as the Board first calls for election of a Delegate for any Neighborhood, the Owners within such Neighborhood shall be entitled personally to cast the votes attributable to their respective Lots on any issue requiring a membership vote under the Governing Documents.

The Owners within each Neighborhood shall elect a Delegate who shall preside over Neighborhood meetings and shall be responsible for communication between the Owners in the Neighborhood and the Board. In addition, each Neighborhood shall elect an alternate Delegate who shall act in the absence of the Delegate. Each Delegate and alternate Delegate must be a Member in Good Standing.

The Delegate and alternate Delegate shall be elected on an annual basis, either by written ballot cast by mail or at a meeting of the Members within such Neighborhood, as the Board determines; provided, however, upon written petition signed by Members holding at least ten percent (10%) of the votes attributable to Lots within any Neighborhood, the election for the Delegate may be held at a Neighborhood meeting (as provided for in Section 6.4.1 above). In the event quorum is not obtained at a Neighborhood meeting called for the purpose of electing the Delegate, the election shall be conducted by written ballot and the results of the written ballot shall control even if a quorum is not obtained through the written ballot process.

The Board may appoint a nominating committee for the purpose of selecting candidates for the Delegate positions. Additionally, eligible candidates may nominate themselves for election to these positions in accordance with procedures adopted by the Board.

The Board shall call for the first election of a Delegate from a Neighborhood not later than one (1) year after the conveyance of a Lot in the Neighborhood to a Home Owner. Subsequent elections shall be held each year on a date established by the Board. Each Member who owns a Lot within the Neighborhood shall be entitled to cast one equal vote per Lot owned. The candidate who receives the greatest number of votes shall be elected as the Delegate and the candidate receiving the next greatest number of votes shall be elected as the alternate Delegate. The Delegate and the alternate Delegate shall serve a term of one (1) year and until their successors are elected.

The Board shall conduct a vote for the removal of any Delegate or alternate Delegate from office upon submission of a signed petition from Members holding at least ten percent (10%) of the votes attributable to Lots within the Neighborhood, requesting that such action be taken. Any Delegate may be

20021127
.01887

removed with or without cause. Removal of a Delegate shall be conducted under the same terms as removal of a Board Member. In the event that the Delegate is removed, or the position becomes vacant for any other reason, the alternative Delegate shall fill the vacancy for the remainder of the term. If the alternate Delegate position becomes vacant, or both positions become vacant at the same time, the Board shall fill such vacancies by appointing a replacement from the pool of Neighborhood Members in Good Standing.

6.5    Representation Districts.

Every Lot shall be located within a Representation District for the purpose of electing directors to the Board after the expiration of the Declarant Control Period. Representation Districts shall be designated by Declarant to promote representation on the Board by groups with dissimilar interests and to avoid particular groups dominating the Board due to the number of votes held by such groups. The Lots within any one Neighborhood must all be classified as part of the same Representation District. The election of directors to the Board shall be conducted in accordance with the Bylaws.

Exhibit "A" to this Declaration, and each Supplemental Declaration submitting additional real property to this Declaration shall initially assign the real property submitted thereby to a specific Representation District (by name or other identifying designation), which Representation District may be then existing or newly created. Declarant may amend such designations, in its discretion, at any time during the Declarant Control Period. In any event, after the expiration of the Declarant Control Period if there are an even number of Board members elected by specific Representation Districts, that one "at large" director shall be elected from among all Representation Districts in order that the Board contain an odd number of directors.

The following is a summary of the formation and function of the Representation Districts:

---

### REPRESENTATION DISTRICTS

- Created by Declarant when real property is annexed or later

- Comprised of Lots within a geographical area which may or may not share common interests

- May be comprised of more than one (1) Neighborhood

- Designated by Declarant to promote diversity on the Board

---

20021127
.01887

6.6     Representative Voting. Declarant also may, with the consent of the Board, require that votes of Members on any matter permitted under Nevada law be exercised by or through a Delegates. In such event, each Delegate shall cast the votes of the Members voting on the matter in the same number as the Members voted and shall cast the remaining votes of the Neighborhood in the same proportion as the votes cast.

## Article 7     Master Association Powers and Responsibilities

7.1     Acceptance and Control of Master Association Property.

7.1.1    The Master Association, through action of its Board, may acquire, hold, and dispose of tangible and intangible personal property and real property.

7.1.2    Declarant and its designees may convey to the Master Association, and the Master Association, through action of its Board, shall accept personal property and fee title, leasehold, or other property interests in any real property, improved or unimproved, described in Exhibits "A" and/or "B." The Master Association shall accept and maintain such property at its expense for the benefit of its Members, subject to any restrictions set forth in the deed or other instrument transferring such property to the Master Association. The Master Association shall maintain and operate, as applicable, all Improvements located on the conveyed property as intended from and after the date of completion of construction of the Improvements (including but not limited to the completion of separate meters for water, power, or other utility) and the issuance of a certificate of occupancy, if applicable. Upon written request of Declarant, the Master Association shall reconvey to Declarant any vacant portions of the Property originally conveyed by Declarant to the Master Association for no consideration, to the extent conveyed by Declarant in error or needed by Declarant to make minor adjustments in real property lines.

7.2     Maintenance of Areas of Common Responsibility.

7.2.1    Generally. The Master Association shall maintain the Areas of Common Responsibility in accordance with the Development Agreement, Community-Wide Standard, and, to the extent applicable, the License Agreements, which maintenance obligation shall, subject to the obligations of the Owners contained elsewhere in this Declaration, including, Sections 5.1 and 5.2.2, include, but need not be limited to:

7.2.1.1    all portions of and structures situated upon the Common Elements subject to Section 7.2.1.6;

7.2.1.2    landscaping within or adjacent to public rights-of-way within or abutting the Property;

7.2.1.3    such portions of any additional real property included within the Areas of Common Responsibility as may be dictated by this Declaration, the Development Agreement, any Plat of

20021127
.01867

any portion of the Property, or any covenant, contract, or agreement for maintenance thereof entered into by the Master Association (or by Declarant on the Master Association's behalf);

7.2.1.4   all drainage facilities located within the Property which serve as part of the stormwater drainage system for the Property, including Improvements and equipment installed therein or used in connection therewith;

7.2.1.5   any real property and facilities Declarant owns and makes available, on a temporary or permanent basis, for the primary use and enjoyment of the Master Association and its Members. Such real property and facilities must be identified by written notice from Declarant to the Master Association and shall remain a part of the Areas of Common Responsibility and shall be maintained by the Master Association until such time as Declarant revokes such privilege of use and enjoyment by written notice to the Master Association; and

7.2.1.6   the right but not the obligation to maintain the exterior surface of any walls and/or fences constructed surrounding the Property or that separate a Lot from the Common Elements, regardless of whether such wall or fence is located on the Common Elements or on a Lot, if the party that is responsible for the maintenance under Section 5.1 or Section 5.2 fails to so maintain any wall and/or fence.

The Master Association may maintain other real property that it does not own, including, without limitation, real property dedicated to the public, if such maintenance is necessary or desirable to maintain the Community-Wide Standard.

The Master Association shall also have the right and power, but not the obligation, to take such actions and adopt such rules as may be necessary for pedestrian or vehicular traffic management or control, relocation, and management of wildlife, snakes, rodents, and pests within the Areas of Common Responsibility.

The Master Association may by resolution establish a Cost Center for the purpose of assuming maintenance responsibility for real property within any Sub-Association, in addition to any real property that the Master Association is obligated to maintain by this Declaration or any Supplemental Declaration, either by agreement with the Sub-Association or because, in the opinion of the Board, the level and quality of service then being provided is not consistent with the Community-Wide Standard. For so long as Declarant owns any of the real property described in Exhibits "A" and/or "B" any such resolution by the Board shall require the Declarant's consent. All costs of such maintenance shall be assessed as a Cost Center Assessment against the Lots within the Cost Center to which the services are provided. The provision of services in accordance with this Section shall not constitute discrimination within a class.

The Master Association shall not be liable for any damage or injury occurring on or arising out of the condition of real property that it does not own except to the extent that it has been negligent in the performance of its maintenance responsibilities.

20021127
01887

7.2.2   Maintenance as Common Expense. The costs associated with maintenance, repair, and replacement of the Areas of Common Responsibility and such other costs as provided in Section 7.2.1 shall be a Common Expense; provided, the Master Association may seek reimbursement from the owner(s) of, or other Persons responsible for, certain portions of the Areas of Common Responsibility pursuant to this Declaration, other Recorded covenants, or agreements with the owner(s) thereof. Maintenance, repair, and replacement of Limited Common Elements shall be a Cost Center Expense assessed to the Cost Center to which such Limited Common Elements are assigned, notwithstanding that the Master Association may be responsible for performing such maintenance hereunder.

7.3   Insurance.

7.3.1   Required Coverages. The Master Association, acting through its Board or its duly authorized agent, shall obtain and continue in effect the following types of insurance, if reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

7.3.1.1   Blanket property insurance covering "risks of direct physical loss" on a "special form" basis (or comparable coverage by whatever name denominated) for all insurable Improvements located on the Common Elements and within the Areas of Common Responsibility to the extent that the Master Association has assumed responsibility in the event of a casualty, regardless of ownership. If such coverage is not generally available at reasonable cost, then "broad form" coverage may be substituted. All property insurance policies obtained by the Master Association shall have policy limits sufficient to cover the full replacement cost of the insured Improvements under current building ordinances and codes;

7.3.1.2   Commercial general liability insurance on the Areas of Common Responsibility, insuring the Master Association and its Members for damage or injury caused by the negligence of the Master Association or any of its Members, employees, agents, or contractors while acting on its behalf. If generally available at reasonable cost, such coverage (including primary and any umbrella coverage) shall have a limit of at least Two Million Dollars ($2,000,000.00) per occurrence with respect to bodily injury, personal injury, and property damage; provided, should additional coverage and higher limits be available at reasonable cost which a reasonably prudent person would obtain, the Master Association shall obtain such additional coverages or limits;

7.3.1.3   Workers' compensation insurance and employers' liability insurance, if and to the extent required by Law;

7.3.1.4   Directors' and officers' liability coverage (including coverage for committee members);

7.3.1.5   Commercial crime insurance, including fidelity insurance covering all Persons responsible for handling Master Association funds in an amount determined in the Board's business judgment but not less than an amount equal to one-quarter (1/4) of the annual Base Assessments on all Lots

20021127
.01887

plus reserves on hand. Fidelity insurance policies shall contain a waiver of all defenses based upon the exclusion of Persons serving without compensation; and

      7.3.1.6  Such additional insurance as the Board, in its business judgment, determines advisable.

      In addition, the Master Association shall, if so specified in a Supplemental Declaration applicable to any Cost Center, obtain and maintain property insurance on the insurable Cost Center Improvements within such Cost Center, which insurance shall comply with the requirements of Section 7.3.1. Any such policies shall provide for a certificate of insurance to be furnished upon request to the Owner of each Lot within the Cost Center benefitting from such insurance.

      Premiums for all insurance on the Areas of Common Responsibility shall be Common Expenses, except that (i) premiums for property insurance on Lots within a Cost Center shall be a Cost Center Expense; and (ii) premiums for insurance on Limited Common Elements may be included in the Cost Center Expenses of the Cost Center to which such Limited Common Elements are assigned unless the Board reasonably determines that other treatment of the premiums is more appropriate.

      7.3.2  <u>Policy Requirements</u>. The Master Association shall arrange for an annual review of the sufficiency of its insurance coverage by one or more qualified Persons, at least one of whom must be familiar with insurable replacement costs in the metropolitan Las Vegas area. All Master Association policies shall provide for a certificate of insurance to be furnished to the Master Association and, upon request, to each Member insured.

      The policies may contain a reasonable deductible and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the policy limits satisfy the requirements of Section 7.3.1. In the event of an insured loss, the deductible shall be treated as a Common Expense or a Cost Center Expense in the same manner as the premiums for the applicable insurance coverage. However, if the Board reasonably determines, after notice and an opportunity to be heard in accordance with the procedures set forth in the Rules, that the loss is the result of the negligence or willful misconduct of one or more Owners, their guests, invitees, or lessees, then the Board may assess the full amount of such deductible against such Owner(s) and their Lots as a Specific Assessment.

      All insurance coverage obtained by the Board shall, to the extent reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

      7.3.2.1  be written with a company authorized to do business in the State of Nevada that satisfies the requirements of the Federal National Mortgage Association, or such other secondary mortgage market agencies or federal agencies as the Board deems appropriate;

      7.3.2.2  be written in the name of the Master Association as trustee for the benefitted parties. Policies on the Common Elements shall be for the benefit of the Master Association and

20021127
.01887

its Members. Policies secured on behalf of Lots within a Cost Center shall be for the benefit of the Owners of Lots within the Cost Center and their Mortgagees, as their interests may appear;

7.3.2.3   not be brought into contribution with insurance purchased by Owners, Occupants, or their Mortgagees individually;

7.3.2.4   contain an inflation guard endorsement;

7.3.2.5   include an agreed amount endorsement, if the policy contains a co-insurance clause;

7.3.2.6   provide that each Owner is an insured person under the policy with respect to liability arising out of such Owner's interest in the Common Elements or membership in the Master Association;

7.3.2.7   provide a waiver of subrogation under the policy against any Owner or household member of an Owner;

7.3.2.8   include an endorsement precluding cancellation, invalidation, suspension, or non-renewal by the insurer on account of any one or more individual Owners, or on account of any curable defect or violation without prior written demand to the Master Association to cure the defect or violation and allowance of a reasonable time to cure;

7.3.2.9   include an endorsement precluding cancellation, invalidation, or condition to recovery under the policy on account of any act or omission of any one or more individual Owners, unless such Owner is acting within the scope of its authority on behalf of the Master Association; and

7.3.2.10   comply with the applicable provisions of the Development Agreement and any License Agreement assigned to the Master Association pursuant to a Declarant Assignment of Maintenance Obligation.

The Master Association shall provide Declarant at least twenty (20) days prior written notice of any cancellation, termination, substantial modification, or non-renewal of any Master Association insurance policy.

7.3.3   <u>Restoring Damaged Improvements</u>. In the event of damage to or destruction of Common Elements or other property that the Master Association is obligated to insure, the Board or its duly authorized agent shall file and adjust all insurance claims and obtain reliable and detailed estimates of the cost of repairing or restoring the property to substantially the condition in which it existed prior to the damage, allowing for changes or Improvements necessitated by changes in applicable building codes. Notwithstanding anything to the contrary contained herein, if any part of the damaged property is part of the Areas of Common Responsibility owned by the City for which the Master Association is obligated to

20021127
01887

insure and maintain, then the damaged property shall be restored to its condition as originally installed or as more specifically set forth in the Development Agreement or the License Agreement.

Except as provided by the Act, damaged Improvements on the Common Elements shall be repaired or reconstructed unless the Members representing at least eighty percent (80%) of the total votes in the Master Association, and Declarant, for so long as it owns any property described on Exhibits "A" and/or "B," decide within sixty (60) days after the loss not to repair or reconstruct. If the damage is to Limited Common Elements, eighty percent (80%) of the Owners to which such Limited Common Elements is assigned and Declarant, for so long as it owns any property described on Exhibits "A" and/or "B", must vote not to repair or reconstruct. Damaged Improvements on any part of the Areas of Common Responsibility owned by the City for which the Master Association is responsible to insure and maintain, shall be repaired and/or reconstructed if required by the applicable License Agreement, notwithstanding any vote by the Members.

If either the insurance proceeds or estimates of the loss, or both, are not available to the Master Association within such sixty (60) day period, then the period shall be extended until such funds or information are available. However, such extension shall not exceed sixty (60) additional days. No Mortgagee shall have the right to participate in the determination of whether the damage or destruction to the Common Elements shall be repaired or reconstructed.

If a decision is made not to restore the damaged Improvements, and no alternative Improvements are authorized, the affected real property shall be cleared of all debris and ruins and thereafter shall be maintained by the Master Association in a neat and attractive, landscaped condition consistent with the Community-Wide Standard.

If Owners vote (as provided above) not to repair or reconstruct Improvements on Common Elements, then any insurance proceeds attributable to such Common Elements, minus the costs of clearing and landscaping, shall be distributed to all Owners in equal amounts. If Owners to which Limited Common Elements are assigned vote (as provided above) not to repair or reconstruct Improvements on such Limited Common Element, then any insurance proceeds attributable to such Limited Common Element, minus the costs of clearing and landscaping, shall be distributed to such Owners in proportion to their ownership interest therein. This provision may be enforced by the Mortgagee of any affected Lot.

If insurance proceeds are insufficient to cover the costs of repair or reconstruction, the Board may, subject to the provisions of the Act, levy Special Assessments to cover the shortfall against those Owners responsible for the premiums for the applicable insurance coverage under Section 7.3.1.

7.3.4    Waiver of Claims. To the extent permitted by Law, the Master Association and each Home Owner, by accepting a deed or entering into a Recorded contract of sale for any portion of the Property, waives any claims against Declarant, each Builder and their respective affiliates for any damages or losses for which insurance coverage is available, to the extent of such insurance coverage.

20021127
.01887

7.4    Compliance and Enforcement.

7.4.1    Every Owner and Occupant of a Lot, Sub-Association and Builder shall comply with the Governing Documents. The Board may impose sanctions for violation of the Governing Documents after notice and a hearing in accordance with the procedures set forth in the Rules. The Board shall establish a range of penalties for such violations, with violations of the Declaration, unsafe conduct, harassment, or intentionally malicious conduct treated more severely than other violations. Such sanctions may include, without limitation:

7.4.1.1    imposing reasonable monetary fines which shall, to the fullest extent permitted under the Act, constitute a lien upon the Lot owned or Occupied by the Violator. The amount of each such fine must be commensurate with the severity of the violation and shall in no event exceed the maximum permitted by the Act. If a fine is imposed pursuant to this Section 7.4.1.1 and the violation is not cured within fourteen (14) days or such longer cure period as the Board establishes, the violation shall be deemed a continuing violation and the Board may thereafter impose an additional fine for the violation for each seven (7) day period or portion thereof that the violation is not cured. Any additional fine may be imposed without notice and an opportunity to be heard. In the event that any Occupant, guest, or invitee of an Owner violates the Governing Documents and a fine is imposed, the fine shall first be assessed against the Violator; provided, however, if the fine is not paid by the Violator within the time period set by the Board, the Owner shall pay the fine upon notice from the Board. The Board shall Notify each Owner of fines applicable to particular violations;

7.4.1.2    suspending an Owner's right to vote;

7.4.1.3    suspending any Person's right to use any recreational facilities within the Common Element; provided, however, nothing herein shall authorize the Board to limit ingress or egress to or from a Lot;

7.4.1.4    suspending any services provided by the Master Association to an Owner or the Owner's Lot if the Owner is more than thirty (30) days delinquent in paying any assessment or other charge owed to the Master Association;

7.4.1.5    entering a Lot and, if necessary, a Residence or Apartment, and exercising self-help or taking action to abate any violation of the Governing Documents in a non-emergency situation;

7.4.1.6    requiring an Owner, at its own expense, to remove any structure or Improvement on such Owner's Lot in violation of Article 4 and to restore the Lot to its previous condition and, upon failure of the Owner to do so, the Board or its designee shall have the right to enter the property, remove the violation and restore the property to substantially the same condition as previously existed and any such action shall not be deemed a trespass;

20021127
.01887

7.4.1.7  without liability to any Person, precluding any contractor, subcontractor, agent, employee, or other invitee of an Owner who fails to comply with the terms and provisions of Article 4 and the Architectural Guidelines from continuing or performing any further activities in the Property;

7.4.1.8  levying Specific Assessments to cover costs incurred by the Master Association to bring a Lot into compliance with the Governing Documents; and

7.4.1.9  recording a Notice of Non-Compliance against a Lot.

7.4.1.10  If an Owner fails properly to perform his or her maintenance responsibility after notice and a hearing in accordance with the procedures set forth in the Rules, then the Board, at its option, may Record a Notice of Non-Compliance, and may peacefully remedy the noncompliance, and the Owner shall reimburse the Master Association, upon demand, for all expenses incurred in connection therewith. If such expenses are not promptly repaid by the Owner to the Master Association, the Board shall levy a Specific Assessment against such Owner's Lot for reimbursement as provided in this Declaration. The right of the Master Association to remove a noncomplying Improvement or otherwise remedy the noncompliance shall be in addition to all other rights and remedies which the Master Association may have at law, in equity, or in this Master Declaration.

7.4.1.11  In addition to any other enforcement rights, if an Owner fails properly to perform his or her maintenance responsibility after notice and a hearing in accordance with the procedures set forth in the Rules, the Master Association may issue a notice of violation, then the Board, at its option, may Record a Notice of Non-Compliance and may peacefully remedy the non-compliance, and the Owner shall reimburse the Master Association, upon demand, for all expenses incurred in connection therewith. If such expenses are not promptly repaid by the Owner to the Master Association, the Board shall levy a Special Assessment against such Owner for reimbursement as provided in this Declaration. The right of the Master Association to remove a noncomplying Improvement or otherwise remedy the non-compliance shall be in addition to all other rights and remedies which the Master Association may have at law, in equity, or in this Master Declaration.

7.4.1.12  If a Sub-Association fails properly to perform its maintenance responsibility after notice and a hearing in accordance with the procedures set forth in the Rules, then the Board, at its option, may Record a Notice of Non-Compliance, and may peacefully remedy the non-compliance, and the Sub-Association shall reimburse the Master Association, upon demand, for all expenses incurred in connection therewith. If such expenses are not promptly repaid by the Sub-Association to the Master Association, the Board shall levy a Specific Assessment against all Lots within such Sub-Association for reimbursement as provided in this Declaration. The right of the Master Association to remove a non-complying Improvement or otherwise remedy the non-compliance shall be in addition to all other rights and remedies which the Master Association may have at law, in equity, or in this Master Declaration.

All remedies set forth in the Governing Documents shall be cumulative of any remedies available at law or in equity. In any action to enforce the Governing Documents, if the Master Association

20021127
.01867

prevails, it shall be entitled to recover all costs, including, without limitation, attorneys' fees and court costs, reasonably incurred in such action.

7.4.2    The decision to pursue enforcement action in any particular case shall be left to the Board's discretion, except that the Board shall not be arbitrary or capricious in taking enforcement action. Such decision shall not be construed a waiver of the Master Association's right to enforce such provision at a later time under other circumstances or preclude the Master Association from enforcing any other covenant, restriction, or Rule. The Master Association, by contract or other agreement, may enforce applicable Laws, and shall permit all applicable governmental bodies to enforce their respective Laws within the Property for the benefit of the Master Association and its Members.

7.5    Implied Rights; Board Authority. The Master Association may exercise any right or privilege given to it expressly by the Governing Documents, by the Act or reasonably implied from or reasonably necessary to effectuate any such right or privilege. Except as otherwise specifically provided in the Governing Documents or by law, all rights and powers of the Master Association may be exercised by the Board without a vote of the membership.

7.6    Indemnification of Officers, Directors and Others.

7.6.1    Indemnification. The Master Association shall protect, defend, indemnify, and hold harmless Declarant, each Reviewing Builder, and every officer, director, agent, and committee member of the Master Association against all liabilities, damages and expenses, including counsel fees, reasonably incurred in connection with any action, suit, or other proceeding (including settlement of any suit or proceeding, if approved by the then Board of Directors) to which he, she or it (including, without limitation, its employees) may be a party by reason of being or having been an officer, director, agent, committee member or Reviewing Builder, or having entered into any contract, commitment or agreement on behalf of the Master Association, except that the obligations of the Master Association under this Section shall be limited to those actions for which liability is limited under this Section, the Articles of Incorporation, the Bylaws, and Nevada law. The Master Association shall, as a Common Expense, maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such insurance is commercially reasonably available.

7.6.2    Claims Related to Breach of Duty. The officers, directors, agents, and committee members of the Master Association shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct, or bad faith. The officers and directors of the Master Association shall have no personal liability with respect to any contract or other commitment made or action taken in good faith on behalf of the Master Association (except to the extent that such officers or directors may also have liability as a Member of the Master Association).

Decisions whether to institute litigation are no different from other decisions directors make. There is no independent legal obligation to bring a civil action against another party, and no provision of the Governing Documents shall be construed to impose a duty upon the Board to sue under any circumstances.

20021127
.01887

In deciding whether to bring a civil action against another party, a director is protected by the business judgment rule as explained in the Bylaws.

### 7.6.3    Exclusion from Liability for Other Tortious Acts.

7.6.3.1    Volunteer directors, officers, committee members and any other Members of the Master Association acting in an official capacity on behalf of the Master Association (as applicable, a "Volunteer") are intended to be protected by the Master Association to the extent of the Master Association's coverage of insurance with respect to any Person who suffers injury, including but not limited to, bodily injury, emotional distress, wrongful death, or property damage or loss as a result of the Volunteer's tortious act or omission as long as the following requirements are met by the Volunteer and the Master Association:

7.6.3.1.1    the Volunteer's act or omission was performed within the scope of his or her duties or otherwise in an official capacity on behalf of the Master Association;

7.6.3.1.2    the Volunteer's act or omission was performed in good faith;

7.6.3.1.3    the Volunteer's act or omission was not willful, wanton, or grossly negligent; and

7.6.3.1.4    the Master Association maintained and had in effect (at the time the act or omission of the Volunteer occurred and at the time a claim was made) one or more insurance policies which included coverage for general liability of the Master Association and individual liability of directors, officers, agents, committee members, and other Members of the Master Association acting in an official capacity on behalf of the Master Association for negligent acts or omissions in that capacity.

7.6.3.2    The payment or reimbursements for actual expenses incurred in the execution of his or her duties shall not affect the status of an officer or director as a Volunteer under this Section 7.6.3.

7.6.4    Indemnities Non-Exclusive.    The rights to indemnification contained in Section 7.6 or elsewhere in the Governing Documents shall not be exclusive of any other rights to which any present or former officer, director, committee member, or other Member acting in an official capacity on behalf of the Master Association may be entitled. Without limiting the foregoing, a right to indemnification in any particular section of this Declaration does not preclude indemnification under any other section.

### 7.7    Safety.

**THE MASTER ASSOCIATION, THE BOARD, THE MASTER ASSOCIATION'S MANAGER, ANY SUB-ASSOCIATION, EACH BUILDER AND DECLARANT SHALL NOT**

20021127
.01887

IN ANY WAY BE CONSIDERED INSURERS OR GUARANTORS OF SECURITY WITHIN THE ALIANTE RESIDENTIAL COMMUNITY, NOR SHALL ANY OF THE ABOVE PARTIES BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OF FAILURE TO PROVIDE ADEQUATE SECURITY OR INEFFECTIVENESS OF SECURITY MEASURES UNDERTAKEN. NO REPRESENTATION OR WARRANTY IS MADE THAT ANY SYSTEMS OR MEASURES, INCLUDING ANY MECHANISM OR SYSTEM FOR LIMITING ACCESS TO ANY PORTION OF THE PROPERTY, CANNOT BE COMPROMISED OR CIRCUMVENTED, NOR THAT ANY SUCH SYSTEMS OR SECURITY MEASURES UNDERTAKEN WILL IN ALL CASES PREVENT LOSS OR PROVIDE THE DETECTION OR PROTECTION FOR WHICH THE SYSTEM IS DESIGNED OR INTENDED.

EACH OWNER ACKNOWLEDGES, UNDERSTANDS, AND COVENANTS TO INFORM ITS TENANTS AND ALL OCCUPANTS OF ITS LOT THAT THE MASTER ASSOCIATION, ITS BOARD, COMMITTEES, SUB-ASSOCIATIONS, AND ALL OTHER PERSONS INVOLVED WITH THE GOVERNANCE, MAINTENANCE, AND MANAGEMENT OF THE ALIANTE RESIDENTIAL COMMUNITY, AS WELL AS DECLARANT, ARE NOT INSURERS OF SAFETY OR SECURITY WITHIN THE ALIANTE RESIDENTIAL COMMUNITY. ALL OWNERS AND OCCUPANTS OF ANY LOT AND THEIR TENANTS, GUESTS, AND INVITEES ASSUME ALL RISKS OF PERSONAL INJURY AND LOSS OR DAMAGE TO PERSONS, RESIDENCES, APARTMENTS, LOTS, AND THE CONTENTS OF LOTS, AND FURTHER ACKNOWLEDGE THAT THE MASTER ASSOCIATION, ITS BOARD AND COMMITTEES, THE MASTER ASSOCIATION'S MANAGER, ANY SUB-ASSOCIATION, AND DECLARANT HAVE MADE NO REPRESENTATIONS OR WARRANTIES, NOR HAS ANY OWNER, OCCUPANT, OR ANY TENANT, GUEST, OR INVITEE OF ANY OWNER OR OCCUPANT RELIED UPON ANY REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, RELATIVE TO ANY ENTRY GATE, PATROLLING OF THE PROPERTY, ANY FIRE PROTECTION SYSTEM, BURGLAR ALARM SYSTEM, COMMUNICATION SYSTEM, OR OTHER SECURITY SYSTEMS RECOMMENDED OR INSTALLED OR ANY SECURITY MEASURES UNDERTAKEN WITHIN ANY PORTION OF THE PROPERTY.

7.8     Provision of Services.  The Master Association shall be authorized, but not obligated, to enter into and terminate, in the Board's discretion, contracts or agreements with other entities, including Declarant, to provide services to and facilities for the Members of the Master Association, their guests, lessees, and invitees and to charge use and consumption fees for such services and facilities. For example, some services and facilities that might be offered include landscape maintenance, pest control service, cable television service, security, caretaker, transportation, fire protection, utilities, and similar services and facilities.  All services provided under this Section 7.8 shall be subject to the terms of the specific contract under which the services or facilities are provided.

7.9     Change of Services and Use of Common Element.  The Board shall have the power and right to terminate provided services or to change the use of portions of the Areas of Common Responsibility

20021127
.01887

during the Declarant Control Period without the consent of the Members. Thereafter, the Board may do so with the consent of a Majority of the Owners, and the Declarant's consent (so long as Declarant owns any real property described in Exhibits "A" or "B"). Any such change shall be made by Board resolution stating that: (a) the present use or service is no longer in the best interest of the Owners, (b) the new use is for the benefit of the Owners, (c) the new use is consistent with any deed restrictions, zoning regulations and the Development Agreement restricting or limiting the use of the Common Elements, and (d) the new use is consistent with the then effective Master Plan.

After conveyance of completed facilities and subject to *force majeure*, the Master Association shall maintain the facilities and equipment within the Areas of Common Responsibility for continuous use, except for any periods necessary, as determined in the sole discretion of the Board, to perform required maintenance or repairs, or replace with reasonable non-material modification, unless a Majority of the Members and Declarant, for so long as it owns any real property described on Exhibits "A" and/or "B," agree in writing to discontinue such operation.

Notwithstanding the above, if the Board resolution states that the change will not have an adverse effect on the Master Association and the Owners, the Board may give notice of the change to all Owners. The notice shall give the Owners a right to object within thirty (30) days of the notice. If less than ten percent (10%) of the Members submit written objections, the change shall be deemed approved and the consent of a Majority of the Owners shall not be necessary.

This Section 7.9 shall not apply to the Board's ability to make and change rules relating to managing existing uses (e.g., scheduling use of Common Element facilities, such as rooms, etc.).

7.10    View Impairment.

**NEITHER DECLARANT, THE MASTER ASSOCIATION, NOR THE OWNER OF ANY EXCLUDED AMENITY, GUARANTEES OR REPRESENTS THAT ANY VIEW OVER AND ACROSS LOTS, THE VIEW OF ANY COMMON ELEMENTS FROM LOTS ADJACENT TO THE COMMON ELEMENTS OR THE VIEW OF ANY EXCLUDED AMENITY FROM LOTS ADJACENT TO THE EXCLUDED AMENITY WILL BE PRESERVED WITHOUT IMPAIRMENT. DECLARANT, AND THE MASTER ASSOCIATION SHALL NOT HAVE ANY OBLIGATION TO RELOCATE, PRUNE, OR THIN TREES OR OTHER LANDSCAPING THAT MAY LIMIT OR IMPAIR THE VIEW FROM A LOT. TREES AND OTHER LANDSCAPING MAY BE ADDED TO LOTS AND TO THE OPEN SPACE FROM TIME TO TIME SUBJECT TO APPLICABLE LAW AND THE GOVERNING DOCUMENTS. OWNERS OF THE EXCLUDED AMENITIES, IF ANY, SHALL HAVE NO OBLIGATION TO PRUNE OR THIN TREES OR OTHER LANDSCAPING, AND SHALL HAVE THE RIGHT, IN THEIR SOLE AND ABSOLUTE DISCRETION, TO ADD TREES AND OTHER LANDSCAPING TO THE EXCLUDED AMENITIES FROM TIME TO TIME. IN ADDITION, THE OWNER OF ANY EXCLUDED AMENITY WHICH INCLUDES THE GOLF COURSE MAY, IN ITS SOLE AND ABSOLUTE DISCRETION, CHANGE THE LOCATION, CONFIGURATION, SIZE AND ELEVATION**

29021127
.01887

**OF THE TREES, BUNKERS, FAIRWAYS AND GREENS FROM TIME TO TIME. ANY SUCH ADDITIONS OR CHANGES MAY DIMINISH OR OBSTRUCT ANY VIEW FROM THE LOTS AND ANY EXPRESS OR IMPLIED EASEMENTS FOR VIEW PURPOSES OR FOR THE PASSAGE OF LIGHT AND AIR ARE HEREBY EXPRESSLY DISCLAIMED.**

7.11    Relationship with Sub-Associations. The Master Association shall have the power but not the duty to enforce the Governing Documents within each Neighborhood that is part of a Sub-Association. The Master Association hereby delegates to each Sub-Association the primary duty and obligation to enforce the Governing Documents with respect to that part of the Property located within such Sub-Association. Each Sub-Association shall have the duty and obligation to enforce the Governing Documents with respect to that part of the Property located within such Sub-Association in a manner consistent with the Community-Wide Standards. It is expressly acknowledged that the enforcement of the Governing Documents may be different within the Aliante Residential Community because Sub-Associations will be enforcing the Governing Documents within certain parts of the Aliante Residential Community and the Master Association will be enforcing the Governing Documents in other parts of the Aliante Residential Community.

The Master Association shall have the right, but not the obligation, to veto any action taken or contemplated to be taken by any Sub-Association or by any other Neighborhood which the Board reasonably determines to be adverse to the interests of the Master Association or its Members or inconsistent with the Community-Wide Standard. The Master Association also shall have the right, but not the obligation, to require specific action to be taken by any Sub-Association in connection with its obligations and responsibilities (whether delegated hereunder or otherwise), such as requiring specific maintenance or repairs or aesthetic changes to be effectuated and requiring that a proposed budget include certain items and that expenditures be made therefor.

A Sub-Association shall take appropriate action required by the Master Association in a written notice within the reasonable time frame set by the Master Association in the notice. If the Sub-Association fails to comply, the Master Association shall have the right, but not the obligation, to effect such action on behalf of the Sub-Association (whether directly or by causing an Owner within the Sub-Association to take such action) and levy Specific Assessments to cover the costs, as well as an administrative charge and sanctions.

7.12    Relationship with Other Properties; Entities. The Master Association may enter into contractual agreements or covenants to share costs with the owner(s) of any neighboring real property or any other Person or entity to contribute funds for, among other things, shared or mutually beneficial property or services and/or a higher level of maintenance for any portion of the Common Elements of Common Responsibility.

**Article 8       Master Association Finances**

8.1    Budgeting and Allocating Common Expenses. At least sixty (60) days before the beginning of each fiscal year, the Board shall prepare a budget of the estimated Common Expenses for the coming

20021127
01887

year in compliance with the Act, which shall include the budget for the daily operation of the Master Association and an adequate reserve for the repair, replacement, and restoration of the major components of the Common Elements pursuant to Section 8.4. The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Lots, and the amount to be generated through the levy of Base Assessments and Special Assessments against the Lots, as authorized in Section 8.5.

The Master Association is hereby authorized to levy Base Assessments against all Lots subject to assessment under Section 8.7 to fund the Common Expenses in proportion with the allocation of votes under Section 6.3.1 and Section 6.3.2. Specifically, each Residential Lot shall be assessed one Base Assessment and each Multi-Family Lot shall be assessed one equal Base Assessment for every five (5) Apartments located on that Multi-Family Lot. In determining the Base Assessment rate per Lot, the Board may consider any assessment income expected to be generated from any additional Lots reasonably anticipated to become subject to assessment during the fiscal year.

Declarant may, but shall not be obligated to, reduce the Base Assessment for any fiscal year by payment of a subsidy (in addition to any amounts paid by Declarant under Section 8.8.2), which may, in Declarant's reasonable discretion, be a contribution, an advance against future assessments due from Declarant, or to the extent not prohibited under the Act a loan. Any such subsidy shall be disclosed as a line item in the income portion of the budget. Payment of such subsidy in any year shall not obligate Declarant to continue payment of such subsidy in future years, unless otherwise provided in a written agreement between the Master Association and Declarant. Furthermore, the Master Association is specifically authorized to enter into a written agreement with the Declarant under which Declarant agrees to the payment of such a subsidy to the Master Association in exchange for a temporary suspension of the Base Assessments that would otherwise be due from Declarant. Declarant intends to base the initial budget based on approximately six thousand five hundred (6,500) Lots in the Property, but reserves the right to create up to the Maximum Number of Lots, in which case the budget will be based on such additional number of Lots. No assurances are made that Declarant will develop six thousand five hundred (6,500) Lots or the Maximum Number of Lots, and nothing in this Declaration shall be construed to require Declarant under any circumstances to so develop the Aliante Residential Community.

The Board shall send a copy of the final budget or a summary thereof, together with notice of the amount of the Base Assessment to be levied pursuant to such budget, to each Owner not less than thirty (30) days before the beginning of each fiscal year and the Board shall set a date for a meeting of the Owners to consider ratification of the budget. The meeting shall be not less than fourteen (14) or more than thirty (30) days after mailing of the budget or summary. Unless at that meeting a majority of the total voting power of the Master Association reject the budget, the budget is ratified, whether or not a quorum is present.

If any proposed budget is rejected, the periodic budget last ratified by the Owners continues until the Owners ratify a subsequent budget proposed by the Board.

20021127
.01887

The Board may revise the budget and adjust the Base Assessment from time to time during the year, subject to the notice requirements and the right of the Owners to disapprove the revised budget as set forth above.

8.2    Limitations on Common Assessment Increases. The Board shall not levy, for any fiscal year, a Base Assessment that exceeds the "Maximum Authorized Common Assessment," unless first approved by the vote of a Majority of the total voting power of the Master Association. The "Maximum Authorized Base Assessment" in any fiscal year following the initial budgeted year shall equal not more than one hundred fifteen percent (115%) of the Base Assessment for the prior year.

8.3    Budgeting and Allocating Cost Center Expenses. At least sixty (60) days before the beginning of each fiscal year, the Board shall prepare a separate budget covering the estimated Cost Center Expenses for each Cost Center on whose behalf Cost Center Expenses are expected to be incurred during the coming year. Each such budget shall be prepared in compliance with the Act, and shall include any costs for additional services or a higher level of services provided by the Master Association through the Cost Center and an adequate reserve for the repair, replacement and restoration of the major components of the Limited Common Elements and other Cost Center Improvements attributable to the Cost Center pursuant to Section 8.4  The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Lots, and the amount required to be generated through the levy of Cost Center Assessments and Special Assessments against the Lots in such Cost Center.

The Master Association is hereby authorized to levy Cost Center Assessments equally against all Lots in a Cost Center that are subject to assessment under Section 8.7 to fund Cost Center Expenses; provided, if so specified in the applicable Supplemental Declaration or if so directed by petition signed by a majority of the Owners within the Cost Center, any portion of the assessment intended for exterior maintenance of structures, insurance on structures, or replacement reserves that pertain to particular structures shall be equally levied on each of the benefitted Lots.

If any proposed budget for any Cost Center is rejected, the periodic budget last ratified by the applicable Owners continues until the Owners ratify a subsequent budget proposed by the Board of Directors.

Subject to the limitations set forth in Section 8.2, the Board may revise the budget for any Cost Center and the amount of any Cost Center Assessment from time to time during the year, subject to the notice requirements and the right of the Owners of Lots in the affected Cost Center to disapprove the revised budget as set forth above.

Cost Center income and expense funds shall be kept in segregated accounts from the general funds of the Master Association, but need not be kept in separate deposit accounts.

8.4    Budgeting for Reserves; Use of Reserves. The Board shall establish and maintain a separate reserve account for the repair, replacement and restoration of the major components of the Common Elements based upon the age, remaining life and the quantity and replacement cost of major components of the Common

20021127
01867

Elements, in accordance with the provisions of this Declaration, the Bylaws and the Act; provided, however, that the reserves of the Master Association must not be used for the daily maintenance expenses of the Aliante Residential Community. The Board shall additionally cause to be conducted at least once every five (5) years a study of the reserves required for the repair, replacement and restoration of the major components of the Common Elements. Such reserve study shall be prepared in compliance with the Act and shall be reviewed at least annually (during the preparation of the Master Association budget) to determine if those reserves are sufficient or whether any adjustments are necessary to maintain adequate reserves.

8.5    Special Assessments. In addition to other authorized assessments, the Master Association may levy Special Assessments to cover capital Improvements, to cover unbudgeted expenses or to cover expenses in excess of those budgeted. Any such Special Assessment may be levied against the entire membership, if such Special Assessment is for Common Expenses, or against the Lots within any Cost Center if such Special Assessment is for Cost Center Expenses. Except as otherwise specifically provided in this Declaration, any Special Assessment shall require the affirmative vote or written consent of a Majority of Owners that will be subject to such Special Assessment and the affirmative vote or written consent of the Declarant during the Declarant Control Period. Special Assessments shall be payable in such manner and at such times as determined by the Board, and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved.

8.6    Specific Assessments. The Master Association shall have the power to levy Specific Assessments against a particular Lot as follows:

8.6.1    to cover the costs, including overhead and administrative costs, of providing services to Lots upon request of an Owner pursuant to any menu of special services that may be offered by the Master Association (which might include the items identified in Section 7.8) or which the Board determines are benefitting fewer than all of the Owners. Specific Assessments for special services may be levied in advance of the provision of the requested service; and

8.6.2    to cover costs incurred in bringing the Lot into compliance with the Governing Documents, or costs incurred as a consequence of the conduct of the Owner or occupants of the Lot, his or her agents, contractors, employees, licensees, invitees, or guests; provided, the Board shall give the Lot Owner prior written notice and an opportunity for a hearing, in accordance with the procedures set forth in the Rules, before levying any Specific Assessment under this Section 8.6.2.

The Master Association may also levy a Specific Assessment against the Lots within any Neighborhood or Sub-Association to reimburse the Master Association for costs incurred in bringing the Neighborhood into compliance with the provisions of the Governing Documents, provided the Board gives prior written notice to the Owners of Lots in the Neighborhood (and the Sub-Association, if any), and an opportunity for such Owners to be heard before levying any such assessment.

8.7    Authority To Assess Owners; Time of Payment. Declarant hereby establishes and the Master Association is hereby authorized to levy assessments as provided for in this Article and elsewhere in the Governing Documents. The obligation to pay assessments shall commence as to each Lot on the first day of

20021127
01867

the month following: (a) the month in which the Lot is made subject to this Declaration, or (b) the month in which the Board first determines a budget and levies assessments pursuant to this Article, whichever is later. The first annual Base Assessment and Cost Center Assessment, if any, levied on each Lot shall be adjusted according to the number of months remaining in the fiscal year at the time assessments commence on the Lot. With respect to any parcel owned by a Builder not yet subdivided into Residential Lots, such Builder shall be charged assessments calculated in accordance with Section 2.62. With respect to any Multi-Family Lot not containing Apartments, the Owner shall be charged assessments calculated in accordance with Section 2.47.

Assessments shall be paid in such manner and on such dates as the Board may establish. The Board may require advance payment of assessments at closing of the transfer of title to a Lot and impose special requirements for Owners with a history of delinquent payment. If the Board so elects, assessments may be paid in two (2) or more installments. Unless the Board otherwise provides, the Base Assessment and any Cost Center Assessment shall be due and payable in twelve (12) equal monthly installments each due on the first day of each month. If any Owner is delinquent in paying any assessments or other charges levied on his or her Lot, the Board may require the outstanding balance on all assessments to be paid in full immediately.

### 8.8    Obligation for Assessments.

8.8.1    Personal Obligation.  Each Owner, by accepting a deed or entering into a Recorded contract of sale for any portion of the Property, is deemed to covenant and agree to pay all assessments authorized in the Governing Documents.  All assessments, together with interest (computed from its due date at a rate of ten percent (10%) per annum or such higher rate as the Board may establish, subject to the limitations of Nevada law), late charges as determined by Board resolution, costs, and reasonable attorneys' fees, shall be the personal obligation of each Owner and a lien upon each Lot until paid in full.  Upon a transfer of title to a Lot, the grantee shall be liable for any assessments and other charges accruing after the conveyance.

Failure of the Board to fix assessment amounts or rates or to deliver or mail each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments.  In such event, each Owner shall continue to pay Base Assessments and Cost Center Assessments on the same basis as during the last year for which an assessment was made, if any, until a new assessment is levied, at which time the Master Association may retroactively assess any shortfalls in collections.

No Owner may exempt himself from liability for assessments by non-use of Common Elements, abandonment of his or her Lot, or any other means.  The obligation to pay assessments is a separate and independent covenant on the part of each Owner.  No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Master Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or Improvements, or from any other action it takes.

Upon written request, the Master Association shall furnish to any Owner liable for any type of assessment a certificate in writing signed by a Master Association officer setting forth whether such assessment has been paid.  Such certificate, if validly issued, shall be presumptive evidence of payment.  The

20021127
01887

Master Association may require the advance payment of a reasonable processing fee for the issuance of such certificate.

8.8.2    Declarant's Option To Fund Budget Deficits. During the Declarant Control Period, Declarant may satisfy its obligation for assessments on Lots that it owns either by paying such assessments in the same manner as any other Owner or by paying the difference between the amount of assessments levied on all other Lots subject to assessment and the amount of actual expenditures, less reserves, by the Master Association during the fiscal year. Unless Declarant otherwise notifies the Board in writing at least sixty (60) days before the beginning of each fiscal year, Declarant shall be deemed to have elected to continue paying on the same basis as during the immediately preceding fiscal year. Regardless of such election, the Master Association shall have a lien against all Lots owned by Declarant to secure Declarant's obligations under this section, which lien shall have the same attributes and shall be enforceable in the same manner as the Master Association's lien against each Lot under Section 8.9. Regardless of Declarant's election, Declarant's obligations hereunder may be satisfied in the form of cash or by "in kind" contributions of services or materials, or by a combination of these. After termination of the Declarant Control Period, Declarant shall pay assessments on its unsold Lots in the same manner as any other Owner.

8.9    Lien for Assessments. The Master Association shall have a lien against each Lot to secure payment of delinquent assessments, as well as interest, late charges (subject to the limitations of Nevada law), and costs of collection (including attorneys fees). Except to the extent permitted under the Act, a lien under this Section is prior to all other liens and encumbrances on a Lot except: (a) liens and encumbrances recorded before the Recordation of this Declaration; (b) a first Mortgage on the Lot recorded before the date on which the assessment sought to be enforced became delinquent; and (c) liens for real estate taxes and other governmental assessments or charges against the Lot. A lien under this Section is also prior to all Mortgages described in (b) above to the extent that the Base Assessments are based on the periodic budget adopted by the Master Association pursuant to the provisions of this Article 8 and would have become due in the absence of acceleration, during the six (6) months immediately preceding institution of an action to enforce the Master Association's lien. A lien under this Section, when delinquent, may be enforced by suit, judgment, and judicial or nonjudicial foreclosure. This Section 8.9 does not affect the priority of mechanics' or materialmen's liens or the priority of a lien for other assessments made by the Master Association.

Fees, charges, late charges, fines and interest charged pursuant to the Act and the Governing Documents are enforceable as assessments under this Section; provided, however, that unless otherwise permitted under the Act, the Master Association may not foreclose upon a lien for unpaid assessments which is comprised solely of fines levied against an Owner for violation of the Governing Documents unless the violation is of a type that threatens the health and welfare of the Occupants of the Aliante Residential Community. If the lien includes fines or any other amounts that may not be foreclosed under the Act, then the Master Association may foreclose any and all portions of the lien that are not so limited. In addition, the Master Association may, with or without foreclosing, exercise any and all other rights and remedies available to the Master Association under applicable Law, including the Act. Furthermore, the Master Association may sue for unpaid assessments and other charges authorized hereunder without foreclosing or waiving the lien securing same.

20021127
.01887

The Master Association's lien may be foreclosed in accordance with procedures set forth in NRS 116.31162 and 116.31164 or elsewhere in the Act or by any other manner permitted by law.

The Master Association may bid for the Lot at the foreclosure sale and acquire, hold, lease, mortgage, and convey the Lot. While a Lot is owned by the Master Association following foreclosure: (a) no right to vote shall be exercised on behalf of such Lot; (b) no assessment shall be levied on it; and (c) each other Lot shall be charged, in addition to its usual assessment, its pro rata share of the assessment that would have been charged such Lot had it not been acquired by the Master Association.

Sale or transfer of any Lot shall not affect the assessment lien or relieve such Lot from the lien for any subsequent assessments. However, the sale or transfer of any Lot pursuant to foreclosure of the first Mortgage shall extinguish the lien as to any installments of such assessments due prior to the Mortgagee's foreclosure. The subsequent Owner of the foreclosed Lot shall not be personally liable for assessments on such Lot due prior to such acquisition of title. Such unpaid assessments shall be deemed to be Common Expenses collectible from Owners of all Lots subject to assessment under Section 8.7, including such acquirer, its successors and assigns. The lien rights created in this Declaration shall be for the benefit of the Master Association.

8.10   Exempt Property. The following real property shall be exempt from payment of Base Assessments, Cost Center Assessments, and Special Assessments:

8.10.1   All Common Elements and such portions of the Property as may be included in the Areas of Common Responsibility;

8.10.2   Any real property dedicated to and accepted by any governmental authority or public utility;

8.10.3   Real property owned by any Neighborhood for the common use and enjoyment of its members, or owned by the members of a Neighborhood as tenants-in-common; and

8.10.4   Real property owned in fee by the Master Association.

In addition, Declarant and/or the Master Association shall have the right, but not the obligation, to grant exemptions to certain Persons qualifying for tax exempt status under Section 501(c) of the Internal Revenue Code so long as such Persons own real property subject to this Declaration for purposes listed in Section 501(c).

8.11   Capital Contributions. Upon acquisition of record title to a Residential Lot by the first Home Owner, that first Home Owner shall make a contribution to the working capital of the Master Association in an amount equal to one-sixth (1/6) of the annual Base Assessment per Residential Lot for that year, and upon acquisition of record title to a Multi-Family Lot by an Owner other than Declarant, that first Owner shall make a contribution to the working capital of the Master Association in an amount equal to one-sixth (1/6) of the annual Base Assessment applicable to that Multi-Family Lot for that year. Capital contributions made under

20021127
01887

this Section 8.11 shall be in addition to, not in lieu of, the annual Base Assessment and shall not be considered an advance payment of such assessment. This amount shall be deposited into the purchase and sales escrow and disbursed therefrom to the Master Association.

## PART FOUR: COMMUNITY DEVELOPMENT

*The Declaration reserves various rights to the Declarant in order to facilitate the smooth and orderly development of the Aliante Residential Community and to accommodate changes in the master plan which inevitably occur as a community the size of the Aliante Residential Community grows and matures.*

### Article 9      Expansion of the Community

9.1      Expansion by Declarant. Declarant may from time to time subject to the provisions of this Declaration all or any portion of the Annexable Property by Recording a Supplemental Declaration describing the additional real property to be subjected. A Supplemental Declaration Recorded pursuant to this Section shall constitute an "amendment" pursuant to NRS 116.2117, but shall not require the consent of any Person except the owner of such real property, if other than Declarant. Declarant's right to expand the community includes the right to create Lots, Common Elements, Cost Centers and Limited Common Elements with respect to such annexed real property.

9.1.1    Expiration/Transfer/Early Termination of Declarant's Right To Expand.

9.1.1.1.1      Expiration/Transfer. Declarant's right to expand the Property pursuant to this Article shall expire twenty (20) years from the date this Declaration is Recorded. Until then, Declarant may transfer or assign this right to any Person who is the developer of at least a portion of the real property described in Exhibits "A" or "B." Any such transfer shall be memorialized in a written, Recorded instrument executed by Declarant.

9.1.1.1.2      Early Relinquishment. Declarant, in its sole and absolute discretion, shall have the right to voluntarily relinquish its right to expand the Property pursuant to this Article with respect to all or portions of the Annexable Property by a Recorded instrument executed by Declarant.

9.1.2    Additional Property. Declarant reserves the right, but not the obligation, to annex additional real property not described in Exhibit "B" to the extent allowed by the Act. Nothing in this Declaration shall be construed to require Declarant or any successor to subject additional real property to this Declaration or to develop any of the Annexable Property in any manner whatsoever.

9.1.3    Supplemental Declaration. Annexation shall be accomplished by Recording a Supplemental Declaration. Each Supplemental Declaration which subjects real property to the Declaration shall contain the following information, as applicable:

9.1.3.1 A legal description of the real property to be annexed;

20021127
.01887

9.1.3.2  Whether the Lots contained within the real property to be annexed are Residential Lots or Multi-Family Lots;

9.1.3.3  The number of Lots.  In addition, if any of the Lots to be annexed are Multi-Family Lots, then the Supplemental Declaration shall identify the total number of Apartments contained or to be contained on each Multi-Family Lot pursuant to the applicable project plan approved by Declarant, or if no project plan has been approved by Declarant, then the maximum number of permissible Apartments as designated by Declarant;

9.1.3.4  A designation of the Neighborhood or Neighborhoods to which the Lots contained within the real property to be annexed are to be included within;

9.1.3.5  A designation of the Representation District to which the Lots contained within the real property to be annexed are to be included within;

9.1.3.6  A legal description of the Common Elements included therein, if any;

9.1.3.7  If any part of the Common Elements is designated as Limited Common Elements or includes a Cost Center or Cost Center Improvements then the Supplemental Declaration shall identify the Limited Common Elements, Cost Centers or Cost Center Improvements and the Lots or Neighborhood to which such Limited Common Elements, Cost Centers and/or Cost Center Improvements are assigned;

9.1.3.8  If, the real property being annexed is part of a Sub-Association, then the Supplemental Declaration shall identify the Sub-Association and specify the common property and any other property for which the Sub-Association has maintenance responsibility;

9.1.3.9  A description of any additional Areas of Common Responsibility for which the Master Association is to become obligated to maintain;

9.1.3.10  If a Builder has been designated by Declarant for the real property to be annexed, then the Supplemental Declaration shall include the name and address of the Builder;

9.1.3.11  If a Reviewing Builder is designated in accordance with Section 4.2.1 by Declarant for the real property to be annexed, then the Supplemental Declaration shall include the following information as applicable: (a) the fact of delegation, (b) the scope of responsibilities delegated, (c) the name and address of the Reviewing Builder, and (d) the term of office of the Reviewing Builder appointed;

9.1.3.12  State that the real property to be annexed is submitted to the covenants, conditions, and restrictions contained herein;

9.1.3.13  Provide for the readjustment of voting rights and assessment allocations in accordance with the formulas provided herein;

20021127
.01887

9.1.3.14 State that any such expansion shall be effective upon the Recordation of the Supplemental Declaration except as provided therein; and

9.1.3.15 Contain such other information as may be necessary to comply with the applicable provisions of the Act.

9.1.4  Limitation. Declarant's right to expand the Property pursuant to Section 9.1 shall be subject to the additional limitation that the Aliante Residential Community may not contain more than the Maximum Number of Lots, except as set forth in the Act.

9.2  Expansion by the Master Association. The Master Association may also subject additional real property to the provisions of this Declaration by Recording a Supplemental Declaration describing the additional real property. Any such Supplemental Declaration shall require the affirmative vote of sixty-seven percent (67%) of the total votes in the Master Association at a meeting duly called for such purpose and the consent of the owner of the real property. In addition, so long as Declarant owns any of the real property described in Exhibit "A" and/or "B", the consent of Declarant shall be necessary. The Supplemental Declaration shall be signed by the President and Secretary of the Master Association, by the owner of the real property, and by Declarant, if Declarant's consent is necessary. Any Supplemental Declaration under this Section shall comply with the requirements of the Act.

9.3  Additional Covenants and Easements. Declarant may subject any portion of the Property to additional covenants and easements, including covenants obligating the Master Association to maintain and insure other real property and authorizing the Master Association to recover its costs through Cost Center Assessments. Such additional covenants and easements may be set forth either in a Supplemental Declaration subjecting such real property to this Declaration or in a separate Supplemental Declaration referencing real property previously subjected to this Declaration. If the real property is owned by someone other than Declarant, then the consent of the Owner(s) shall be necessary and shall be evidenced by their execution of the Supplemental Declaration. Any such Supplemental Declaration may supplement, create exceptions to, or otherwise modify the terms of this Declaration as it applies to the subject property in order to reflect the different character and intended use of such real property.

9.4  Effective Date of Supplemental Declaration. Any Supplemental Declaration Recorded pursuant to this Article shall be effective upon Recording unless otherwise specified in such Supplemental Declaration.

**Article 10      Additional Rights Reserved to Declarant**

10.1  Withdrawal of Real Property. For so long as Declarant has a right to annex additional real property pursuant to Section 9.1, Declarant reserves the right to amend this Declaration for the purpose of removing and withdrawing any portion of the Property from the coverage of this Declaration, whether originally described in Exhibit "A" or added by Supplemental Declaration; provided, however, that no real property described on a particular Plat shall be withdrawn after a Lot shown on that Plat has been conveyed by Declarant to any Person other than an affiliate of Declarant. Any withdrawal shall reduce the number of Lots

20021127
.01887

subject to the Declaration, the number of votes in the Master Association, and the Lots subject to assessment. To the fullest extent permitted by law, such amendment shall not require the consent of any Person other than the Owner of the real property to be withdrawn, if not Declarant. If the real property is Common Elements, the Master Association shall consent to such withdrawal upon the request of Declarant.

10.2    Marketing and Sales Activities. Declarant (and Builders, subject to Declarant's reserved rights in Article 4) may construct and maintain upon portions of the Common Elements and Lots such facilities and activities as may be reasonably required, convenient, or incidental, to the construction or sale of Lots, including, but not limited to, business offices, signs, model Lots, and sales offices, and shall have easements for access to and use of such facilities.

10.3    Right to Develop. Declarant and its employees, agents, and designees shall have a right of access and use and an easement over and upon all of the Common Elements for the purpose of making, constructing, and installing such Improvements to the Common Elements and to the Annexable Property as indicated on any Plat, in this Declaration, or as it deems appropriate in its sole discretion.

Every Person that acquires any interest in the Property acknowledges that the Aliante Residential Community is a master planned community, the development of which is likely to extend over many years, and agrees not to protest, challenge, or otherwise object to (a) changes in uses or density of real property outside the Neighborhood in which such Person holds an interest, or (b) changes in the Master Plan as it relates to real property outside the Neighborhood in which such Person holds an interest so long as such changes are in compliance with the Development Agreement.

10.4    Right to Designate Sites for Governmental and Public Interests. For so long as Declarant owns any real property described in Exhibits "A" and/or "B," Declarant may designate sites within the Property for government, education, or religious activities and interests, including without limitation, fire, police, and utility facilities, schools and educational facilities, houses of worship, parks, and other public facilities.

10.5    Right to Approve Additional Covenants. No Person shall Record any declaration (as defined in the Act) or similar instrument affecting any portion of the Property without Declarant's review and consent. The granting or withholding of such consent shall be within Declarant's sole discretion. Any Recording without such consent shall result in such instrument being void and of no force and effect unless subsequently approved by Recorded consent signed by Declarant. Once approved by Declarant and Recorded, any declaration (as defined in the Act) or similar instrument affecting any portion of the Property shall be in addition to and not in limitation of, the provisions of this Declaration. In the event of any conflict between this Declaration or any Governing Document and any declaration (as defined in the Act) or similar instrument affecting any portion of the Property which is Recorded, then the terms of the Governing Documents shall control.

10.6    Right to Approve Change in Community Standards. No amendment to or modification of any Use Restrictions or Rules or Architectural Guidelines shall be effective without prior notice to and the written approval of Declarant so long as Declarant owns real property subject to this Declaration or that may become subject to this Declaration in accordance with Section 9.1.

20021127
01867

10.7    Right to Merge or Consolidate the Master Association. Declarant reserves the right to merge or consolidate the Master Association with another common interest community of the same form of ownership.

10.8    Right to Appoint and Remove Directors During Declarant Control Period. Declarant may appoint and remove the Master Association's officers and directors during the Declarant Control Period as provided in the Bylaws.

10.9    Right to Transfer or Assign Declarant Rights. Any or all of the special rights and obligations of Declarant set forth in the Act, this Declaration or the Bylaws may be transferred in whole or in part to other Persons; provided, the transfer shall not reduce an obligation nor enlarge a right beyond that which Declarant has under the Act, this Declaration or the Bylaws. No such transfer or assignment shall be effective unless it is in a Recorded written instrument signed by Declarant. The foregoing sentence shall not preclude Declarant from permitting other Persons to exercise, on a one time or limited basis, any right reserved to Declarant in this Declaration where Declarant does not intend to transfer such right in its entirety, and in such case it shall not be necessary to Record any written assignment unless necessary to evidence Declarant's consent to such exercise.

10.10    Exclusive Rights to Use Name of Development. No Person shall use the name "Aliante" or any derivative of such name in any printed or promotional material without Declarant's prior consent. However, Owners may use the name "Aliante" in printed or promotional matter where such term is used solely to specify that particular real property is located within "Aliante" and the Master Association shall be entitled to use the words "Aliante" in its name.

10.11    Declarant Marks. Any use by the Master Association of names, marks, or symbols of North Valley Enterprises, LLC or any of its affiliates including, without limitation, the name "Aliante" (collectively "Declarant Marks") shall inure to the benefit of North Valley Enterprises, LLC and shall be subject to periodic review by North Valley Enterprises, LLC periodic review for quality control. The Master Association shall enter into license agreements with North Valley Enterprises, LLC, terminable with or without cause and in a form specified by North Valley Enterprises, LLC, in its sole discretion, with respect to permissive use of certain Declarant Marks. The Master Association shall not use any Declarant Mark without the prior written consent of North Valley Enterprises, LLC.

10.12    Equal Treatment. For so long as Declarant or any Builder owns any part of the real property described in Exhibits "A" and/or "B," neither the Master Association nor any Sub-Association shall, without the prior consent of Declarant or any Builder, adopt any policy, rule, or procedure that:

10.12.1    limits the access of Declarant, any Builder, and their respective successors, assigns, and affiliates or their employees, agents, representatives, and/or guests, including visitors, to the Common Elements of the Master Association or to any real property owned by any of them;

20021127
.01887

10.12.2  limits or prevents Declarant, any Builder, and their respective successors, assigns, and affiliates or their personnel from advertising, marketing, or using the Master Association or its Common Elements or any real property owned by any of them in promotional materials;

10.12.3  limits or prevents Owners from becoming members of the Master Association, subject to the provisions of this Declaration and the Bylaws, or enjoying full use of its Common Elements;

10.12.4  discriminates against or singles out any group of Members or prospective Members or Declarant or any Builder [this provision shall expressly prohibit the establishment of a fee structure (i.e., Base Assessments, Special Assessments and other mandatory fees or charges other than Specific Assessments, chartered club dues, and use fees) that discriminates against or singles out any group of Members or Declarant, but shall not prohibit the establishment of Cost Center Assessments or Specific Assessments];

10.12.5  impacts the ability of Declarant, any Builder, and their respective successors, assigns, and affiliates, to carry out to completion its development plans and related construction activities for Aliante, as such plans are expressed in the Master Plan, as such may be amended and updated from time to time. Policies, rules, or procedures affecting the provisions of existing easements established by Declarant and limiting the establishment by Declarant of easements necessary to complete Aliante shall be expressly included in this provision. Easements that may be established by Declarant shall include but shall not be limited to easements for development, construction, and landscaping activities and utilities; or

10.12.6  impacts the ability of Declarant, any Builder, and their respective successors, assigns, and affiliates to develop and conduct customer service programs and activities in a customary and reasonable manner.

Neither the Master Association nor any Sub-Association shall exercise its authority over the Common Elements (including, but not limited to, any gated entrances and other means of access to the Property or the Annexable Property) to interfere with the rights of Declarant or any Builder set forth in this Declaration or to impede access to any portion of the Property or the Annexable Property over the streets and other Common Elements within the Property.

10.13  <u>Right to Use Common Elements for Special Events</u>. As long as Declarant owns any real property described in Exhibits "A" and/or "B," Declarant shall have the right to use all Common Elements, including any recreational facilities, for up to eight (8) days each year to sponsor special events for charitable, philanthropic, political, or marketing purposes as determined by Declarant in its sole discretion. Any such event shall be subject to the following conditions:

10.13.1  the availability of the facilities at the time a request is submitted to the Master Association;

10.13.2  Declarant shall pay all costs and expenses incurred and shall indemnify the Master Association against any loss or damage (excluding lost revenue) resulting from the special event; and

20021127
.01887

10.13.3  Declarant shall return the facilities and personal property owned by the Master Association and used in conjunction with the special event to the Master Association in the same condition as existed prior to the special events.

Declarant shall have the right to assign the rights contained in this Section 10.13 to charitable organizations or foundations selected by Declarant. Declarant's right to use the Common Elements for special events shall be enforceable by injunction, by any other remedy in law or equity, and by the terms of this Declaration.

10.14    Right to Assign Declarant Rights under Development Agreement to Master Association. Any or all of the special rights and obligations reserved to the Declarant under the Development Agreement may be transferred in whole or in part to the Master Association, including without limitation the right to approve any material modification of the constructed amenities within those City of North Las Vegas parks located near or adjacent to the Property.

## PART FIVE: PROPERTY RIGHTS WITHIN THE COMMUNITY

*The nature of living in a master planned community, with its wide array of properties and development types and its ongoing development activity, requires the creation of special property rights and provisions to address the needs and responsibilities of the Owners, Declarant, the Master Association, and others within or adjacent to the community.*

**Article 11      Easements**

11.1    Easements in Common Elements.  Declarant grants to each Owner a nonexclusive right and easement of use, access, and enjoyment in and to the Common Elements which right and easement shall be appurtenant to the title to each Lot, subject to:

11.1.1  the Governing Documents and any other applicable covenants;

11.1.2  any restrictions or limitations contained in any deed conveying such real property to the Master Association;

11.1.3  the Board's right to:

11.1.3.1  adopt rules regulating the use and enjoyment of the Common Elements, including rules limiting the number of guests who may use the Common Elements;

11.1.3.2  suspend the right of an Owner to use' recreational facilities within the Common Elements:

11.1.3.2.1  for any period during which any charge against such Owner's Lot remains delinquent after a period of thirty (30) days, and,

20021127
01887

11.1.3.2.2  for a period not to exceed thirty (30) days for a single violation or for a longer period in the case of any continuing violation, of the Governing Documents after notice and a hearing pursuant to the Rules;

11.1.3.3  dedicate or transfer all or any part of the Common Elements, subject to such approval requirements as may be set forth in this Declaration and the Act;

11.1.3.4  impose reasonable membership requirements and charge reasonable admission or other use fees for the use of any recreational facility situated upon the Common Elements;

11.1.3.5  permit use of any recreational facilities situated on the Common Elements by persons other than Owners, their families, lessees, and guests upon payment of use fees established by the Board;

11.1.3.6  mortgage, pledge, or hypothecate any or all of its real or personal property as security for money borrowed or debts incurred, subject to such approval requirements as may be set forth in this Declaration and the Act, and the approval requirements set forth in Section 16.5;

11.1.3.7  limit the use of those portions of the Common Elements designated "Limited Common Elements," as described in Article 12 to the exclusive use of certain Owners; and,

11.1.4  the right of the Master Association to rent or lease any portion of any clubhouse or other recreational facilities within the Common Elements on a short-term basis to any Person approved by the Master Association for the exclusive use of such Person and such Person's family and guests.

The initial Common Elements contained within the real property identified in Exhibit "A" shall be conveyed to the Master Association prior to or concurrent with the conveyance of the first Lot to a Home Owner.

11.2    Easements of Encroachment.    Declarant grants reciprocal appurtenant easements of encroachment, and for maintenance and use of any permitted encroachment, between each Lot and any adjacent Common Elements and between adjacent Lots due to the unintentional placement or settling or shifting of the Improvements constructed, reconstructed, or altered thereon (in accordance with the terms of this Declaration and the Architectural Guidelines) to a distance of not more than one (1) foot, as measured from any point on the common boundary along a line perpendicular to such boundary. However, in no event shall an easement for encroachment exist if such encroachment occurred due to willful and knowing conduct on the part of, or with the knowledge and consent of, the Person claiming the benefit of such easement.

11.3    Right To Develop; Construction Easement.    Declarant and its employees, agents, and representatives shall have a right of access and use and an easement over and upon all of the Property for the purpose of making, constructing, and installing such Improvements to the Property as Declarant deems appropriate in its sole discretion (subject to the extent, if any, such discretion of Declarant is expressly limited by written agreement between Declarant and a Builder). Additionally, Declarant hereby partially assigns to and

20021127
.01887

reserves for the benefit of each Builder a concurrent right of access and use and an easement over and upon only the real property located within such Builder's subdivision, for the purpose of Builder making, constructing, and installing Improvements to such real property, subject to and only to the extent provided in the Builder's Project Plan approved by Declarant, or as otherwise may be approved by Declarant in writing (but without any liability to Declarant by reason of such approval).

11.4    Easements for Utilities, Etc.

11.4.1    Master Association and Utility Easements. Declarant reserves for itself, so long as Declarant owns any real property described in Exhibit "A" and/or "B" of this Declaration, and grants to the Master Association and all utility providers (including, without limitation, cable and telecommunication providers), perpetual non-exclusive easements throughout all of the Property (but not through a structure) to the extent reasonably necessary for the purpose of:

11.4.1.1    installing utilities and infrastructure to serve the Property, cable and other systems for sending and receiving data and/or other electronic signals, security and similar systems, walkways, pathways, trails, drainage systems, street lights, and signage on real property that Declarant owns or within public rights-of-way or easements reserved for such purpose on a Plat;

11.4.1.2    inspecting, maintaining, repairing, and replacing the utilities, infrastructure, and other Improvements described in Section 11.4.1.1; and

11.4.1.3    reading utility meters.

11.4.2    Other Specific Easements. Declarant also reserves for itself the non-exclusive right and power to grant and Record such specific easements as may be necessary, in the sole discretion of Declarant, in connection with the orderly development of any real property described in Exhibits "A" and/or "B."

11.4.3    Proper Restoration. All work associated with the exercise of the easements described in Sections 11.4.1 and 11.4.2 shall be performed in such a manner as to minimize interference with the use and enjoyment of the real property burdened by the easement. Upon completion of the work, the Person exercising the easement shall restore the real property, to the extent reasonably possible, to its condition prior to the commencement of the work. The exercise of these easements shall not extend to permitting entry into the structures on any Lot, nor shall it unreasonably interfere with the use of any Lot and, except in an emergency, entry onto any Lot shall be made only after reasonable notice to the Owner or Occupant.

11.5    Easement to Inspect and Right to Correct.

11.5.1    Easement. Declarant reserves, for itself and such other Persons as it may designate, perpetual, non-exclusive easements throughout the Property to the extent reasonably necessary for the purposes of complying with the Development Agreement and/or access, inspecting, testing, redesigning, correcting, or improving any portion of Property, including Lots and the Areas of Common Responsibility.

20021127
.01887

Declarant shall have the right to redesign, correct, or improve any part of the Aliante Residential Community, including Lots and the Areas of Common Responsibility.

11.5.2  Right of Entry. In addition to the above easement, Declarant reserves for itself and its employees, agents and representatives, a right of entry onto a Lot upon reasonable notice to the Owner; provided, in an emergency, no such notice need be given. Entry into a Lot shall be only after Declarant notifies the Owner and agrees with the Owner regarding a reasonable time to enter the Lot to perform such activities. Each Owner agrees to cooperate in a reasonable manner with Declarant in Declarant's exercise of the rights provided to it by this Section.

Entry onto the Areas of Common Responsibility and into any Improvements and structures thereon may be made by Declarant at any time, provided advance notice is given to the Master Association, except that in an emergency no notice need be given.

11.5.3  Damage. Any damage to a Lot or the Areas of Common Responsibility resulting from the exercise of the easement or right of entry described in Sections 11.5.1 and 11.5.2 shall promptly be repaired by, and at the expense of, Declarant. The exercise of these easements shall not unreasonably interfere with the use of any Lot and entry onto any Lot shall be made only after reasonable notice to the Owner.

11.6   Easements for Vehicular and Pedestrian Traffic.  There hereby are reserved to Declarant, the Master Association, and their respective successors, assigns, agents, invitees, non-exclusive, appurtenant easements for vehicular and pedestrian traffic over private main entry gate areas and all private streets and sidewalks within the Property (including, but not limited to, those which may yet be built from time to time, and those which, when or after being built (by Declarant, Builder, or other authorized third party), comprise or will comprise Limited Common Elements or the Common Elements of a Sub-Association).

11.7   Easements to Serve Annexable Property.  Declarant hereby reserves for itself and its duly authorized agents, successors, assigns, and mortgagees, an easement over the Common Elements for the purposes of enjoyment, use, access, and development of the Annexable Property, whether or not such real property is made subject to this Declaration. This easement includes, but is not limited to, a right of ingress and egress over the Common Elements for construction of roads and for connecting and installing utilities (including, without limitation, cable and telecommunication providers) on the Annexable Property.

Declarant agrees that it and its successors or assigns shall be responsible for any damage caused to the Common Elements as a result of vehicular traffic connected with development of the Annexable Property. Declarant further agrees that if the easement is exercised for permanent access to the Annexable Property and such Annexable Property or any portion thereof benefitting from such easement is not made subject to this Declaration, Declarant, its successors or assigns shall enter into a reasonable agreement with the Master Association to share the cost of any maintenance which the Master Association provides to or along any roadway providing access to such Annexable Property.

11.8   Easements for Maintenance, Emergency, and Enforcement.  Declarant grants to the Master Association easements over the Property as necessary to enable the Master Association to fulfill its

20021127
01887

maintenance responsibilities under Section 7.2, including, but not limited to any maintenance of the exterior of the perimeter walls and/or fences by the Master Association under Section 7.2.1.6. The Master Association also shall have the right, but not the obligation, to enter upon any Lot for emergency, security, and safety reasons, to perform maintenance and to inspect for the purpose of ensuring compliance with and enforcing the Governing Documents. Such right may be exercised by any member of the Board and its duly authorized agents and assignees, and all emergency personnel in the performance of their duties. Except in an emergency situation, entry shall be only during reasonable hours and after notice to the Owner. Any damage caused as a result of the Master Association fulfilling its maintenance responsibilities shall be repaired by the Master Association at its expense.

Declarant grants to the Master Association, an easement and the right to enter a Lot to abate or remove, using such measures as may be reasonably necessary, any structure, thing or condition which violates the Governing Documents. All costs incurred, including reasonable attorneys' fees, may be assessed against the violator as a Specific Assessment.

11.9    Easements for Flood Water.  Declarant reserves for itself, the Master Association, and its successors, assigns, agents, and designees, the nonexclusive right and easement, but not the obligation, to enter upon any part of the real property located within the Areas of Common Responsibility to (a) construct, maintain, and repair structures and equipment used for retaining water; and (b) maintain such areas in a manner consistent with the Community-Wide Standard. Declarant, the Master Association, and their successors, assigns, and designees shall have an access easement over and across any of the Property to the extent reasonably necessary to exercise their rights under this Section. Except in the case of an emergency, reasonable notice shall be given prior to the exercise of the above easements.

Declarant further reserves for itself, the Master Association, and its successors, assigns, agents, and designees, a perpetual, nonexclusive right and easement of access and encroachment over the Common Elements and Lots (but not the dwellings thereon) adjacent to or within one hundred (100) feet of bodies of water within the Property, in order to (a) temporarily flood and back water upon and maintain water over such portions of the Property; (b) alter in any manner and generally maintain the bodies of water within the Areas of Common Responsibility; and (c) maintain and landscape the slopes and banks pertaining to such areas. All Persons entitled to exercise these easements shall use reasonable care in and repair any damage resulting from the intentional exercise of such easements. Nothing herein shall be construed to make Declarant or any other Person liable for damage resulting from flooding due to hurricanes, heavy rainfall, or other natural occurrences.

11.10   Easements for Cross-Drainage.  Declarant hereby reserves for itself and grants to the Master Association that every Lot and the Common Elements shall be burdened with easements for drainage of storm water runoff from other portions of the Property (whether natural drainage or as improved by Declarant or any Builder); provided, no Person shall alter the drainage on any Lot (whether natural drainage or as improved by Declarant or any Builder) to increase materially the drainage of storm water onto adjacent portions of the Property without the consent of the Owner(s) of the affected real property, the Board, and Declarant as long as it owns any real property described in Exhibit "A" and/or "B" to the Declaration.

20021127
.01887

11.11  Rights to Stormwater Runoff, Effluent, and Water Reclamation.  Declarant hereby reserves for itself and its designees all rights to ground water, surface water, storm water runoff, and effluent located or produced within the Property, and each Owner agrees, by acceptance of a deed to a Lot, that Declarant shall retain all such rights. Such rights shall include the reservation of an easement over the Property for access, and for installation and maintenance of facilities and equipment to capture and transport such water, runoff, and effluent. This Section 11.11 may not be amended without the consent of Declarant or its successor, and the rights created in this 11.11 shall survive termination of this Declaration.

11.12  Easements for Public Service Use.  In addition to the foregoing easements over the Common Elements, there shall be and Declarant hereby reserves and covenants for itself and all future Owners within the Property, easements for: (a) placement of any fire hydrants on portions of certain Lots and/or Common Elements, and other purposes normally related thereto; and (b) City, county, state, and federal public services, including but not limited to, the right of postal, law enforcement, and fire protection services and their respective employees and agents, to enter upon any part of the Common Elements or any Lot, for the purpose of carrying out their official duties.

## Article 12      Limited Common Elements

12.1  Purpose.  Certain portions of the Common Elements may be designated as Limited Common Elements and reserved for the exclusive or primary use or benefit of Owners and Occupants within a particular Neighborhood or Neighborhoods. By way of illustration and not limitation, Limited Common Elements may include entry features, recreational facilities, landscaped medians, cul-de-sacs, and other portions of the Common Elements within a particular Neighborhood or Neighborhoods. All costs associated with maintenance, repair, replacement, and insurance of a Limited Common Elements by the Master Association shall assessed as a Cost Center Expense allocated among the Lots or Neighborhood(s) to which the Limited Common Elements are assigned.

12.2  Designation.  Initially, any Limited Common Elements shall be designated as such in this Declaration or in a Supplemental Declaration relating to such Common Elements, and may also be designated in the deed conveying such area to the Master Association or on the subdivision plat relating to such Common Elements; provided, however, any such conveyance or designation shall not preclude Declarant from later assigning use of the same Limited Common Elements to additional Lots and/or Neighborhoods, so long as Declarant has a right to subject additional real property to this Declaration pursuant to Section 9.1.

Thereafter, a portion of the Common Elements may be assigned as Limited Common Elements and Limited Common Elements may be reassigned upon approval of the Board and, to the extent permitted under the Act, the vote of Delegates representing a Majority of the total votes in the Master Association, including a Majority of the votes of the Owners of the Lots affected by the proposed assignment or reassignment. As long as Declarant owns any real property subject to this Declaration or that may become subject to this Declaration in accordance with Section 9.1, any such assignment or reassignment shall also require Declarant's consent. Any assignment or reassignment of Limited Common Elements shall be made in accordance with the requirements of the Act.

20021127
.01887

12.3     Use by Others.  The Master Association may, upon approval of a Majority of the Owners of or upon approval of the board of directors of a Sub-Association (if applicable) for the Neighborhood(s) to which any Limited Common Elements is assigned, permit Owners of Lots in other Neighborhoods to use all or a portion of such Limited Common Elements upon payment of reasonable user fees, which fees shall be used to offset the Cost Center Expenses attributable to such Limited Common Elements.

## Article 13     Party Walls and Other Shared Structures

13.1     General Rules of Law to Apply.  Each wall, fence, driveway, or similar structure, which serves and/or separates any two adjoining Lots shall constitute a "party structure". To the extent not inconsistent with the provisions of this Section, the general rules of law regarding party walls and liability for property damage due to negligence or willful acts or omissions shall apply thereto.

13.2     Maintenance, Damage, and Destruction.  The cost of reasonable repair and maintenance of a party structure shall be shared equally by the Owners who make use of the party structure; such cost is not the responsibility of the Master Association, except to the limited extent the Master Association elects to exercise its rights under Section 5.1.

If a party structure is destroyed or damaged by fire or other casualty, then to the extent that such damage is not covered by insurance and is not repaired out of the proceeds of insurance, any Owner who has used the structure may restore it. If other Owners thereafter use the structure, they shall contribute to the restoration cost in equal proportions. However, such contribution will not prejudice the right to call for a larger contribution from the other users under any rule of law regarding liability for negligent or willful acts or omissions.

13.3     Right to Contribution Runs with Land.  The right of any Owner to contribution from any other Owner under this Section shall be appurtenant to the land and shall pass to such Owner's successors-in-title.

13.4     Disputes.  Any dispute arising concerning a party structure shall be handled in accordance with the provisions of Article 15.

## Article 14     Excluded Amenities

14.1     General.  Neither membership in the Master Association nor ownership or occupancy of a Lot shall confer any ownership interest in or right to use any Excluded Amenity.  Rights to use the Excluded Amenities will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the respective owners and operators of the Excluded Amenities.  The owners and operators of the Excluded Amenities shall have the right, from time to time in their sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of their respective Excluded Amenities, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the terms of any written agreements with their respective members and/or, if applicable, the terms of the Development Agreement.

14.2    Conveyance of Excluded Amenities.  All Persons, including all Owners, are hereby advised that no representations or warranties have been or are made by Declarant, the Master Association, any Builder, or by any Person acting on behalf of any of the foregoing, with regard to the continuing ownership or operation of any Excluded Amenity, and no purported representation or warranty in such regard, either written or oral, shall be effective unless specifically set forth in a written instrument executed by the record owner of the Excluded Amenity.  Further, the ownership or operation of the Excluded Amenity may change at any time by virtue of, but without limitation, (a) the sale to or assumption of operations of any Excluded Amenity by a Person other than the current owner or operator; (b) the establishment of, or conversion of the membership structure to, an "equity" club or similar arrangement whereby the members of the Excluded Amenity or an entity owned or controlled by its members become the owner(s) and/or operator(s) of the Excluded Amenity; (c) the conveyance of any Excluded Amenity to one or more of Declarant's affiliates, shareholders, employees, or independent contractors or (d) the conveyance of any Excluded Amenity to the City of North Las Vegas. Consent of the Master Association, any Sub-Association, or any Owner shall not be required to effectuate any change in ownership or operation of any Excluded Amenity, for or without consideration and subject to or free of any mortgage, covenant, lien or other encumbrance.

14.3    Cost Sharing.  The Master Association may enter into a contractual arrangement or covenant to share costs with any Excluded Amenity obligating the Excluded Amenity to contribute funds for, among other things, shared property or services and/or a higher level of Common Elements maintenance.

14.4    Rights of Access and Parking.

14.4.1  Burdened and Benefitted Property.  For purposes of this Article 14, the Property shall comprise the burdened property ("Burdened Property") and the Excluded Amenities (including, but not limited to, any office facility, day care facility, sales center facility, the Golf Course, and any Golf Course maintenance facilities) shall comprise the benefitted property ("Benefitted Property").  The owner(s) of the Benefitted Property, and portions thereof, are collectively referred to herein as the "Benefitted Property Owner." In addition to, and without limiting, any other easement set forth in this Declaration, Declarant has deemed it desirable to establish certain protective covenants, conditions, restrictions and easements on and running with the Burdened Property, for the benefit of the Benefitted Property, in part to protect Declarant and any owner(s) of all or any part of the Benefitted Property, against improper or inappropriate development and use of, and/or restrictions on, the Burdened Property or any part thereof.

14.4.2  Reservation of Easements.  Declarant hereby expressly reserves the following easements. The Benefitted Property Owner, its successors and assigns, their respective tenants, employees, guests, and other invitees, and the Persons permitted to use the Excluded Amenities (or portion thereof) by the Benefitted Property Owner (regardless of whether such persons are Owners hereunder) and their families and tenants, guests, and other invitees, shall at all times have a right and non-exclusive easement of ingress, egress, access and use over all Common Elements and streets within the Property, whether by automobile, golf cart, or other means, as reasonably necessary to travel between the entrances to the Property and the Benefitted Property, respectively and, further, over those portions of the Property (whether Common Elements or otherwise) reasonably necessary to the use, operation, maintenance, repair and replacement of the Benefitted Property.  Without limiting the generality of the foregoing, persons who are permitted use of the

20021127
.01887

Excluded Amenities (or portions thereof) and members of the public as designated or permitted by the Benefitted Property Owner, shall have the right to park their vehicles on the streets within the Property at reasonable times before, during, and after, events, tournaments, and other similar functions held by or at the Benefitted Property.

The use restrictions set forth in the Governing Documents shall inure to the benefit of the Benefitted Property and the Benefitted Property Owners, to the extent reasonably appropriate.

The Master Association and the Benefitted Property Owner shall cooperate to the maximum extent reasonably possible in the respective operation of the Property and the Excluded Amenities. Notwithstanding the foregoing, without the prior consent of the Benefitted Property Owner in its sole discretion: (a) the Master Association shall have no power to promulgate or enforce the Rules or Use Restrictions affecting activities on or use of the Benefitted Property, and (b) the Benefitted Property shall not be subject to any Master Association assessments, or other Master Association charges, including, but not limited to, such assessments or charges for use, maintenance, or repair of the Common Elements.

The covenants, conditions, restrictions, and reservation of easements, contained herein shall run with, burden and bind the Burdened Property and shall inure to the benefit of the Benefitted Property and the Benefitted Property Owner, and shall be enforceable by the Benefitted Property Owner. Neither this Section, nor any other portion of this Declaration that affects the Benefitted Property or the use and enjoyment thereof, may be terminated, extended, modified, or amended, as to the whole of the Burdened Property or any portion thereof, except by Recorded instrument executed and acknowledged by Benefitted Property Owner.

14.5    Additional Golf Course Easements. Declarant further expressly grants the following additional easements over the Burdened Property, to and for the benefit of the portion of the Benefitted Property that comprises the Golf Course:

14.5.1  the right, for a five minute period commencing on the departure of any golf ball from the Golf Course onto the Property, of the owner and/or lessee of the Golf Course and of all players and guests at the Golf Course to enter upon the Property to search for and recover errant golf balls provided, if any Lot is fenced or walled, the golfer shall seek the Owner's permission before entry. The existence of this easement shall not relieve golfers of liability for damage caused by errant golf balls;

14.5.2  the right of the players and tenants, guests, and other invitees at the Golf Course to enter, on golf carts or on foot, upon the Common Elements in order to reasonably traverse the various playing elements of the Golf Course;

14.5.3  the right of the owner and/or lessee of the Golf Course and of their employees and contractors to enter upon the Property for the purpose of maintaining and repairing water and irrigation lines and pipes that are located in or originate from the Golf Course and are used in connection with the irrigation or sprinkling of the Golf Course landscaping or landscaping on the Property;

20021127
.01887

14.5.4 a non-exclusive easement is hereby reserved to the Benefitted Property Owner, its successors and assigns, and their respective tenants, guests, and other invitees, upon, over, in, and across those portions of the Common Elements and streets within the Property as may be reasonably necessary to travel, with storage and maintenance equipment, chemicals, and other items, to and from various portions of the Golf Course, and the right to take all action reasonably necessary for the storage and maintenance of equipment, chemicals and all other items;

14.5.5 any portion of the Property immediately adjacent to any Golf Course is hereby burdened with a non-exclusive easement in favor of the Golf Course for overspray of water from the irrigation system such Golf Course. Under no circumstances shall the Master Association or the owner or operator of such Golf Course be held liable for any damage or injury resulting from such overspray or the exercise of this easement; and

14.5.6 the owner and/or operator of any Golf Course within or adjacent to any portion of the Property, its successors and assigns, shall have a perpetual, exclusive easement of access over the Property for the purpose of retrieving golf balls from bodies of water upon the Common Elements lying reasonably within range of golf balls hit from the Golf Course.

Under no circumstances shall any of the following Persons be held liable for any damage or injury resulting from errant golf balls (or the design of the Golf Course) or the exercise of the easements described in this Section 14.5: Declarant; the Master Association and/or its Members (in their capacities as such); the owner or operator of the Golf Course, its successors, or assigns; any Builder or contractor (in their capacities as such); or any officer, director, partner, member, or manager of any of the foregoing.

14.6    Limitations on Amendments. In recognition of the fact that the provisions of this Article are for the benefit of the Excluded Amenities, no amendment to this Article, and no amendment in derogation of any other provisions of this Declaration benefitting any Excluded Amenity (any other provision of this Declaration that would adversely affect any Benefitted Property Owner, any Benefitted Property, or access to or use and enjoyment of any Excluded Amenity), may be made without the written approval of the owner of the Excluded Amenities and the applicable Benefitted Property Owner. The foregoing shall not apply, however, to amendments made by Declarant.

14.7    Jurisdiction and Cooperation. It is Declarant's intention that the Master Association and the owner of each Excluded Amenity shall cooperate to the maximum extent possible in the operation of the Aliante Residential Community and the Excluded Amenities. Each shall reasonably assist the other in upholding the Community-Wide Standard as it pertains to maintenance and the Architectural Guidelines and the Development Agreement.

20021127
.01887

# PART SIX: RELATIONSHIPS WITHIN AND OUTSIDE THE COMMUNITY

*The growth and success of the Aliante Residential Community as a community in which people enjoy living, working, and playing requires good faith efforts to resolve disputes amicably, attention to and understanding of relationships within the community and with our neighbors, and protection of the rights of others who have an interest in the Aliante Residential Community.*

## Article 15    Dispute Resolution and Limitation on Litigation

15.1    Prerequisites to Actions Against Declarant.  Prior to any Owner, the Master Association, or any Sub-Association filing a civil action, undertaking any action or retaining an expert for such actions against Declarant or any Builder or sub-contractor of any portion of the Property, the Owner, the Board or the board of the Sub-Association, as appropriate, shall notify and meet with the Members to discuss the alleged problem or deficiency. Moreover, prior to taking any action, the potential adverse party shall be notified of the alleged problem or deficiency and provided reasonable opportunity to inspect and repair the problem.

15.2    Consensus for Master Association Litigation.  Except as provided in this Section, the Master Association or a Sub-Association shall not commence a civil action without first providing at least twenty-one (21) days written Notice of a meeting to consider such proposed action to its Members. Taking such action shall require the vote of Owners of seventy-five percent (75%) of the total number of Lots in the Master Association or in the Sub-Association, as appropriate. This Section shall not operate to require a meeting or vote by the Owners for:  (a) civil actions brought by the Master Association to enforce the Governing Documents (including, without limitation, the collection of assessments and the foreclosure of liens); (b) counterclaims brought by the Master Association in proceedings instituted against it; or (c) civil actions to protect the health, safety, and welfare of the Members. This Section shall not be amended unless such amendment is approved by the percentage of votes, and pursuant to the same procedures, necessary to institute proceedings as provided above.

15.3    Alternative Method for Resolving Disputes.  Declarant, the Master Association, any Sub-Association, their officers, directors, and committee members, all Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who otherwise agrees to be bound to this Article (collectively, "Bound Parties") agree to encourage the amicable resolution of disputes involving the Property, without the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees that those claims, grievances, or disputes described in Section 15.4 ("Claims") shall be resolved using the procedures set forth in Section 15.5 in lieu of filing suit in any court.

15.4    Claims.  Unless specifically exempted below, all Claims arising out of or relating to the interpretation, application, or enforcement of the Governing Documents, or the rights, obligations, and duties of any Bound Party under the Governing Documents or relating to the design or construction of Improvements on the Property shall be subject to the provisions of Section 15.5.

Notwithstanding the above, unless all parties thereto otherwise agree, the following shall not constitute a Claim and shall not be subject to the provisions of Section 15.5:

20021127
.01887

15.4.1  any suit by the Master Association against any Bound Party to enforce the Governing Documents (including, without limitation, the collection of assessments and the foreclosure of liens);

15.4.2  any suit by the Master Association to obtain a temporary restraining order (or equivalent emergency equitable relief) and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve the Master Association's ability to enforce the provisions of Article 3 and Article 4;

15.4.3  any suit between Owners, which does not include Declarant or the Master Association as a party, if such suit asserts a Claim which would constitute a cause of action independent of the Governing Documents;

15.4.4  any suit in which any indispensable party is not a Bound Party; and

15.4.5  any suit as to which any applicable statute of limitations would expire within ninety (90) days of giving the Notice required by Section 15.5.1, unless the party or parties against whom the Claim is made agree to toll the statute of limitations as to such Claim for such period as may reasonably be necessary to comply with this Article.

With the consent of all parties thereto, any of the above may be submitted to the alternative dispute resolution procedures set forth in Section 15.5.

15.5   Mandatory Procedures.

15.5.1  Notice. Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent") (collectively, the "Parties") shall notify each Respondent in writing (the "Notice"), stating plainly and concisely:

15.5.1.1  the nature of the Claim, including the Persons involved and Respondent's role in the Claim;

15.5.1.2  the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

15.5.1.3  Claimant's proposed remedy; and

15.5.1.4  that Claimant will meet with Respondent to discuss good faith ways to resolve the Claim.

15.5.2  Negotiation and Mediation. The Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation. If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Parties in negotiation.

20021127
.01887

If the Parties do not resolve the Claim within thirty (30) days of the date of the Notice (or within such other period as may be agreed upon by the Parties) ("Termination of Negotiations"), Claimant shall have thirty (30) additional days to submit the Claim to mediation under the auspices of an independent agency providing dispute resolution services in the Las Vegas, Nevada area.

If Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, Claimant shall be deemed to have waived the Claim, and Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to any Person other than the Claimant.

Any settlement of the Claim through mediation shall be documented in writing by the mediator and signed by the Parties. If the Parties do not settle the Claim within thirty (30) days after submission of the matter to the mediation, or within such time as determined by the mediator, the mediator shall issue a written notice of termination of the mediation proceedings. The notice of termination of mediation shall set forth that the Parties are at an impasse and the date that mediation was terminated.

The Master Association must satisfy the mediation or arbitration process under the direction of the Nevada Real Estate Division and in compliance with applicable Nevada law.

15.6    Allocation of Costs of Resolving Claims. Each Party shall bear its own costs, including attorneys' fees, and each Party shall share equally all charges rendered by the mediator(s).

15.7    Enforcement of Resolution. After resolution of any Claim through negotiation or mediation, if any Party fails to abide by the terms of any agreement, then any other Party may file suit or initiate administrative proceedings to enforce such agreement without the need to again comply with the procedures set forth in Section 15.5. In such event, the Party taking action to enforce the agreement shall be entitled to recover from the non-complying Party (or if more than one non-complying Party, from all such Parties pro rata) all costs incurred in enforcing such agreement, including, without limitation, attorneys' fees and court costs.

15.8    Attorneys' Fees. In the event of an action instituted to enforce any of the provisions contained in the Governing Documents, the party prevailing in such action shall be entitled to recover from the other party thereto as part of the judgment, reasonable attorneys' fees and costs of such suit. In the event the Master Association is a prevailing party in such action, the amount of such attorneys' fees and costs shall be a Specific Assessment with respect to the Lot(s) involved in the action.

## Article 16    Mortgagee Provisions

The following provisions are for the benefit of holders, insurers, and guarantors of first Mortgages on Lots in the Property. The provisions of this Article apply to both this Declaration and to the Bylaws, notwithstanding any other provisions contained therein.

20021127
.01887

16.1    Notices of Action. An institutional holder, insurer, or guarantor of a first Mortgage which provides a written request to the Master Association (such request to state the name and address of such holder, insurer, or guarantor and the street address of the Lot to which its Mortgage relates, thereby becoming an "Eligible Holder"), will be entitled to timely written notice of:

16.1.1 Any condemnation loss or any casualty loss that affects a material portion of the Property or that affects any Lot on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

16.1.2 Any delinquency in the payment of assessments or charges owed by a Lot subject to the Mortgage of such Eligible Holder, where such delinquency has continued for a period of sixty (60) days, or any other violation of the Governing Documents relating to such Lot or the Owner or Occupant that is not cured within sixty (60) days;

16.1.3 Any lapse, cancellation, or material modification of any insurance policy maintained by the Master Association; and

16.1.4 Any proposed action that would require the consent of a specified percentage of Eligible Holders.

16.2    No Priority. No provision of this Declaration or the Bylaws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Lot in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Elements.

16.3    Notice to Master Association. Upon request, each Owner shall be obligated to furnish to the Master Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

16.4    Failure of Mortgagee to Respond. Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Master Association does not receive a written response from the Mortgagee within thirty (30) days of the date of the Master Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

16.5    HUD/VA Approval. During the Declarant Control Period, the following actions shall require the prior approval of the U.S. Department of Housing and Urban Development or the U.S. Department of Veterans Affairs, if either such agency is insuring or guaranteeing the Mortgage on any Residential Lot: merger, consolidation, or dissolution of the Master Association; annexation of additional real property other than the Annexable Property, dedication, conveyance, or mortgaging of Common Elements; or material amendment of this Declaration; provided, however, that such prior approval shall not be required if any such agency has ceased to regularly require or issue such prior approval. The granting of easements for utilities or other similar purposes consistent with the intended use of the Common Elements shall not be deemed a conveyance within the meaning of this Section.

20021127
.01887

## PART SEVEN: CHANGES IN THE COMMUNITY

*Communities such as the Aliante Residential Community are dynamic and constantly evolving as circumstances, technology, needs, desires, and laws change over time. The Aliante Residential Community and its governing documents must be able to adapt to these changes while protecting the things that make the Aliante Residential Community unique.*

### Article 17    Changes in Ownership of Lots

Any Owner, except Declarant or any Builder, desiring to sell or otherwise transfer title to his or her Lot shall give the Board at least seven (7) days' prior written notice of the name and address of the purchaser or transferee, the date of such transfer of title, and such other information as the Board may reasonably require. The transferor shall continue to be jointly and severally responsible with the transferee for all obligations of the Owner of the Lot, including assessment obligations, until the date upon which such notice is received by the Board, notwithstanding the transfer of title. The provisions of this Article shall not apply to sales or transfers by Declarant or to sales or transfers by any Builder to a Home Owner.

### Article 18    Changes in Common Elements

18.1    <u>Condemnation</u>.  If a Lot or portion thereof shall be taken by eminent domain, compensation and the Owner's interests in the Common Elements shall be allocated as provided in the Act. If any part of the Common Elements shall be taken (or conveyed in lieu of and under threat of condemnation by the Board acting on the written direction of Members representing at least sixty-seven percent (67%) of the total votes in the Master Association and of Declarant, as long as Declarant owns any real property subject to the Declaration or which may be made subject to the Declaration in accordance with Section 9.1) by any authority having the power of condemnation or eminent domain, each Owner shall be entitled to written Notice of such taking or conveyance prior to disbursement of any condemnation award or proceeds from such conveyance. Such award or proceeds shall be payable to the Master Association to be disbursed as follows:

If the taking or conveyance involves a portion of the Common Elements on which Improvements have been constructed, the Master Association shall restore or replace such Improvements on the remaining land included in the Common Elements to the extent available, unless within sixty (60) days after such taking Declarant, so long as Declarant owns any real property subject to the Declaration or that may be made subject to the Declaration in accordance with Section 9.1, and Members representing at least sixty-seven percent (67%) of the total vote of the Master Association shall otherwise agree. Any such construction shall be in accordance with plans approved by the Board. The provisions of Section 7.3.3 regarding funds for restoring Improvements shall apply.

If the taking or conveyance does not involve any Improvements on the Common Elements, or if a decision is made not to repair or restore, or if net funds remain after any such restoration or replacement is complete, then such award or net funds shall be disbursed to the Master Association and used for such purposes as the Board shall determine.

20021127
.01887

18.2    Partition. Except as permitted in this Declaration, the Common Elements shall remain undivided, and no Person shall bring any action for partition of any portion of the Common Elements without the consent of all Owners and Mortgagees. This Section shall not prohibit the Board from acquiring and disposing of tangible personal property nor from acquiring and disposing of real property that may or may not be subject to this Declaration.

18.3    Transfer or Dedication of Common Elements. The Master Association may dedicate portions of the Common Elements to the City or Clark County, Nevada, or to any other local, state, or federal governmental or quasi-governmental entity, subject to such approval as may be required by Section 16.5 and the Act.

18.4    Actions Requiring Member Approval. If either the U.S. Department of Housing and Urban Development or the U.S. Department of Veterans Affairs is insuring or guaranteeing the Mortgage on any Lot, then the following actions shall require the prior approval of Members representing not less than sixty-seven percent ( 67%) of the total votes in the Master Association, and the consent of Declarant: merger, consolidation, or dissolution of the Master Association; annexation of additional property (other than the Annexable Property) other than as set forth in this Declaration; and dedication, conveyance, or mortgaging by the Master Association of Common Elements. Notwithstanding anything to the contrary in this Section, the Master Association, acting through the Board, may grant easements over the Common Elements for installation and maintenance of utilities and drainage facilities and for other purposes not inconsistent with the intended use of the Common Elements, without the approval of the membership.

18.5    Delivery of Amendments to Owners. If any change is made to this Declaration or other Governing Document of the Master Association, the Master Association shall, within thirty (30) days after the change is made, prepare and cause Notice of such change to be given to each Owner.

18.6    Liberal Construction to Comply with the Act. It is the intention of Declarant that this Declaration be liberally construed to conform to the provisions of the Act. To the extent that it does not expressly conform to the Act, as amended, this Declaration shall be deemed to conform with the Act by operation of law.

**Article 19    Amendment of Declaration**

19.1    Corrective Amendment. In addition to specific amendment rights granted elsewhere in this Declaration, until conveyance of any portion of the Property to a Home Owner, Declarant may unilaterally amend this Declaration for any purpose. Thereafter, Declarant, or the Board with consent of the Declarant, unilaterally may amend this Declaration if such amendment is necessary: (a) to bring any provision into compliance with any applicable Law; (b) to enable any reputable title insurance company to issue title insurance coverage on the Lots; (c) to enable any institutional or governmental lender, purchaser, insurer, or guarantor of mortgage loans, including, for example, the Federal National Mortgage Master Association or Federal Home Loan Mortgage Corporation, to make, purchase, insure, or guarantee mortgage loans on the Lots; or (d) to satisfy the requirements of any local, state, or federal governmental agency. However, any such

20021127
.01887

amendment shall not adversely affect the title to any Lot or Multi-Family Lot unless the Owner thereof shall consent.

19.2   By Owners. Except as otherwise specifically provided above, in the Act, and elsewhere in this Declaration, this Declaration may be amended only by the affirmative vote or written consent, or any combination thereof, of Owners representing sixty-seven percent (67%) of the total votes in the Master Association, and the consent of Declarant, so long as Declarant is entitled to exercise rights under Article 9.

Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause.

19.3   Validity and Effective Date. No amendment may remove, revoke, or modify any right or privilege of Declarant without the consent of Declarant (or the assignee, including without limitation, any Builder, of such right or privilege).

If an Owner consents to any amendment to this Declaration or the Bylaws, it will be presumed conclusively that such Owner has the authority to consent, and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment.

Any amendment validly adopted by the Master Association shall be certified by the President or Secretary of the Master Association, and shall become effective upon Recording, unless a later effective date is specified in the amendment. Any procedural challenge to an amendment must be made within one (1) year of its Recording or such amendment shall be presumed to have been validly adopted. In no event shall a change of conditions or circumstances operate to amend any provisions of this Declaration.

Nothing in this Article shall be construed to permit termination of any easement created in this Declaration or Supplemental Declaration without the consent of the holder of such easement.

19.4   Exhibit. Exhibits "A," "B," and "C" attached to this Declaration are incorporated by this reference and amendment of such exhibits shall be governed by this Article.

## PART EIGHT: ADDITIONAL PROVISIONS

## Article 20   Additional Disclosures, Disclaimers and Releases

20.1   General Disclosures. By acceptance of a deed to a Lot, each Owner (for purposes of this Article 20, the term "Owner" shall include an Owner and/or Resident, and their respective families and tenants, guests, and other invitees), shall conclusively be deemed to understand, and to have acknowledged and agreed to, each of the notifications, disclosures, disclaimers, consents, agreements, acknowledgments, releases, waivers and other provisions contained in this Article.

20.2   Disclaimers Regarding Excluded Amenities. The Lots and Common Elements include absolutely no right, title, or interest in or to (or membership in, use of, or access to) the Excluded Amenities


20021127
.01887

(including, but not necessarily limited to the Golf Course (and its components, and related facilities and features), as the same are subject to change in the sole discretion of the management of the Excluded Amenities. The Excluded Amenities are **NOT A PART OF** the Property, and **ARE NOT** Common Elements. Excluded Amenity ownership, membership, use, and access, are separate from, and not included in, the Property. Notwithstanding the foregoing, the owners and members of the Excluded Amenities, and their respective tenants, guests, and other invitees, shall have the easements of access to, enjoyment of, and ingress and egress over, the Common Elements and streets within the Property, as described in further detail in Article 14.

20.3   Additional Disclosures and Disclaimers Regarding Excluded Amenities. Without limiting Section 20.1 and Section 20.2 above, by acceptance of a deed to a Lot, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following disclosures and disclaimers:

20.3.1  Portions of the Property are located adjacent to or nearby the Golf Course. In connection with the Golf Course: (a) the water facilities, hazards, other installations located on the Golf Course may be an attractive nuisance to children; (b) operation, maintenance, and use, of each of the Golf Course may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the limited right of golfers on the Golf Course ("Golfers") to enter upon the Property to retrieve errant golf balls; (2) the right of Golfers, on foot or on golf carts, to enter upon and traverse easements over the Property in connection with golf play on the Golf Course; (3) the right of owner(s) and operator(s) of the Golf Course, and their employees, agents, suppliers, and contractors, to (i) enter upon and travel over the Property to and from and between any one or more of the Property entry areas, and portions of the Golf Course, and (ii) enter upon the Property to maintain, repair, and replace, water and irrigation lines and pipes used in connection with Golf Course landscaping; (4) operation and use of noisy electric, gasoline, diesel and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (5) operation of sprinkler and other irrigation systems during the day and night; (6) storage, transportation, and application of insecticides, pesticides, herbicides, fertilizers, and other supplies and chemical substances (all, collectively, "chemical substances"); (7) parking and/or storage of vehicles, equipment, chemical substances, and other items; (8) irrigation of the Golf Course, and supply of water facilities thereon, with recycled or effluent water; (9) "overspray" of recycled or effluent water and chemicals onto the Property that may result in damage to Improvements constructed on Lots and/or Common Elements within the Property; and/or (10) Golfers from time to time may shout and use language, particularly in and around tee and green areas of the Golf Course, that may be distinctly audible to persons in the Property; and that language may be profane or otherwise offensive in tone and content; (c) play on the Golf Course may be allowed by the owner(s) or operator(s) thereof during the daylight and/or evening hours, up to and including seven days a week; (d) play on the Golf Course may result in damage to the Property as a result of golf balls or other items leaving the Golf Course, including, without limitation, damage to windows, doors, stucco, roof tiles, sky lights, and other areas of the Lot and other portions of the Property, and damage to real and personal property of Owner or others, whether outdoors or within a residence or other building, and injury to person; and (e) although fencing and other features may (but need not necessarily) be incorporated into the Lot or other portions of the Property in an effort to decrease the hazards associated with golf balls entering the

20021127
.01887

Property from the Golf Course, the Owner acknowledges that such fencing and other features may protect against some, but certainly not all golf balls that enter the Property from the Golf Course and no liability shall be imposed on Declarant as a result of the Golf Course design.

20.3.2  The Golf Course also may include one or more separate large maintenance and/or warehouse-type building(s), storage area(s) for vehicles, equipment, and chemical substances (as defined above), fuel storage and above-ground fuel island(s), and related facilities (all, collectively, "Maintenance Facility"), constructed and operated by the owner(s) or operator(s) of the Maintenance Facility, at a location on or adjacent to the Property but not contiguous to other portions of the Golf Course. **The location of the Maintenance Facility may require frequent and recurring travel by Maintenance Facility and other Golf Course personnel, and vehicles (and travel by and transportation of other personnel, equipment, chemicals, fuel, and other items) over the Common Elements and streets within the Property to and from the Maintenance Facility and other portions of the Golf Course and the Property entry areas.** In connection with the Maintenance Facility: (a) the facilities and related items located on the Maintenance Facility may be an attractive nuisance to children; (b) operation, maintenance, and use, of the Maintenance Facility may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the right of owner(s) and operator(s) of the Maintenance Facility, and their employees, agents, suppliers, and contractors, to enter upon and travel over the Property to and from and between any one or more of the Property entry areas, the Maintenance Facility, and other portions of the Golf Course; (2) operation, maintenance, and repair of noisy electric, gasoline, and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (3) storage, transportation, and application, of chemical substances; (4) parking and/or storage of vehicles, equipment, chemical substances, fuel, and other items; and (5) fueling and related operations; and (c) although walls, fencing, and other features may be incorporated into the Maintenance Facility, the Owner acknowledges that such walls, fencing, and other features will certainly not eliminate all sight, noise, or other conditions, on or emanating from the Maintenance Facility and no liability shall be imposed on Declarant as a result of the Golf Course design.

20.3.3  All and any one or more of the matters described above may cause inconvenience and disturbance to the Owner, and other occupants of and visitors to the Lot and/or Common Elements, and possible injury to person and damage to property, and the Owner has carefully considered the foregoing matters, and the location of the Property (including the Common Elements and the Lot) and their proximity to the playing elements of the Golf Course and to the Maintenance Facility, before making the decision to purchase a Lot in the Property, and hereby waives and releases Declarant from any and all claims arising from or relating to any of the matters set forth in this Section 20.3.

20.4    Disclosures and Disclaimers of Certain Other Matters.  Without limiting any other provision in this Declaration, by acceptance of a deed to a Lot, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following:

20.4.1  that the Property is or may be located within or nearby certain airplane flight patterns, and/or subject to significant levels of airplane traffic noise; and that Declarant hereby specifically disclaims any

20021127
.01887

and all representations or warranties, express and implied, with regard to or pertaining to airplane flight patterns, and/or airplane noise; and that Owner hereby waives and releases Declarant from any and all claims arising from or relating to airplane flight patterns or airplane noise; and

20.4.2   that the Aliante Residential Community is or may be located adjacent to or nearby major roadways, and subject to levels of traffic thereon and noise, dust, and other nuisance from such roadways and vehicles; that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to roads and/or noise, dust, and other nuisance therefrom; and that Owner hereby waives and releases Declarant from any and all claims arising therefrom or relating thereto; and

20.4.3   that construction of installation of Improvements by Declarant, Builders, other Owners, or third parties, involves the operation of noisy equipment, generates dust and traffic, and may impair or eliminate the view, if any, of or from any Lot and/or Common Elements; and that Owner hereby waives and releases Declarant from any and all claims arising from or relating to said activities, impairment or elimination including, but not necessarily limited to, any claims for nuisance or health hazards; and

20.4.4   that residential subdivision and home construction is an industry inherently subject to variations and imperfections, and items that do not materially affect safety or structural integrity shall be deemed "expected minor flaws" (including, but not limited to: reasonable wear, tear or deterioration; shrinkage, swelling, expansion or settlement; squeaking, peeling, chipping, cracking, or fading; touch-up painting; minor flaws or corrective work; and like items) and not constructional defects; and

20.4.5   that: (1) the finished construction of the Lot and the Common Elements, while within the standards of the industry in metropolitan Las Vegas, Clark County, Nevada, and while in substantial compliance with the plans and specifications, will be subject to expected minor flaws; and (2) issuance of a Certificate of Occupancy by the relevant governmental authority with jurisdiction shall be deemed conclusive evidence that the relevant Improvement has been built within such industry standards; and

20.4.6   that creation of the Property shall not create any presumption, or duty whatsoever of Declarant or the Master Association (or their respective officers, directors, managers, employees, agents, and/or contractors), with regard to security or protection of person or property within or adjacent to the Property and no warranty or assurances are given with respect to the hours of operation of any such security feature; and

20.4.7   that Declarant presently plans to develop only those Lots which have already been included as part of the Property, and that Declarant has no obligation with respect to future phases, plans, zoning, or development of other real property contiguous to or nearby the Lots; (b) proposed or contemplated residential and other developments may have been illustrated in the plot plan or other sales literature distributed by a Builder or Declarant's sales personnel, and/or Owner may have been advised of the same in discussions with sales personnel; however, notwithstanding such plot plans, sales literature, or discussions or representations by sales personnel or otherwise, Declarant is under no obligation to cause the construction of such future or planned developments or units, and the such construction shall not occur in the event that

Declarant, for any reason whatsoever, decides not to cause such construction to occur; (c) Owner is not entitled to rely upon, and in fact has not relied upon, the presumption or belief that the same will be built; and (d) no sales personnel or any other person in any way associated with Declarant has any authority to make any statement contrary to the provisions set forth in the foregoing or any provision of the written purchase agreement.

    20.5   Releases.

    BY ACCEPTANCE OF A DEED TO A LOT, EACH OWNER, FOR ITSELF AND ALL PERSONS CLAIMING UNDER SUCH OWNER, SHALL CONCLUSIVELY BE DEEMED TO HAVE ACKNOWLEDGED AND AGREED, TO WAIVE AND RELEASE DECLARANT, THE MASTER ASSOCIATION (AND: (A) TO THE EXTENT APPLICABLE, ANY BUILDER, AND (B) WITH RESPECT TO THE EXCLUDED AMENITIES, THE ARCHITECTS, DESIGNERS, OWNER(S) AND ANY OPERATOR(S) THEREOF, THEIR SUCCESSORS AND ASSIGNS, AND THEIR RESPECTIVE TENANTS, GUESTS, AND OTHER INVITEES INVITEES), AND EACH OF THEIR RESPECTIVE OFFICERS, MANAGERS, PARTNERS, MEMBERS, AGENTS, EMPLOYEES, SUPPLIERS AND CONTRACTORS, FROM ANY AND ALL LOSS, DAMAGE OR LIABILITY (INCLUDING, BUT NOT LIMITED TO, ANY CLAIM FOR NUISANCE OR HEALTH HAZARDS) RELATED TO OR ARISING IN CONNECTION WITH ANY DISTURBANCE, INCONVENIENCE, INJURY, OR DAMAGE RESULTING FROM OR PERTAINING TO ALL AND/OR ANY ONE OR MORE OF THE CONDITIONS, ACTIVITIES, OCCURRENCES DESCRIBED IN THE FOREGOING SECTIONS 20.1 THROUGH 20.4, INCLUSIVE.

**Article 21    General Provisions**

    21.1   No Public Right or Dedication. Nothing contained in this Declaration shall be deemed to be a gift or dedication of all or any part of the Property to the public, or for any public use.

    21.2   No Representations or Warranties. No representations or warranties of any kind, express or implied, have been given or made by Declarant or its agents or employees in connection with the Aliante Residential Community or any portion of the Aliante Residential Community, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance or taxes, except as specifically and expressly set forth in this Declaration.

20021127
.01887

IN WITNESS WHEREOF, the undersigned Declarant has executed this Declaration as of the date and year first written above.

North Valley Enterprises, LLC, a Nevada limited liability company

By: _J. A. Kilduff_

Name: _JOHN A. KILDUFF_

Title: _SENIOR VICE PRESIDENT_

**STATE OF NEVADA**

**COUNTY OF CLARK**

This instrument was acknowledged before me on _November 26_, 2002, by _JOHN A. KILDUFF_ as _SENIOR VICE PRES_ of North Valley Enterprises, LLC, a Nevada limited liability company.

_Evelyn M. Rullis_

Notary Public

My appointment expires: _11/24/05_

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
EVELYN MARIE RULLIS
No. 97-4588-1
My Appointment Expires Nov. 24, 2005

H:\USERS\MEB\North Valley\Association Documents\master form ccr 16.wpd

20021127
01887

## EXHIBIT "A"

## LAND INITIALLY SUBMITTED

**A.   PORTIONS OF THE REAL PROPERTY LOCATED WITHIN PARCEL 21 ("PARCEL 21") AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 21, A PLANNED DEVELOPMENT AND COMMON INTEREST COMMUNITY, RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0017 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA AS FOLLOWS:**

1.  Lots. The legal description of the Lots in Parcel 21 which are initially submitted to this Declaration ("Parcel 21 Lots") is as follows:

> LOTS SEVENTY-SEVEN (77) THROUGH NINETY-FOUR (94) AND ONE HUNDRED TWENTY-EIGHT (128) THROUGH ONE HUNDRED SEVENTY-TWO (172) IN BLOCK ONE (1); AND LOTS ONE HUNDRED ONE (101) THROUGH ONE HUNDRED TWENTY-SEVEN (127) IN BLOCK FOUR (4) INCLUSIVE, AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 21, A PLANNED DEVELOPMENT AND COMMON INTEREST COMMUNITY, RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0017 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

2.  Common Elements and Areas of Common Responsibility. There are ___ Common Elements or other Areas of Common Responsibility in Parcel 21 designated in this Exhibit "A".

3.  Limited Common Elements, Cost Center Improvements and Cost Centers. There are no Limited Common Elements, Cost Center Improvements and/or Cost Centers in Parcel 21 designated in this Exhibit "A".

4.  Neighborhood and Representation District. The Parcel 21 Lots shall be part of the Neighborhood hereby designated as "The Manor at Aliante", and the Parcel 21 Lots shall be part of the Representation District hereby designated as District No. 1.

5.  Sub-Association. The Parcel 21 Lots shall be part of a Sub-Association, which Sub-Association shall be known as "The Manor at Aliante Homeowners Association". The Sub-Association shall have maintenance responsibility for that portion of Parcel 21 described as follows:

> LOTS B, C, D, E AND I, AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 21, A PLANNED DEVELOPMENT AND COMMON INTEREST COMMUNITY, RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0017 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA; and

20021127
01887

ALL PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 21, A PLANNED DEVELOPMENT AND COMMON INTEREST COMMUNITY, RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0017 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

6. Builder Designation. The name and address of the Builder who has or will acquire the Parcel 21 Lots and who has or will be designated as the Reviewing Builder for each Lot within The Manor at Aliante Neighborhood is: DR HORTON, INC., whose address is 6845 Escondido Street, Suite 105, Las Vegas, NV 89119 (the "*Builder*"). Pursuant to Section 4.2 of the Declaration, Declarant has or will appoint the Builder to be a Reviewing Builder and delegate and assign to such Builder the obligations of a Reviewing Builder under Article 4 of the Declaration to review new construction and modifications and to administer and enforce the architectural controls for the Parcel 21 Lots. The Builder's term of office as a Reviewing Builder shall automatically terminate upon the date Builder no longer owns any Lots within The Manor at Aliante Neighborhood.

**B. PORTIONS OF THE REAL PROPERTY LOCATED WITHIN PARCEL 23 ("PARCEL 23") AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 23 (COMMON INTEREST COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0019 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA AS FOLLOWS:**

1. Lots. The legal description of the Lots in Parcel 23 which are initially submitted to this Declaration ("Parcel 23 Lots") is as follows:

LOTS ONE (1) THROUGH TWENTY (20) IN BLOCK ONE (1); LOTS THIRTY-THREE (33) THROUGH FORTY-SIX (46) IN BLOCK TWO (2); LOTS TWENTY-ONE (21) THROUGH THIRTY-TWO (32) AND FORTY-SEVEN (47) THROUGH ONE HUNDRED NINETEEN (119) IN BLOCK THREE (3); LOTS ONE HUNDRED TWENTY (120) THROUGH ONE HUNDRED THIRTY-NINE (139) IN BLOCK FOUR (4); AND LOTS ONE HUNDRED FORTY (140) THROUGH ONE HUNDRED FORTY-SEVEN (147) IN BLOCK FIVE (5) INCLUSIVE, AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 23 (COMMON INTEREST COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0019 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

2. Common Elements and Areas of Common Responsibility. There are no Common Elements or Areas of Common Responsibility in Parcel 23 designated in this Exhibit "A".

3. Limited Common Elements, Cost Center Improvements and Cost Centers. There are no Limited Common Elements, Cost Center Improvements and/or Cost Centers in Parcel 23 designated in this Exhibit "A".

20021127
.01887

4. <u>Neighborhood and Representation District</u>. The Parcel 23 Lots shall be part of the Neighborhood hereby designated as "Serenata at Aliante", and the Parcel 23 Lots shall be part of the Representation District hereby designated as District No. 1.

5. <u>No Sub-Association</u>. The Parcel 23 Lots shall not be part of a Sub-Association.

6. <u>Builder Designation</u>. The name and address of the Builder who has or will acquire the Parcel 23 Lots and who has or will be designated as the Reviewing Builder for each Lot within the Serenata at Aliante Neighborhood is: PN II, INC., whose address is Pulte Homes of Nevada, 1635 Village Center Circle, Suite 250, Las Vegas, Nevada 89134 (the "*Builder*"). Pursuant to Section 4.2 of the Declaration, Declarant has or will appoint the Builder to be a Reviewing Builder and delegate and assign to such Builder the obligations of a Reviewing Builder under Article 4 of the Declaration to review new construction and modifications and to administer and enforce the architectural controls for the Parcel 23 Lots. The Builder's term of office as a Reviewing Builder shall automatically terminate upon the date Builder no longer owns any Lots within the Serenata at Aliante Neighborhood.

## C. PORTIONS OF THE REAL PROPERTY LOCATED WITHIN PARCEL 24 ("PARCEL 24") AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 24 (A COMMON INTEREST COMMUNITY) RECORDED ON NOVEMBER 5, 2002, IN BOOK 107 OF PLATS, PAGE 00450 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA AS FOLLOWS:

1. <u>Lots</u>. The legal description of the Lots in Parcel 24 which are initially submitted to this Declaration ("Parcel 24 Lots") is as follows:

LOTS ONE HUNDRED NINE (109) THROUGH ONE HUNDRED ELEVEN (111) IN BLOCK THREE (3); LOTS EIGHTY (80) THROUGH EIGHTY-FOUR (84) N BLOCK FIVE (5); AND LOTS EIGHTY-SEVEN (87) THROUGH NINETY-SIX (96) IN BLOCK SIX (6) INCLUSIVE, AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 24 (A COMMON INTEREST COMMUNITY) RECORDED ON NOVEMBER 5, 2002, IN BOOK 107 OF PLATS, PAGE 0045 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

2. <u>Common Elements and Areas of Common Responsibility</u>. There are no Common Elements or other Areas of Common Responsibility in Parcel 24 designated in this Exhibit "A".

3. <u>Limited Common Elements, Cost Center Improvements and Cost Centers</u>. There are no Limited Common Elements, Cost Center Improvements and/or Cost Centers in Parcel 24 designated in this Exhibit "A".

4. <u>Neighborhood and Representation District</u>. The Parcel 24 Lots shall be part of the Neighborhood hereby designated as "Seasons at Aliante", and the Parcel 24 Lots shall be part of the Representation District hereby designated as District No. 1.

20021127
.01887

5. Sub-Association. The Parcel 24 Lots shall be part of a Sub-Association, which Sub-Association shall be known as "Seasons at Aliante Homeowners Association". The Sub-Association shall have maintenance responsibility for that portion of Parcel 24 described as follows:

> COMMON ELEMENT LOTS A AND B AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 24 (A COMMON INTEREST COMMUNITY) RECORDED ON NOVEMBER 5, 2002, IN BOOK 107 OF PLATS, PAGE 0045 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA; and

> ALL PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 24 (A COMMON INTEREST COMMUNITY) RECORDED ON NOVEMBER 5, 2002, IN BOOK 107 OF PLATS, PAGE 0045 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

6. Builder Designation. The name and address of the Builder who has or will acquire the Parcel 24 Lots and who has or will be designated as the Reviewing Builder for each Lot within the Seasons at Aliante Neighborhood is: PARDEE HOMES OF NEVADA, INC., whose address is 7220 Bermuda Road, Las Vegas 89119 (the "Builder"). Pursuant to Section 4.2 of the Declaration, Declarant has or will appoint the Builder to be a Reviewing Builder and delegate and assign to such Builder the obligations of a Reviewing Builder under Article 4 of the Declaration to review new construction and modifications and to administer and enforce the architectural controls for the Parcel 24 Lots. The Builder's term of office as a Reviewing Builder shall automatically terminate upon the date Builder no longer owns any Lots within the Seasons at Aliante Neighborhood.

**D. PORTIONS OF THE REAL PROPERTY LOCATED WITHIN PARCEL 25 ("PARCEL 25") AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 25 (A COMMON INTEREST COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0020 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA AS FOLLOWS:**

1. Lots. The legal description of the Lots in Parcel 25 which are initially submitted to this Declaration ("Parcel 25 Lots") is as follows:

> LOTS TEN (10) THROUGH TWENTY-ONE (21) IN BLOCK ONE (1); LOTS SEVENTY-TWO (72) THROUGH NINETY (90) IN BLOCK TWO (2); LOTS ONE HUNDRED TWENTY-SEVEN (127) THROUGH ONE HUNDRED FORTY-EIGHT (148) IN BLOCK THREE (3); LOTS TWENTY-TWO (22) THROUGH THIRTY-EIGHT (38) IN BLOCK FOUR (4); AND LOTS ONE HUNDRED FOURTEEN (114) THROUGH ONE HUNDRED SIXTEEN (116) IN BLOCK FIVE (5) INCLUSIVE, AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 25 (A COMMON INTEREST

20021127
.01887

COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0020 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

2. <u>Common Elements and Areas of Common Responsibility</u>.  There are no Common Elements or other Areas of Common Responsibility in Parcel 25 designated in this Exhibit "A".

3. <u>Limited Common Elements, Cost Center Improvements and Cost Centers</u>.  There are no Limited Common Elements, Cost Center Improvements and/or Cost Centers in Parcel 25 designated in this Exhibit "A".

4. <u>Neighborhood and Representation District</u>.  The Parcel 25 Lots shall be part of the Neighborhood hereby designated as "The Estates at Aliante", and the Parcel 25 Lots shall be part of the Representation District hereby designated as District No. 1.

5. <u>Sub-Association</u>.  The Parcel 25 Lots shall be part of a Sub-Association, which Sub-Association shall be known as "The Estates at Aliante Homeowners Association".  The Sub-Association shall have maintenance responsibility for that portion of the Parcel described as follows:

LOT A, AND COMMON ELEMENT LOTS B, C, D, E AND I AS SHOWN BY THE FINAL MAP OF ALIANTE PARCEL 25 (A COMMON INTEREST COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0020 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA; and

ALL PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 25 (A COMMON INTEREST COMMUNITY) RECORDED ON OCTOBER 24, 2002, IN BOOK 107 OF PLATS, PAGE 0020 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

6. <u>Builder Designation</u>.  The name and address of the Builder who has or will acquire the Parcel 25 Lots and who has or will be designated as the Reviewing Builder for each Lot within The Estates at Aliante Neighborhood is:  DR HORTON, INC., whose address is D. R. Horton, Inc., 6845 Escondido Street, Suite 105, Las Vegas, Nevada 89119 (the "*Builder*").  Pursuant to Section 4.2 of the Declaration, Declarant has or will appoint the Builder to be a Reviewing Builder and delegate and assign to such Builder the obligations of a Reviewing Builder under Article 4 of the Declaration to review new construction and modifications and to administer and enforce the architectural controls for the Parcel 25 Lots.  The Builder's term of office as a Reviewing Builder shall automatically terminate upon the date Builder no longer owns any Lots within The Estates at Aliante Neighborhood.

20021127
.01887

## EXHIBIT "B"

## LAND SUBJECT TO ANNEXATION

ANY OTHER PARCELS OF REAL PROPERTY NOW OR HEREAFTER ACQUIRED BY DECLARANT LOCATED WITHIN THE BOUNDARIES OF THE FOLLOWING GENERALLY DESCRIBED REAL PROPERTY:

GOVERNMENT LOT TWENTY-THREE (23) OF SECTION 16, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

GOVERNMENT LOTS ONE THROUGH ELEVEN (1-11), LOTS THIRTEEN (13) THROUGH SIXTEEN (16), AND LOT EIGHTEEN (18) OF SECTION 17, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

EXCEPTING THEREFROM ALL OF CNLV 1905 - ACTIVE ADULT UNIT 2 AS SHOWN BY MAP THEREOF ON FILE IN BOOK 106 OF PLATS, PAGE 37, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

GOVERNMENT LOTS THIRTEEN (13) AND TWENTY (20) OF SECTION 18, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

GOVERNMENT LOTS FIVE (5), SIX (6), TEN THROUGH FOURTEEN (10-14), SEVENTEEN (17), EIGHTEEN (18), TWENTY-TWO (22), TWENTY-THREE (23), TWENTY-FIVE (25), TWENTY-SIX (26) AND TWENTY-EIGHT (28) OF SECTION 19, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

GOVERNMENT LOTS ONE THROUGH SEVEN (1-7), NINE THROUGH SEVENTEEN (9-17), NINETEEN (19) AND TWENTY-ONE (21) OF SECTION 20, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

GOVERNMENT LOTS FOUR (4) AND NINE (9) OF SECTION 21, TOWNSHIP 19 SOUTH, RANGE 61 EAST, MOUNT DIABLO BASE AND MERIDIAN.

TOGETHER WITH ALL THAT REAL PROPERTY AS CONVEYED TO NORTH VALLEY ENTERPRISES, LLC BY DEED RECORDED OCTOBER 16, 2002 IN BOOK 20021016 AS DOCUMENT NO. 01258, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM FROM THE ABOVE PARCELS ALL THAT REAL PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED RECORDED JANUARY 9, 2002 IN BOOK 20020109 AS DOCUMENT NO. 00433 OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

20021127
.01887

FURTHER EXCEPTING THEREFROM ALL THAT REAL PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED RECORDED MAY 30, 2002 IN BOOK 20020530 AS DOCUMENT NO. 02551 OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM ALL THAT REAL PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED RECORDED AUGUST 15, 2002 IN BOOK 20020815 AS DOCUMENT NO. 02515, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM ALL THAT REAL PROPERTY AS CONVEYED TO THE CITY OF NORTH LAST VEGAS BY DEED RECORDED AUGUST 29, 2002 IN BOOK 20020829 AS DOCUMENT NO. 01768, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM ALL THAT REAL PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY DEED RECORDED OCTOBER 14, 2002 IN BOOK 20021014 AS DOCUMENT NO. 00970, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM ALL THAT REAL PROPERTY AS CONVEYED TO THE COUNTY OF CLARK BY CORRECTIVE DEED RECORDED OCTOBER 14, 2002 IN BOOK 20021014 AS DOCUMENT NO. 00971, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM LOTS SEVENTY-SEVEN (77) THROUGH NINETY-FOUR (94) AND LOTS ONE HUNDRED TWENTY-EIGHT (128) THROUGH ONE HUNDRED SEVENTY-TWO (172) IN BLOCK ONE (1); AND LOTS ONE HUNDRED ONE (101) THROUGH ONE HUNDRED TWENTY-SEVEN (127) IN BLOCK FOUR (4) INCLUSIVE, COMMON ELEMENT LOTS B, C, D, E AND I; AND ALL PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS, ALL AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 21, RECORDED OCTOBER 24, 2002, IN BOOK 107 AT PAGE 0017 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM LOTS ONE (1) THROUGH TWENTY (20) IN BLOCK ONE (1); LOTS THIRTY-THREE (33) THROUGH FORTY-SIX (46) IN BLOCK TWO (2); LOTS TWENTY-ONE (21) THROUGH THIRTY-TWO (32) AND LOTS FORTY-SEVEN (47) THROUGH ONE HUNDRED NINETEEN (119) IN BLOCK THREE (3); LOTS ONE HUNDRED TWENTY (120) THROUGH ONE HUNDRED THIRTY-NINE (139) IN BLOCK FOUR (4); AND LOTS ONE HUNDRED FORTY (140) THROUGH ONE HUNDRED FORTY-SEVEN (147) IN BLOCK FIVE (5) INCLUSIVE, AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 23, RECORDED OCTOBER 24, 2002 IN BOOK 107 AT PAGE 0019 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

FURTHER EXCEPTING THEREFROM LOTS ONE HUNDRED NINE (109) THROUGH ONE HUNDRED ELEVEN (111) IN BLOCK THREE (3); LOTS EIGHTY (80) THROUGH EIGHTY-FOUR (84) IN BLOCK FIVE (5); AND LOTS EIGHTY-SEVEN (87) THROUGH NINETY-SIX (96) IN BLOCK SIX (6) INCLUSIVE; COMMON ELEMENT LOTS A AND B; AND ALL

20021127
.01887

PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS, ALL AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 24, RECORDED NOVEMBER 5, 2002, IN BOOK 107 AT PAGE 0045 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

AND FURTHER EXCEPTING THEREFROM LOTS TEN (10) THROUGH TWENTY-ONE (21) IN BLOCK ONE (1); LOTS SEVENTY-TWO (72) THROUGH NINETY (90) IN BLOCK TWO (2); LOTS ONE HUNDRED TWENTY-SEVEN (127) THROUGH ONE HUNDRED FORTY-EIGHT (148) IN BLOCK THREE (3); LOTS TWENTY-TWO (22) THROUGH THIRTY-EIGHT (38) IN BLOCK FOUR (4); AND LOTS ONE HUNDRED FOURTEEN (114) THROUGH ONE HUNDRED SIXTEEN (116) IN BLOCK FIVE (5) INCLUSIVE; AND LOT A AND COMMON ELEMENT LOTS B, C, D, E, F AND I; AND ALL PRIVATE STREETS AND PUBLIC UTILITY EASEMENTS, ALL AS SHOWN ON THE FINAL MAP OF ALIANTE PARCEL 25, RECORDED OCTOBER 24, 2002, IN BOOK 107 AT PAGE 0020 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

AND FURTHER EXCEPTING THEREFROM  GOVERNMENT LOT 17 IN SECTION 17, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.B. AND M. AND GOVERNMENT LOTS 18 AND 20 IN SECTION 20, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.B. AND M.



GOLF COURSE PROPERTY
EXHIBIT C

